1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3    TESSERA, INC. et al,        :
                                 : C.A. No. 16-0380-LPS-CJB
4          Plaintiffs,           :
                                 :
5      v.                        :
                                 :
6    BROADCOM CORPORATION,       :
                                 :
7          Defendant.            :

8

9                    Wednesday, November 23, 2016
                     2:30 p.m.
10

11                   Teleconference
                     Chambers of Judge Christopher J. Burke
12
                     844 King Street
13                   Wilmington, Delaware

14
       BEFORE:   THE HONORABLE Christopher J. Burke,
15               United States District Court Magistrate

16
       APPEARANCES:
17

18                   FARNAN LLP
                     BY:  BRIAN FARNAN, ESQ.
19
                                    -and-
20
                     COVINGTON & BURLING LLP
21                   BY:  LAURA MUSCHAMP, ESQ.
                     BY:  CHRISTOPHER EPPICH, ESQ.
22
                          On behalf of Plaintiffs
23

24

1      APPEARANCES CONTINUED:

2

3              YOUNG CONAWAY STARGATT & TAYLOR, LLP
               BY:  ADAM POFF, ESQ.

4                            -and-

5              KILPATRICK TOWNSEND & STOCKTON LLP
               BY:  ROBERT ARTUZ, ESQ.

6                            -and-

7              FOLEY & LARDNER LLP

8              BY:  STEVEN RIZZI, ESQ.
               BY:  RAMY HANNA, ESQ.

9                   On behalf of Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          THE COURT:  Good afternoon,

2    everyone.  It's Judge Burke here.  Before we

3    begin, let me just say a few things for the

4    record.  We here for a status teleconference

5    regarding discovery issues in the matter of

6    Tessera Inc. and Tessera Advanced Technologies,

7    Inc. vs. Broadcom Corporation.  It's Civil

8    Action No. 16-380-LPS-CJB here in our court.

9              Because we're on the record for

10   today's call, I have with me in my chambers a

11   court reporter from the Hawkins Reporting

12   Service who will be taking down the call this

13   afternoon.  So if counsel would identify

14   themselves before they speak, that would help to

15   make sure that we get a good and accurate record

16   of our call today.

17             With that said, let's ask counsel

18   to identify themselves for the record.  We will

19   begin with Plaintiff's counsel and there we will

20   begin with Delaware counsel.

21             MR. FARNAN:  Good afternoon, Your

22   Honor.  I'm Brian Farnan for the record.  And

23   with me is Laura Muschamp and Christopher Eppich

24   both from Covington & Burling.

```
 1                  THE COURT:  Okay.  Good to speak

 2       to you all.  And who's on for the Defendant's

 3       side?

 4                  MR. POFF:  Good afternoon, Your

 5       Honor.  Adam Poff from Young Conaway and with me

 6       from Kilpatrick Townsend Rob Artuz and from

 7       Foley & Lardner Steve Rizzi and Ramy Hanna.

 8                  THE COURT:  To you all, good

 9       afternoon as well.  We had originally scheduled

10       this call for a couple of weeks ago and I

11       apologize to the parties.  I think we had to

12       reschedule because I was unexpectedly ill and

13       out of the office.  So I appreciate it's been a

14       few weeks since the parties submitted their

15       letter of November 7th to me which is D.I. 53 on

16       the docket.

17                  I reviewed the letter and the

18       purpose of the prior call is that I was trying

19       to help the parties to narrow their disputes as

20       to the nature of the core technical document

21       production that the Defendant should have to

22       make and I had issued a previous order providing

23       some guidance.  The parties had responded to my

24       request in that November 7th letter.
```

1          Since there's been some time since

2      that letter, I don't know whether the parties

3      had any further discussion about these issues or

4      have been able to further narrow or resolve any

5      of them.  Why don't I start by just asking each

6      side to crystallize where they think things

7      stand in terms of the outstanding disputes as to

8      core technical documents regarding accused

9      products as to the two patents-at-issue.  And

10     also, let me know in summarizing where things

11     stand and what is still in dispute, whether

12     there's been any resolution of any issues since

13     your prior letter.

14          Why don't I get that initial

15     summary first from Plaintiffs' counsel and then

16     we will hear from counsel from Defendant's side.

17          MS. MUSCHAMP:  Thank you, Your

18     Honor.  This is Laura Muschamp and I will

19     address your question.  There has not been any

20     further discussion since the submission of the

21     letters so the situation is essentially that for

22     the '605 and '215 patents, and those are the two

23     patents of thixotropic materials and Tessera has

24     identified as being relevant to Broadcom's BGA

1          Flip Chip packages, the proposals are still

2          submitted in the letter.

3                    Tessera believes that the right

4          number of representative products is the 27

5          products that have been identified by the long

6          Product No. in this initial identification of an

7          accused product and Broadcom has proposed that

8          Tessera select 10 products.  For the second

9          patent family, the '563 patent, Your Honor

10         requested some additional information on

11         compliant layers and bonding ribbons.

12                    We did provide that information.

13         We did attach it to the letter as well.  And we

14         believe that that satisfactorily provides the

15         information that the Court was seeking, but

16         we're first happy to address any continuing

17         concerns or additional information that the

18         Court believes it needs.

19                    THE COURT:  Okay.  Thank you,

20         Ms. Muschamp, that was helpful and let me just

21         get Defendant's take on whether that kind of

22         accurately summarizes where we are.

23                    MR. RIZZI:  Thank you, Your Honor.

24         This is Steven Rizzi for Broadcom.  So the '215

1    and '605, yes, we offered Tessera its choice of

2    10 of the 27 long Part Nos.  And again to

3    clarify, it's not actually 10 BOMs associated

4    with that.  It's probably on the order of 100 or

5    so and we gave one example where a single Part

6    No. translated to more than 30 different BOMs,

7    and it is a tedious process to track all of that

8    down.

9              We think that's well within the

10   spirit of Your Honor's order in terms of some

11   smaller set than the full scope of what Tessera

12   identified as accused products for that purpose.

13   Also, one point that Ms. Muschamp didn't mention

14   is the identification we received from Tessera

15   of 39 compounds it allegedly contends are

16   thixotropic within the meaning of the patent

17   frankly raises more questions than answers,

18   because we did our own search for technical

19   datasheets for those products and we couldn't

20   find all of them but we did find a fair number.

21              And in large part, most of the

22   technical datasheets say nothing about whether

23   or not these are thixotropic.  Some include a

24   thixotropic index, but most of them are silent.

1          So it really does raise the question of how is

2      this list generated and what are the objectives,

3      what are the contours of this term that is so

4      fundamental to Tessera's patents.

5                     Our concern based on kind of where

6      we are is that Tessera's objective here is

7      essentially to kind of use Broadcom's products

8      to define what it means by thixotropic.  In

9      other words, if they want to know what Broadcom

10     is using before they take a meaningful position

11     on thixotropic, we believe that's improper.  And

12     that is why as indicated in our letter we think

13     the process that we're in now in terms of

14     identifying accused products and core technical

15     documents should include in addition an

16     identification by Tessera of frankly how it came

17     up with its list, what are the criteria used to

18     determine whether or not something is

19     thixotropic given that most of the datasheets

20     are silent on this.

21                     And frankly, also they've

22     indicated they eliminated some.  We want to know

23     which ones have been eliminated so that we can

24     cross them off the list and not waste time of

```
1          having to deal with discovery on those.  And --
2                    THE COURT:  Mr. Rizzi, let me stop
3          you there because we're probably doing more than
4          summarizing there.  Why don't we focus on this
5          first issue and then I'll turn back to
6          Ms. Muschamp on the first issue.  Then we can
7          kind of pivot to the second.  On the first, tell
8          me if this is right, I gather what's going on
9          here is there's a term used in the patent,
10         thixotropic materials.  The parties probably
11         have different views of what that term means.
12                   And part of what's going on is
13         both sides are trying to tease out what the
14         other side thinks that means, and it's clearly a
15         dispute that we're probably going to have down
16         the line in the case.  I'm guessing maybe in
17         claim construction as well.
18                   Does everything that I've said so
19         far generally sound right, Mr. Rizzi?
20                   MR. RIZZI:  Yes, Your Honor.  I
21         think definitely the meaning of thixotropic is
22         certainly going to be an issue for claim
23         construction, indefiniteness.  The more we roll
24         up our sleeves and dig into this, the more we
```

1   think it's going to be the case.

2           THE COURT:  On that front, in

3   terms of your disagreement with they've provided

4   a certain number of what they deem to be

5   thixotropic materials, you disagree.  You found

6   some evidence that suggest that certain of the

7   materials they've identified aren't thixotropic,

8   at least the way you define the term.  Why does

9   that matter at this stage?

10          I'm just trying to think of other

11  scenarios where the Defendant says to the

12  Plaintiff, we disagree with your construction of

13  a term and you've got to come and tell us

14  basically what all of your evidence is for how

15  you define the term and particularly how you're

16  thinking about it, and if you satisfy us, then

17  maybe we will give you some core technical

18  documents.

19          Isn't that kind of what you're

20  asking, kind of a pretty detailed version of

21  infringement contentions or kind of a detailed

22  advanced preview of claim construction at this

23  stage?

24          MR. RIZZI:  I can explain, Your

1    Honor.  I think the issue is we don't know -- at

2    this point, we don't know what they've

3    identified is or isn't.  And the problem is it's

4    essentially a subjective relative term.  So the

5    issue is without having some understanding of

6    what process was used to prepare this list to

7    identify, we don't know if there's a dispute.

8    It's a complete moving target.

9                   We're not coming out and saying we

10   disagree this is thixotropic.  We're saying we

11   have no idea what Tessera even means by this.

12   And I appreciate this goes to the issue of claim

13   construction, but it's so fundamental to their

14   claim of infringement that we don't think it's

15   inappropriate now for Tessera to at least

16   identify how did they come up with this list and

17   put some broad parameters, of course it's going

18   to be claim construction issues, but some broad

19   parameters so we have some idea of what we're

20   dealing with here, and what went into this

21   decision as to identify something that is

22   thixotropic versus not for purposes of their

23   contentions.

24                   THE COURT:  I understand that

```
 1          ultimately whether you disagree with their
 2          definition or what they claim is thixotropic
 3          doesn't matter.  It's what you're looking for is
 4          some specificity about what they think is
 5          thixotropic so that you can gather all of the
 6          docs that you need to gather and obviously
 7          issues like that, although they might well be
 8          the kind of things that are flushed out in
 9          infringement contentions and in claim
10          construction, sometimes they have to get
11          addressed earlier because they provide some
12          barriers to having efficient core technical
13          document production and that's what we're trying
14          to do here.
15                    We're requiring the Plaintiff to
16          do a little more than it normally would, to be a
17          little more specific about what a term means
18          because you have convinced me enough because you
19          need a little more specificity to be able to
20          make your production, but they have now provided
21          you with at least 39 examples of what they think
22          are thixotropic materials and we're going to be
23          talking about a limited universe.  We will have
24          to decide how limited on this call bills of
```

| | |
|---|---|
| 1 | materials you're going to provide to help them |
| 2 | further kind of finalize that list. |
| 3 | I guess with that is the preamble, |
| 4 | why isn't the discussion we need to have about |
| 5 | this issue about whether 27 is the right number |
| 6 | or 10 is the right number or some variation on |
| 7 | that is the right number?  Why does it need to |
| 8 | be anything more than that for now? |
| 9 | MR. RIZZI:  Because I can see the |
| 10 | path we're going down, Your Honor, which is |
| 11 | we're going to provide some bills of materials, |
| 12 | whatever number it is, and Tessera is going to |
| 13 | come back and say, okay, here is our list for |
| 14 | the additional ones for the thixotropic.  We |
| 15 | will be in the same dark we are now in terms of |
| 16 | how did they do that and it doesn't inform us at |
| 17 | all about the rest of the universe of Broadcom's |
| 18 | product as to how Broadcom is supposed to go |
| 19 | about drawing the line.  How -- |
| 20 | THE COURT:  If they do that, if |
| 21 | they come back and here's our list, it's the |
| 22 | same 39 or it's 27 or it's 42 and your concern |
| 23 | is, look, I can look for products that |
| 24 | incorporate these things but I can't look for |

1       products that incorporate some other

2       undetermined type of allegedly thixotropic

3       materials.  Presumably, you get traction with

4       that type of response.

5                    You would still be on the hook to

6       look for the 42 or the 37 or whatever it is

7       unless you would further say even doing that is

8       unduly burdensome.  Why wouldn't it kind of go

9       that way?

10                   MR. RIZZI:  I think that's what

11      we're proposing, Your Honor.  We suggested 10

12      and we've said we're willing to go and collect

13      those BOMs and give them to Tessera, but we

14      think the response to that shouldn't just be,

15      okay, here is the ones that are thixotropic,

16      that response needs to include and here is why,

17      so we have something more than Tessera's

18      subjective thumbs up, thumbs down which does

19      nothing to help us understand what actually is

20      at issue here.

21                   THE COURT:  I know you used the

22      word BOM.  Are you saying bombs, B-o-m-b-s?

23                   MR. RIZZI:  Yes, I'm sorry,

24      billing of materials.  I think they're called

1    assembly construction, what has the information

2    about the specific compounds that are used in

3    the product.

4              THE COURT:  Okay.  So just in

5    terms of the hierarchy here there's a Marketing

6    Part No. that they identified in the pleadings

7    and you've used an example the BCM No. on Page 4

8    of the letter.  As to that, your assertion is

9    that there are 15 unique I-Part Nos.  How would

10   you explain what an I-Part No. is  as

11   distinguished from something representative of

12   the Marketing No. that's being described there?

13             MR. RIZZI:  Well, I'm glad my

14   colleague is on the phone Mr. Hanna.  I'm going

15   to let him handle that because he's much more

16   familiar with that than I am.

17             THE COURT:  Mr. Hanna, good

18   afternoon to you.

19             MR. HANNA:  Good afternoon, Your

20   Honor.  So a long Marketing Part No. sort of

21   specifically based off of what's called the

22   marketing core and that sort has to do with the

23   chip functionality which is not related to the

24   packaging issue discussed in this case.  Now,

1     each time you do a package and you make a

2     product in a particular way and you have this

3     chip and you have to package it for a particular

4     product, that's an I-Part No.

5                    The I-Part No. is an internal

6     number that says for Customer x,y, we're going

7     to make 100 of a particular packaging type and

8     within that packaging type here are the x,y, Y

9     and Z parameters we're going to use or materials

10    we're going to use.  So each time there's a

11    purchase order essentially, and I'm being sort

12    of overly inclusive here, every time there's a

13    purchase order it gets a Part No. for a

14    particular product.

15                    A purchase order can contain

16    multiple orders of different things but each

17    type of thing would be a different I-Part No.

18    So if I may explain, Your Honor, say a long

19    Marketing Part No. like a BMW 7 series, the

20    I-Part No. would refer to all of the bells and

21    whistles that go inside it, and they could vary

22    a lot between one I-Part No. to the next.

23                    THE COURT:  So as to particular

24    I-Part Nos., there's another level of gradation

1    which is assembly instructions.  Help me

2    understand assembly instructions, how that

3    differs from what an I-Part No. is.

4                    MR. HANNA:  Sure.  So an I-Part

5    No. is the reference number that's used and we

6    could use that to get the documents that went

7    into building that product.  And one of the

8    documents is what's called a doc-com(ph)

9    assembly instructions and within those

10   instructions is sort of how you package that

11   product and what materials went into that.

12                   There are also documents as well

13   such as bonding diagrams and substrate drawings

14   and other different things that go into the

15   structure of the package.  But in terms of what

16   the material is, a doc-com would be available in

17   the assembly instructions.

18                   THE COURT:  We know here we're

19   worried about a particular component, and that

20   is whatever thixotropic materials are.  And I

21   think at the bottom of Page 4 of your letter

22   what you were saying is, look, I don't know, it

23   could be if you have a bunch of I-Part Nos. that

24   in turn have a whole bunch of assembly

```
 1    instructions per I-Part No., it might well be

 2    that the various different assembly instructions

 3    may not differ as to the particular allegedly

 4    thixotropic material used, but we just wouldn't

 5    know until we went in and looked at it.  Is that

 6    the deal?

 7                    MR. HANNA:  That's correct, Your

 8    Honor.

 9                    THE COURT:  So is it fair to say

10    that of the 27 Broadcom products that the

11    Plaintiff identified, for each one of them there

12    is some number of I-Part Nos. and then for each

13    one of those I-Part Nos. there is some number of

14    assembly instructions?

15                    MR. HANNA:  That's correct, Your

16    Honor.

17                    THE COURT:  And your point would

18    be that as to one of the ones you picked out,

19    one of the Marketing Nos., it wasn't one, it's

20    more like 33.  So does that mean there's 33

21    different bills of materials for that one

22    particular Marketing No.?

23                    MR. HANNA:  It could be.  I don't

24    have the letter right in front of me at this
```

```
 1        point, Your Honor.  But if it's 33 different

 2        I-Part Nos., it would be at least 33 assembly

 3        instructions.

 4                     THE COURT:  I meant the example

 5        you used on Page 4 says 15 I-Part Nos. for that

 6        Marketing No., 33 different assembly

 7        instructions and that means we're using bill of

 8        materials as a synonym for assembly

 9        instructions; am I right?

10                     MR. HANNA:  That's correct, Your

11        Honor.

12                     THE COURT:  So if we got 33 BOMs

13        for one Marketing No., if that played out, we

14        might have 33 times 27 if they were to get all

15        that they wished for; is that right?

16                     MR. HANNA:  That's correct, Your

17        Honor.

18                     THE COURT:  Okay.  Mr. Rizzi, when

19        you were saying BOMs, you meant B-O-M-s; is that

20        right?

21                     MR. RIZZI:  Yes, I'm sorry, Your

22        Honor, BOMs, assembly instructions.  Just to

23        finish that, the last piece of it is revision.

24        So if a given assembly instruction may have been
```

1     revised over the years and that would also have

2     to be checked, that again may or may not include

3     a change in the materials that Tessera alleges

4     is thixotropic.

5                    THE COURT:  But they're willing to

6     limit it to the last three years.  That might

7     help, right?

8                    MR. RIZZI:  That might.  That

9     should reduce the number of revisions, but until

10    we go in and collect them, we don't know.

11                   THE COURT:  How hard is it to

12    collect, let's say we were just talking about

13    collecting each of the 33 different assembly

14    instructions for this one Marketing No.  What's

15    the proffer on how burdensome or prejudicial

16    that is to the Defendant?

17                   MR. RIZZI:  Mr. Hanna can correct

18    me if I'm wrong, but I believe one of the issues

19    is for each different long marketing part, there

20    could be a different technical lead and that

21    person for better or worse is sort of the

22    custodian of the correct documentation, and what

23    we found is that there may be many different

24    versions of assembly instructions but unless you

```
 1      track down the person who is actually

 2      responsible for that part, you really can't tell

 3      which is sort of the operative set, and that can

 4      involve many different people because there are

 5      different leads associated with each of these

 6      long marketing parts.  I will ask Mr. Hanna if I

 7      got that right.

 8                    MR. HANNA:  So Mr. Rizzi is

 9      correct in some aspect, Your Honor.  So, yes,

10      there are chip leads that sort of would know

11      which are the latest documents.  For assembly

12      instructions, many of them will be in our

13      documents.  Some of them may not be so we will

14      have to get them manually.  But even for the

15      ones that are on our document management system,

16      in some instances we would have to go and

17      download them manually if we're not able to do

18      it at the back-end.  And we've seen some

19      instances because we have the parallel ICC

20      litigation where we actually have to go in and

21      download them on a document-by-document basis.

22                    THE COURT:  And last question

23      before I turn to the Plaintiffs' side:  I see

24      your proposal which is let's limit it as to 10
```

```
 1        of these 27 and let the Plaintiff pick, but I'm
 2        just thinking about alternatives that might be
 3        less than the whole of what Plaintiff asked for
 4        but that might be a little more representative.
 5                  What if you were to try to figure
 6        out, well, what if the Plaintiff picked at least
 7        some I-Part Nos., not all but some, within each
 8        of the 27 Marketing No. categories with the idea
 9        that you were trying to get to roughly the same
10        amount of documents as is reflective in your
11        proposal but you were doing it not as to just 10
12        Marketing Nos., but as to all 27.  Do you know
13        what I'm asking?
14                  And I guess the question is could
15        you do that in a way that was not more
16        burdensome than your proposal of 10?
17                  MR. RIZZI:  I will let Mr. Hanna
18        address that.  I think he will have a better
19        grasp on that.
20                  THE COURT:  Sure.  Mr. Hanna, was
21        I clear enough in what I was asking?
22                  MR. HANNA:  Let me make sure I
23        understand Your Honor.  So Your Honor is saying
24        the 27 Marketing Nos. will have a certain number
```

1     of I-Part Nos. so within each one of the 27,

2     pick a subset of the I-Part Nos. and select for

3     those.  Did I get that right?

4                THE COURT:  In other words, the

5     Plaintiff seems particularly interested in

6     wanting to get some bill of materials for each

7     of the 27 Marketing Nos. that it called out in

8     its pleadings.  I can understand that.  It's

9     made at least some identification in its

10    pleadings.  It feels like that's a solid base of

11    information that it wants to get core technical

12    documents from.

13                But I understand you to be saying,

14    look, each of those Marketing Nos., all 27 of

15    them in turn reflect some larger subset of

16    I-Part Nos. and some even larger subset of bills

17    of materials and it's just too much.  So if I

18    was trying to think of alternatives to your

19    proposal that would still allow the Plaintiff to

20    get some information by way of bills of

21    materials as to each of its 27 Marketing Nos.,

22    but maybe not the entirety of what they're

23    asking for such that it was kind of a similar

24    number of bills of materials as to what you've

```
 1        proposed but just inclusive of all 27 Marketing

 2        Nos., is there a way we could figure that out

 3        and do that such that it wouldn't be materially

 4        different in its burden on the Defendant?

 5                    MR. HANNA:  The way we would do

 6        it, Your Honor, and what I propose is maybe we

 7        can give them a list of all the I-Part Nos. that

 8        corresponds to the 27 parts and they tell us

 9        which I-Part Nos. they want from each.  And

10        let's say for the 27 they pick two or three

11        I-Part Nos. and then they would go and look and

12        see how many of those correspond and if it turns

13        out to be a very large number, we could sort of

14        have a discussion but obviously we would not

15        know until we do that process.

16                    THE COURT:  Okay.  I think we're

17        on the same page at least in terms of what I'm

18        asking.  Ms. Muschamp, back to you.  You've hard

19        the questions I've been asking.  I'm trying to

20        get you a representative number of bills of

21        materials here and I'm thinking you would prefer

22        having that related to all of the 27 Marketing

23        Nos. that you identified in some way.  Is the

24        kind of proposal I've suggested most recently
```

1     here something you think is a good thing more

2     preferable than what the Defendant has proposed

3     if you were to get something less than the

4     entirety of what you've asked for?

5                    MS. MUSCHAMP:  Thank you, Your

6     Honor.  So I do appreciate the proposal.  I do

7     see some definite possibilities.  I do want to

8     make a couple of comments.  This is the first

9     time this information has been provided to us.

10    Our concern in part is being able to make

11    educated choices as opposed to just randomly

12    picking two I-Part Nos.

13                    So if we go the I-Part No. route,

14    we would welcome to get that information.  We

15    would also want to receive the documents that

16    explain what the numbers and letters that

17    comprise that I-Part No. mean.  So that, for

18    example, say some of the numbers mean it's a

19    reorder of a part on a different date but I

20    don't want to pick the two I-Part Nos. that's

21    kind of suggestive is identical and we can group

22    those into representative products.

23                    So I would request if we go the

24    I-Part route, that Broadcom will also provide us

1    documents that explain the meaning between those

2    numbers and letters.  I don't know how an I-Part

3    No. looks, but the long Product No. may be the

4    4334 XUHG, well, what does x,y, U, H, G mean, so

5    we can make an educated decision and --

6              THE COURT:  You don't want to ask

7    for two different numbers thinking they're going

8    to provide you with information about two

9    different products and only to later realize you

10   didn't know what you were asking for because you

11   just got a bunch of numbers, and if you knew

12   what the numbers meant, anybody could have seen

13   that those requests were redundant, didn't make

14   any sense.  Is that what you're saying?

15             MS. MUSCHAMP:  Correct, Your

16   Honor.  And it may be that every I-Part uses the

17   same packaging materials and I'd like to make an

18   educated choice to get some that looked as

19   diverse as possible or some of them, for

20   example, we've already said we're only

21   interested in BGA and Flip Chip.  So I want to

22   limit it to the packaging types that we think

23   are relevant, so that would be the reason to

24   request that additional information so we can

```
 1        make educated choices.

 2                    THE COURT:  And you were going to

 3        make another point.

 4                    MS. MUSCHAMP:  The other thing I

 5        wanted to -- if I understood right, this is the

 6        first time I've heard today but it sounded to me

 7        as well like a number of these assembly

 8        instructions are kept in the document management

 9        system and there isn't a substantial -- the

10        burden doesn't lie so much in those documents as

11        it is for someone and they have to manually pull

12        documents.

13                    We obviously have been trying to

14        target discovery with the publicly available

15        information that we have.  But if I'm hearing it

16        correctly that the point of assembly

17        instructions that are maintained on the document

18        production database at Broadcom is not as

19        burdensome.  One suggestion as I listen to this

20        that I had was that those assembly instructions

21        could be produced and reviewed as an initial

22        step.

23                    I don't know if those are for long

24        Part Nos., I don't know if that's more based on
```

1      a time, I don't know why one is or isn't in the

2      document management system, but it does seem

3      logical that for those, maybe that production

4      does get made on December 16th.  We can review

5      those and have a discussion for products that

6      weren't available on that system that have to

7      get manually pulled to look into it after we

8      were able to review the initial set, and I may

9      have misunderstood because I hadn't heard this

10     before.

11                  THE COURT:  Well, that's why we're

12     doing this.  We're having some good

13     communication and I appreciate that.

14     Mr. Hanna?

15                  MR. HANNA:  Yes, Your Honor.

16                  THE COURT:  On these two points --

17     well, let's do the second one first.  Is it

18     right that if we're talking about whatever

19     number of bills of materials are implicated by

20     the 27 Marketing Nos., and let's assume it's a

21     big number, a couple of hundred, in terms of the

22     burden on tracking those things down, is what

23     Ms. Muschamp said correct, that it's a lot

24     easier to find the ones that are already in the

1       document management system as opposed to ones

2       that you might have to manually pull from

3       somewhere else?

4                       MR. HANNA:  Yes and no, Your

5       Honor.  So the ones that are in the document

6       management system, we may be able to locate them

7       easily and they may not be all exhaustive

8       because the document management system, I'm not

9       sure if it goes back to six years or not.  I

10      have to check on that.  But in some instances

11      what we've come across in the ICC is that the

12      system is not amendable to a back-end download

13      where you can have an IT person grab it from the

14      back-end.  In some instances it is and some

15      instances it's not.

16                      In the instances where it's not,

17      we've had to sit down at a computer and download

18      them one document by one document.

19                      THE COURT:  For a particular bill

20      of materials if it's downloadable versus if it's

21      not downloadable, what is the difference in

22      time/burden?

23                      MR. HANNA:  The burden would be

24      sort of having to track it down manually within

1   the system which is not an easy task.  The

2   system is not as self-explanatory even for

3   Broadcom personnel as one may think, but it

4   would be a question of a large amount of time

5   devoted.

6          And what Mr. Rizzi alluded to,

7   Your Honor, without sort of having that idea

8   we're downloading something that's even within

9   what they're contending is thixotropic or not,

10  we may download it and then figure out, oh, it's

11  not one that is thixotropic.  That's why I

12  think, Your Honor, it was kind of important to

13  mention what Mr. Rizzi said.

14          It's really important to

15  understand, well, if it's not accused or is it

16  potentially accused or is that the one that we

17  are just downloading for the sake of

18  downloading.

19          THE COURT:  So those that are

20  easily downloadable, those would not have to be

21  tracked down manually but those that are not

22  easily downloadable, would have to be tracked

23  down manually; is that right?

24          MR. HANNA:  Yes, that's fair, Your

```
 1    Honor, or the ones that are not in the system at

 2    all would also have to be tracked down manually.

 3              THE COURT:  What does it mean to

 4    be in the system but not easily downloadable?

 5              MR. HANNA:  So in the system but

 6    not easily downloadable would come across, Your

 7    Honor, is that in some instances the system has

 8    somewhat what I'm going to call bugs, but I'm

 9    not entirely sure what the technical term is,

10    that prevents us from downloading some of the

11    documents.  Where normally when you sort of want

12    to do this the easy way, you get the list from

13    the IT person and say, well, we want the

14    documents of Type x,y for these Part Nos. and he

15    will do that.

16              What we've come across is that's

17    not possible in some instances.  So what we've

18    had to do in those instances to literally just

19    sit at a computer terminal, pull one document at

20    a time, download them and save them to a thumb

21    drive.

22              THE COURT:  So I guess to kind of

23    force you out on maybe a question Ms. Muschamp

24    might have asked, could we figure out of the 27
```

1    Marketing Nos., however many I-Part Nos. that

2    implicated and in turn however BOMs that

3    implicated, could you figure out how many of

4    those BOMs were "easily downloadable" and with

5    not too much burden produce all of the easily

6    downloadable ones?  Is that another potential

7    path here?

8                    MR. HANNA:  We could check, Your

9    Honor.  We could definitely check into that,

10   Your Honor.

11                   THE COURT:  And then on the first

12   path that I was talking about which was, forget

13   that, let's just identify some subset of I-Part

14   Nos. that include I-Part Nos. for each of the 27

15   Marketing Nos. but not the entire amount of

16   I-Part Nos. to reduce the burden, as to

17   Ms. Muschamp's request, is there a way I can get

18   a little more information of what these numbers

19   might reflect so that I can make some educated

20   choices instead of just picking them at random?

21                    Is there any way to provide the

22   Plaintiff with something amounting to the more

23   information that Ms. Muschamp is asking for

24   without requiring you to go in the first

1        instance and literally track all of these BOMs

2        down to be able to provide extra information?

3        Do you know what I'm asking?

4                        MR. HANNA:  Yes, Your Honor.  And

5        Ms. Muschamp alluded to sort of the decoders for

6        the I-Part Nos.  While that may be helpful on

7        some level for the thixotropic material, it's

8        likely not to have a lot of impact because it

9        will not tell you what the material is used for

10        the compound.  It will not say that.  If it was

11        easy enough for us to decode from the I-Part No.

12        to figure out it's either this or that, we would

13        have done it on our end.  The problem is --

14        we're happy to engage in sort of looking for the

15        decoders, but it will not provide that

16        information as far as I'm aware, Your Honor.

17                        THE COURT:  Would it provide any

18        information that will be helpful for the

19        Plaintiff in helping it make educated choices at

20        least from the perspective of not requesting

21        different I-Part Nos. that, in fact, really

22        aren't all that different at all?

23                        MR. HANNA:  What it may provide,

24        Your Honor, is sort of, and I think Ms. Muschamp

```
 1        was correct on this, it will say this is a Flip

 2        Chip or this is a BGA, but it will not say any

 3        more than that.  And this is based on memory,

 4        this is long streams of characters with a very

 5        large decoder, so it will say if it's a Flip

 6        chip or BGA.

 7                    THE COURT:  Ms. Muschamp, back to

 8        you to kind of finish up here.  Here is where

 9        I'm at which is if we're doing the rough math,

10        what the Defendants have suggested, look, if you

11        look at one Marketing No. that we have picked at

12        random, there's 33 different BOMs for that.

13        Now, maybe they picked the one that's the worst;

14        I don't know.  But at the most, if you played

15        that out and you multiplied 33 times 27, you're

16        talking about a little under 900 different BOMs.

17                    I'm saying, okay, maybe the

18        entirety of what you're asking for, every BOM

19        for every one of the 27 I-Part Nos. that's a

20        part of the 27 Marketing Nos. you requested is

21        too much to ask, but I want you to be able to

22        have some good amount of what you've asked for,

23        and we've got two possibilities.

24                    We've got the parties kind of
```

1    further discussing the Defendant providing some

2    further information to decode the I-Part Nos.

3    and then the Plaintiff makes a selection of

4    I-Part Nos. within each of the 27 Marketing Nos.

5    and the Defendant goes and finds the BOMs for

6    each of those.  That's one option.

7              Another option is maybe the

8    parties talk a little further and the Plaintiff

9    understands what it means to be easily

10   downloadable in terms of a BOM and the Defendant

11   gives the Plaintiff the easily downloadable BOMs

12   that fall within these Marketing Nos.  Would you

13   like the opportunity to choose one or the other

14   of those now or further talk with the Defendants

15   about which one you would want to pick?  What

16   would you say?

17             MS. MUSCHAMP:  I guess it's not an

18   option for me to say let's have them to proceed

19   in parallel.  It's hard for me to know because

20   just based on what I've heard today, I don't

21   know if the answer back is going to be there's

22   only two parts that are easily downloadable out

23   of 900.  Obviously, that would not be something

24   we would be interested in.

```
 1              And for the I-Part Nos., I could

 2    see that selecting some of the -- if I had to

 3    pick one today based on a limited number I know,

 4    I would have to go with the I-Part No. because

 5    we would have some idea that I'm picking a

 6    representative product looking at differences to

 7    see is the material changing or not.  If I'm

 8    picking -- if a particular product has a BGA and

 9    a Flip Chip version, so I want pick one of both

10    to see if the material is changing based on

11    that.  So if I had to pick one, I would proceed

12    with the I-Part.

13              I do very much, however, also want

14    to -- and I guess this is something Your Honor

15    is suggesting, that we schedule a call with

16    Broadcom to get a better sense of how many of

17    these BOMs are easily downloadable because it is

18    our -- again, the potential is hard to say, Your

19    Honor, is it a representative product they

20    provided or was it the most favorable they

21    provide the numbers on.

22              If there are truly 900 BOMs and at

23    least 500 are easily downloadable and they are

24    across the 27 products, I think we can start
```

```
 1      with that, even if it's 200 of those and they go

 2      across the product.  So I guess I feel like I've

 3      gotten a little bit of information today, but

 4      not enough to make a great choice.

 5                  THE COURT:  So you would like the

 6      opportunity to further discuss with Defendant

 7      and find a mutually agreeable option, either one

 8      or the other of these two or some combination

 9      thereof; is that correct?

10                  MS. MUSCHAMP:  I think, Your

11      Honor, that would be the best approach.  My only

12      concern is the core document production is

13      supposed to happen on December 16th, and

14      obviously the infringement contentions are based

15      off of that date as well so I just want to make

16      sure that we are going to see a core document

17      production on December 16th and if we set up

18      another call just among the parties next week to

19      talk about these two options, we're not going to

20      run into, oh, no, we can't get you documents

21      until January or something.

22                  THE COURT:  Okay.  Mr. Hanna,

23      Mr. Rizzi, would you like the opportunity to

24      have a further conversation with Plaintiff as
```

1    opposed to me picking an option now, and then

2    second question is assuming you did have a

3    conversation at the beginning of next week, if

4    you made the decision soon after, would the

5    Plaintiffs be able to expect some documents

6    produced in this regard on December 16th?

7              MR. RIZZI:  Your Honor, this is

8    Mr. Rizzi.  I think honestly to ensure we can

9    meet that deadline it would be best to make a

10   decision today and move forward.  We certainly

11   started the process otherwise in core documents.

12   We have a Markman hearing next week in the ICC

13   so it's a lot going on and I think it would be

14   more expeditious to make a decision today.

15              Mr. Hanna, correct if I'm wrong,

16   but part of the problem is I don't think you can

17   know in advance which ones are easily

18   downloadable or not so you have to kind of go

19   and first run everything through the process

20   before you even know.  So it's not like we can

21   tell, well, here are the ones that are easily

22   downloadable.  Again, Mr. Hanna might have more

23   information on that than I do.

24              THE COURT:  Mr. Hanna, on those

```
 1        questions?

 2                     MR. HANNA:  I agree with Mr. Rizzi

 3        completely, Your Honor.  I think it's going to

 4        be better if maybe we decide today in light of

 5        sort of deadlines that we're facing to make sure

 6        we are able to go and try.  We will not be able

 7        to figure out what is easily downloadable until

 8        we go through the process and see what's there

 9        and we give it to IT and having them tell us are

10        they easily downloadable from the system or not.

11                     Your Honor, I know your order was

12        clear but when we were talking about

13        representative products, it's not representative

14        products in sort of the down-the-road test

15        because we obviously disagree that anything

16        would be representative at this point, Your

17        Honor.

18                     THE COURT:  Sure.  What we're

19        really trying to do here is we are trying to

20        avoid disputes down the road over what types of

21        products are accused, what kind of documents are

22        core technical documents as to those products

23        and we're really trying to provide in some ways

24        without prejudicing either side too much the
```

1    Defendant with enough understanding of the types

2    of products that Plaintiffs allege are accused

3    or may be accused without requiring Plaintiffs

4    to in essence provide Defendant its claim

5    construction positions at this stage or its

6    fulsome infringement contentions, and we're

7    trying to thread a middle ground there.

8                    I have sympathy for the idea that

9    it's getting late and there's a lot going on in

10    the ICC.  The reality is if the parties had

11    gotten on the phone with each other in the many

12    weeks since our last call and done what we've

13    done over the last 30 minutes, we wouldn't be

14    sitting here November 23rd.  We would be working

15    towards a reasonable mid-ground solution from

16    what was at issue in this November 7th letter.

17                    Unfortunately, that didn't happen

18    and we've had to go through this 30 minutes so

19    I'm trying to get to a point where we can get to

20    a production of documents on the 16th that is

21    not unduly burdensome for the Defendant but

22    moves us along in terms of where we stand.

23    That's my goal at least.

24                    So knowing that and knowing that I

1     need to make a decision now of the two options,

2     as I said I'm not prepared to grant the

3     Plaintiffs' request for every bill of materials

4     that's implicated by every one of the 27

5     Marketing Nos. that they have identified.  The

6     Defendants have sufficiently explained to me why

7     that could be not only a number of BOMs that

8     might approach 1,000 but I have at least enough

9     of an understanding as to why the man hours and

10    time involved in identifying every single one of

11    those may be unduly burdensome at this stage.

12    With that said, I think the Plaintiff should get

13    a substantial number of what it's asking for.

14              My decision would be that the

15    Plaintiffs should identify and the Defendant

16    should provide the Plaintiffs with sufficient

17    information to help it identify some number of

18    BOMs that fall within each of the 27 Marketing

19    Nos.

20              Now, I don't know enough to know

21    right now whether if I say two BOMs or seven or

22    four, whether that makes any sense because I

23    don't know how many BOMs there are within each

24    of the 33 Marketing Nos., but it should be

1    something greater than two assuming -- I'm

2    sorry.  I said BOMs.  Some number of I-Part Nos.

3    that are within each of the 27 Marketing Nos.,

4    and I don't know how many I-Part Nos. there are

5    so it seems to me it should be something greater

6    than at least two I-Part Nos. or greater,

7    assuming there are at least two I-Part Nos.

8    within each of the Marketing Nos. and it

9    probably should be no more than five.

10           So my hope is with that guidance

11   the Defendant can provide the Plaintiffs with a

12   list of I-Part Nos. across the 27 Marketing Nos.

13   and some guidance or helpful decoding guidance

14   as to what those I-Part Nos. represent.  The

15   Plaintiffs can quickly make a selection of

16   somewhere between two and five I-Part Nos.

17   within each of the 27 Marketing Nos. and then

18   the Defendants can produce BOMs that relate to

19   each of those I-Part Nos., and then at least

20   some substantial part of that production, at

21   least a very good start to that production, can

22   be made by December 16th.

23           With that guidance, do the parties

24   think that we can get to that end?

1    Ms. Muschamp, do you see any issues or any

2    further clarification needed with regard to what

3    the Court has suggested?

4             MS. MUSCHAMP:  Just very briefly.

5    I think generally that approach works.  We

6    obviously need the list of I-Part Nos.  They are

7    confidential.  They're not publicly available so

8    we need that list from Broadcom and we need the

9    decoders from Broadcom.  Assuming we can get

10    those early next week, we will immediately start

11    working on making a selection of those.  There

12    may be some products -- Your Honor may be right,

13    there may only be two I-Part Nos.  We don't know

14    because that's all confidential but we are happy

15    to take that approach.

16             I do want to make sure it's clear,

17    as we go through this if we are discovering that

18    within a multiple I-Part No. for the same part

19    are all using thixotropic material, we're not

20    precluded from seeking later discovery to say,

21    hey, you're using this material, we think it's

22    thixotropic, we want to know which other

23    products use that material to get further

24    discovery.  I think this is a reasonable

1     approach.  I just want to make sure it's not

2     used later to say you're not entitled to any

3     other discovery.

4                    THE COURT:  I understand what

5     you're saying and at least in my mind, the Court

6     is not putting a final limit on the absolute

7     number of accused products that may be accused

8     in the case.  We are trying to get to a point

9     where we reach that limit but it's a part of the

10    process, not the endpoint at least in the

11    Court's mind.

12                   Mr. Rizzi, Mr. Hanna, the guidance

13    that I provided is there further clarification

14    that Defendants need and/or anything else that

15    you think I haven't considered that I need to

16    explain?

17                   MR. RIZZI:  I think that's fine,

18    Your Honor.  We can proceed along those lines.

19    And in fairness, we know that not all of them

20    have 33.  There may well be some that have a

21    small number so we're happy to proceed along

22    those lines.  In terms of timing, I believe it

23    should be possible to provide this information

24    by next week, but Mr. Hanna can chime in on that

```
 1     if he thinks otherwise.
 2                 THE COURT:  Mr. Hanna, if I'm
 3     trying to find a date in which I'm going to
 4     require you to provide the list of the I-Part
 5     Nos. across the 27 Marketing Nos. and some type
 6     of decoding information with regard to those,
 7     what is a reasonable date?
 8                 MR. HANNA:  Just because this week
 9     is Thanksgiving, I'm sure everybody is out at
10     this point, Your Honor, can we say Thursday or
11     Friday of next week, Your Honor?
12                 THE COURT:  Ms. Muschamp, is that
13     okay for you?
14                 MS. MUSCHAMP:  That's fine, Your
15     Honor.  As long as that still allows them to
16     provide substantial documents on December 16th,
17     that's really the date we're working off of.
18                 THE COURT:  If you got them next
19     Thursday, Ms. Muschamp, when do you think you
20     would be able to provide your I-Part No.
21     selection?
22                 MS. MUSCHAMP:  So we would get
23     those on December 1st or 2nd.  If we work over
24     the weekend, we could have them a selection by
```

 1    Wednesday; that would be the 7th, hopefully

 2    sooner.  We would definitely try to do it sooner

 3    but no later than December 7th.

 4                    THE COURT:  Mr. Hanna, if you got

 5    the I-Part No. request by December 7th, would

 6    you be able to if not provide every BOM by the

 7    16th, be able to at least provide a substantial

 8    number of them?

 9                    MR. HANNA:  Yes, Your Honor.

10                    THE COURT:  Okay.  Well, that's

11    good enough for me.  Obviously, to the extent

12    the goal would be to provide all by then, but if

13    that couldn't be achieved, to provide as many as

14    possible and then to indicate when if more time

15    was needed you expect the remainder to be

16    produced.  What is next Thursday?  What is the

17    date for next Thursday?

18                    MR. HANNA:  The 1st, Your Honor.

19                    THE COURT:  So to try to give as

20    clear a guidance as I can, I'm going to order

21    that the Defendants by no later than next

22    Thursday, December 1st will provide a list of

23    I-Part Nos. corresponding to the 27 Marketing

24    Nos. that the Plaintiff has identified in their

1          pleadings and provide some decoding information

2          with regard to those I-Part Nos. to allow

3          Plaintiff to make their selections.

4                    And then the Plaintiff by no later

5          than December 7th will identify for Defendants a

6          list of I-Part Nos. within each of the 27

7          Marketing Nos. for which they would like BOMs.

8          That list of I-Part Nos. within a particular

9          Marketing No. will be no less than two and no

10         greater than five.

11                   The Defendants will endeavor to

12         produce the relevant BOMs for all of the

13         selected I-Part Nos. by no later than December

14         16th.  To the extent the Defendants are unable

15         to produce the entirety of that information by

16         the 16th, they will produce as much is as

17         reasonably possible.  And on the 16th they will

18         provide indication to the Plaintiffs as to when

19         they can expect the remainder of the documents,

20         so I think we've got where we're going on Issue

21         1.

22                   Issue 2 was addressed much more

23         briefly in the letters and in a way it wasn't

24         clear to me whether there might be some --

1    again, if there was some further conversation

2    the parties might not have gotten there on their

3    own.  It sounds like that has not happened, but

4    I had gotten a summary from Ms. Muschamp of the

5    Plaintiffs' view as to where we stood on that

6    issue and we never got there from the

7    Defendants.

8                    Who's going to speak on the

9    Defendant's side on this issue?

10                   MR. RIZZI:  I will, Your Honor.

11   Can I just briefly go back to Issue 1 first?

12                   THE COURT:  Sure.

13                   MR. RIZZI:  We had earlier

14   discussed a while ago what happens next, so we

15   understand Tessera on the 7th will identify the

16   product, we will provide the BOMs of the order

17   by the 16th, and then Tessera is going to tell

18   us which additional compositions in those BOMS

19   it alleges are thixotropic.

20                   I just want to reiterate that that

21   identification and maybe this is something we

22   can revisit later but since it was raised in our

23   letter, that that identification also include an

24   explanation of how they got there so we do have

1     some objective guideposts to work with going

2     forward, especially since Tessera has made it

3     clear they're going to be pursuing discovery of

4     other products besides these, and we're not in a

5     situation where we'll let you know when we get

6     the information to what thixotropic is without

7     keeping us in the dark in terms of the actual

8     issue at hand.

9                    THE COURT:  Actually --

10                   MS. MUSCHAMP:  Your Honor, may I

11    address that?

12                   THE COURT:  Sure, Ms. Muschamp.

13                   MS. MUSCHAMP:  If you're going to

14    decide that issue, I'd like to be hard on it.

15    We do disagree with the Defendant that

16    thixotropic is a term that's not understandable

17    either from the art or the specification.  And

18    in particular, the specification gives an

19    extensive description about thixotropic

20    materials about how you have to have a reduced

21    viscosity.

22                   This isn't something we can

23    manipulate.  We can't change the viscosity of a

24    material like here the way the Defendant is

1    suggesting.  So I disagree that we should have

2    to disclose work product or expert work in the

3    early stages of discovery.  We are more than

4    happy after reviewing the BOMs to say these are

5    the materials of the BOMs that are provided that

6    we believe are thixotropic.

7                    It may be fast.  It may be -- like

8    the one datasheet that they provided to Your

9    Honor and it identifies on its face thixotropic,

10   so it may be very easy to do, but not all

11   datasheets do that.  As to other BOM datasheets

12   attached to the letter shows that it may require

13   some testing and additional analysis.  But to

14   the extent that is expert work or work product

15   of our client, we don't think it's appropriate

16   to say that has to be disclosed prior to the

17   dates that are already set in the scheduling

18   order.

19                    THE COURT:  Well, what I would say

20   is two things that this reminds me of.  The

21   first is why are we doing this, why are we

22   getting a representative number of bills of

23   materials.  That's not the end.  The end

24   ultimately is that that's supposed to help the

1          Plaintiff further identify what are the accused

2     products here as to these two patents, so there

3     is going to be obviously some further

4     articulation of that after these bill of

5     materials are received and reviewed.

6                    There's going to be some further

7     articulation of what is the Plaintiff asserting

8     are the thixotropic materials that would be

9     included in products that the Defendants should

10    further search for.  And then the second thing

11    is what more, if anything, am I going to order

12    now that the Plaintiff do, and the answer is

13    nothing right now.

14                    I'm not certain that I will

15    require the Plaintiff to provide a further

16    description of how it determined what is a

17    thixotropic material.  But the thing I am

18    certain of is I'm not going to order it now.  I

19    will say down the line if the Plaintiff at some

20    stage is simply willing to say, I'm going to

21    tell you what materials I believe are

22    thixotropic so I want you to search for accused

23    products that include these materials, that's

24    one thing.

1              But if the Plaintiff isn't willing

2      to say, let me further give you my definition

3      for what is thixotropic material so that you can

4      further search, if we get further down the line

5      the Defendants might be able to say, well, look,

6      at a certain point if you're only going to

7      identify certain materials, we can look for

8      those.  But at some point if you're going to

9      come back to us later and say, oh, yeah, by the

10     way, here is this other list or here is this

11     broader definition that we weren't willing to

12     give you earlier, at some point the Defendants

13     will be able to assert, you should have done

14     that sooner.  We're too far along.

15              For now I will give the Plaintiffs

16     some leeway.  I will not require that it provide

17     the additional explanation the Defendants are

18     asking for before 12/16 or sooner.  It's all

19     just to say that the Plaintiff too will have to

20     make some choices, how much are they going to

21     share about what is asserted to be a thixotropic

22     material and the less information they provide,

23     the greater the chance as we go along further

24     if things drag on that the Defendants will be

1       able to say it's too prejudicial at this late

2       stage to now open up a new category of accused

3       products as to these patents.

4                     With all that being said, I'm not

5       going to require anything of the Plaintiffs but

6       that's the guidance I would give.  On the other

7       issue, the issue as to the '563 process patent,

8       what I asked the Plaintiff for and what I'm now

9       asking the Defendant's counsel is can you give

10      me an understanding of your view as to where the

11      current dispute lies and what it is the

12      Defendants are asserting should be the Court's

13      position?

14                     MR. RIZZI:  Yes, Your Honor.

15      Thank you.  I think we're close on this one

16      honestly.  All we ask for is a better definition

17      of essentially where the picture was taken in

18      the product.  If you look at what they provided,

19      this is attached to the letter but it has no

20      number.  It's the page that has little balls on

21      the bottom and they draw a line across the

22      corner that says cross-section.

23                     THE COURT:  Are you referring to

24      the parties' joint letter?

```
 1              MR. RIZZI:  Yes, Your Honor,
 2    Exhibit A.
 3              THE COURT:  Okay.
 4              MR. RIZZI:  This is the second
 5    image under Exhibit A, the line where it says
 6    cross-section.
 7              THE COURT:  Yes.
 8              MR. RIZZI:  And then presumably
 9    the next page purports to show an image of that
10    cross-section.  All we're asking for is a more
11    precise definition of where this image is, where
12    is this cross-section.  And we ask that because
13    these are devices with very minute details and
14    we know that when a section like this is done,
15    it has to be very precise because you're looking
16    for a certain feature and you typically specify
17    down to a fraction of a micron exactly the x,y
18    coordinates of the cut that you're making so
19    that you know exactly where you are and you're
20    in the right area of interest within the
21    semiconductor.
22              So all we've requested is that
23    information so that we're sure that we know what
24    we're looking at in this image and we can go to
```

1      the Broadcom technical people and uniquely

2      specify for them exactly where this image was

3      taken so they can be sure to identify the

4      correct set of core technical documents.

5                     THE COURT:  This is on the request

6      of Page 5 of your letter that they provide you

7      with x,y coordinates as to the cross-section.

8                     My question to you, Ms. Muschamp,

9      is what is wrong with that request?  Could you

10     provide them with the respective coordinates

11     they're asking for or do you see that their

12     request creates problems?

13                    MS. MUSCHAMP:  Your Honor, if I

14     can, Mr. Eppich is our resident expert on the

15     '563 but generally I do think a request of

16     fractions of a micron is a bit excessive for the

17     production of core documents where we've

18     identified 18 specific products.  Mr. Eppich is

19     more knowledgeable on this topic so I will turn

20     it over to him.

21                    THE COURT:  Mr. Eppich?

22                    MR. EPPICH:  Good afternoon, Your

23     Honor.

24                    THE COURT:  Good afternoon.

1              MR. EPPICH:  I will first start

2     with how we got to this point which is

3     Broadcom's request and understanding of what the

4     compliant layer and what various features of the

5     claim that are depicted in this image are in one

6     of the accused products so that they can have a

7     better idea of the documents.

8                    And at their request, we provided

9     these tear-downs.  We seem to forget, Your

10    Honor, that this is Broadcom's product and this

11    simple cross-section which the red line is

12    accurate.  It goes through that very most lower

13    right-hand corner of the guide.  This is a

14    product that they have all of the design files,

15    they have the engineers.  And the image is very

16    clear.  It provides them with enough instruction

17    to simply go and collect the relevant documents

18    that are needed for the December 16th

19    production.  So whether or not we give them the

20    x,y coordinates is really irrelevant to the

21    point.

22                    To answer your question, Your

23    Honor, as to whether or not we can provide

24    information, I would have to go back to our

```
1        tear-down people and ask them how difficult that

2        is.  But again, like I said even with those

3        coordinates it's not going to change the

4        information provided to the Defendant in this

5        case, where they can simply go to the design

6        files and look for themselves and see this

7        information with their engineers.

8                    And as I said, what we did provide

9        gives them that direction and any information

10       they need to at least make this initial

11       production.

12                   THE COURT:  I guess maybe to help

13       me further understand, if the assertion on the

14       other side is we need to have a better

15       understanding of what is the asserted compliant

16       layer and what are the asserted bond ribbons

17       that are said to be a part of an accused product

18       here and you have given them a depiction of what

19       that looks like and we kind of mutually agree

20       that it comes roughly from the cross-section of

21       the chip that's identified in the exhibit we

22       were looking at, it sounds like what you're

23       saying to me is I don't think giving them the

24       exact coordinates of exactly where we took this
```

1    slice from should tell you anything about how to

2    identify other products that would be accused.

3                    If that's what you're saying to

4    me, can you help me understand why that is?

5                    MR. EPPICH:  What I'm saying is

6    simply providing the x,y coordinates of where

7    this cross-section was taken, it's not going to

8    change the information that we provided on the

9    final slide.  It's not going to change the arrow

10   that we pointed to, to show them what the

11   compliant layer is or what the bonding ribbon is

12   in their product.

13                   To us providing x,y coordinates is

14   really unnecessary at this stage, where we've

15   given them a photograph of the chip, we've given

16   them the location of where we took the

17   cross-section and then a detailed SCM image of

18   the product itself showing them the information

19   that they originally requested in order to help

20   them produce documents by the 16th of December.

21   And --

22                   THE COURT:  Right, but you're not

23   answering my question and maybe I'm phrasing it

24   improperly.  The answer I was hoping for is

```
1        something like, Judge, the bottom line is the

2        requests for coordinates is immaterial to an

3        understanding of what type of product is accused

4        because dot, dot, dot, because if you understood

5        you would see that it doesn't matter where we

6        took the slice from or what coordinates we took

7        it from because and, again, fill in the blanks.

8                       Help me understand why their

9        request for more information is irrelevant or

10       immaterial or why it is, not just saying it, but

11       tell me why it is.

12                       MR. EPPICH:  I'm sorry if I wasn't

13       clear but you're exactly right.  We could have

14       taken a cross-section at multiple points through

15       that chip and it would have shown the same

16       compliant layer and the same bonding ribbon.

17       They may have looked a little bit different, but

18       taking a slice almost anywhere on that guide is

19       going to give you the same answer.

20                       We selected the cut where we did

21       because the bonding ribbon was shorter there

22       between the terminal and the contact and it was

23       just easy to depict in one simple image.

24                       THE COURT:  But you're saying,
```

```
 1        look, the equivalent for our purposes of

 2        compliant layer and bond ribbon can be found

 3        likely in other parts of the chip, we just

 4        picked one.  So knowing exactly where we took

 5        the slice from doesn't tell you anything that

 6        you need to know about whether or not some other

 7        product has the same kind of compliant layer or

 8        bond ribbon; is that right?

 9                    MR. EPPICH:  That's right.  We

10        believe the SCM image we gave them communicates

11        to the Defendants what we're saying is a

12        compliant layer, what we're saying is a bonding

13        ribbon.

14                    THE COURT:  Back to the

15        Defendant's side, again, to help me understand.

16        You seem to be asserting the opposite that, no,

17        you really need to know exactly down to the

18        microscopic level where they took this

19        cross-section from to enable us to understand

20        the types of products we should be looking for.

21        Explain to me why that is and why you disagree

22        with what Mr. Eppich said.

23                    MR. RIZZI:  Honestly, I really

24        didn't think this would be this controversial.
```

1      They obviously have much -- I don't know what

2      fraction of a micron, but they have a specific

3      location that they can easily provide and it's

4      not prejudicial.  The way we got here, I don't

5      agree with Mr. Eppich.  Your order required them

6      to identify what component in the accused

7      product constitutes the bonding ribbon.

8                      As I indicated before, these

9      products have microscopic details in them down

10     to fractions of a micron.  It's tiny little

11     details you can't see with a naked eye so in

12     order for us to identify the specific component

13     in the accused product, we need to know where

14     this image was taken.  And frankly, they really

15     haven't identified where the image was taken

16     because this cross-section is such a wide -- in

17     the microscopic scale of these products, the

18     cross-section is identified in a way that could

19     cover multiple components.

20                     THE COURT:  But give me the next

21     level of detail there.  You said so we need to

22     know exactly where this cross-section was taken

23     in order to identify, to have a better

24     understanding of what the compliant layer or

1          bonding ribbon that is because dot, dot, dot.

2          If we didn't know exactly where this was taken,

3          then I disagree with Mr. Eppich that in essence

4          you could have gone to any different part of

5          this chip and have found the same thing, tell me

6          why.  Help me understand why it is what's been

7          provided is insufficient.

8                          MR. RIZZI:  I think that's the

9          point, Your Honor.  Without knowing exactly what

10         they're showing here, how are we supposed to

11         determine where else it might be found?  We need

12         to make sure we're on the same page in terms of

13         understanding what they've actually identified

14         in the chip.  And the only way to be precise as

15         possible is with respect to where this cut was

16         taken and then we can go to the drawing and have

17         the technical people say, okay, now we can

18         identify what that feature actually is.

19                          THE COURT:  You're saying that you

20         cannot based on the image provided by the other

21         side identify within the chip what is asserted

22         to be the compliant layer or the bond ribbon?

23                          MR. RIZZI:  I believe it's at

24         least potentially ambiguous based on this, and

```
 1        that's the concern.  Essentially, the location

 2        of the cut is such a wide swath that at least

 3        potentially within the width of what they show

 4        is that line representing the cross-section

 5        there could be multiple features, and we don't

 6        know which of those features we're looking at.

 7                    THE COURT:  Mr. Eppich, regardless

 8        of whether it's necessary, is Mr. Rizzi right,

 9        is it all that difficult for you to provide the

10        coordinates they're asking for?

11                    MR. EPPICH:  Your Honor, honestly

12        I don't know as I sit here today, but we are

13        willing to go back to our tear-down people and

14        work with them and ask them how difficult is it

15        to provide these coordinates.  I think the issue

16        that Mr. Rizzi raised is that I disagree with

17        the characterization that he is unable to work

18        with Broadcom engineers at this point to

19        determine exactly what's the accused compliant

20        layer based on what we've provided.  But as I

21        said, we're happy to go back and see what

22        information we can provide if that's what the

23        Court desires.

24                    THE COURT:  If I was going to ask
```

1    that you do that and that you provide what

2    information you can as to the requested

3    coordinates by date X, can you give me a handle

4    on when you think you would be in a position to

5    do that?

6                    MR. EPPICH:  I'd like to say

7    around the same time as the 1st of December as

8    the Defendants have agreed to provide us with

9    information on their own products, so I think we

10   can aim for that.  If this requires a complete

11   reprocess, then that's another story.

12                   THE COURT:  Okay.  Can you remind

13   me, the December 16th date is the current date

14   for core technical document production; is that

15   correct?

16                   MR. EPPICH:  Yes, Your Honor.

17                   THE COURT:  So on this issue what

18   I would say is that I've required the Plaintiff

19   to do more, to provide some visual

20   identifications of what are the particular

21   components they are accusing here that will make

22   up the compliant layer and bond ribbon.  I think

23   I previously had said that I didn't understand

24   how describing that by how it was constituted,

1 i.e., what ingredients constituted it, how that

2 was sufficient, but now I've seen the Plaintiffs

3 provide a visual depiction of what is the

4 asserted compliant layer and bond ribbon in at

5 least one of the accused products.

6  What I guess I would say is that

7 based on the materials provided to me on this

8 call, I don't believe that the Defendants have

9 sufficiently articulated to me that why it is

10 what's been provided is insufficient for them to

11 be able to make a core technical document

12 production as to products that include the

13 accused bond ribbon and compliant layer.

14  So based on what I have before me,

15 I don't have any basis to suggest that the

16 Plaintiffs need to do more before I'm expecting

17 the Defendants to provide core technical

18 documents as to accused products.  To put it

19 differently, to the extent that the Defendants

20 are asserting that there is something deficient

21 in what the Plaintiffs have provided, they

22 haven't sufficiently made that case to me.

23  Nevertheless, although it's not

24 necessarily information that should stand in the

1        way of Defendants making a core technical

2        document production as to this patent, I will

3        ask the Plaintiff to provide to the Defendant by

4        no later than the 1st either the x,y coordinates

5        for the cross-section that they identified or if

6        they can't do so by then, some explanation for

7        when they expect to do so or why they can't do

8        so.

9                    Mr. Eppich, did what I say make

10       sense?  Do you need any further clarification?

11                   MR. EPPICH:  It makes sense and

12       thank you.

13                   THE COURT:  Mr. Rizzi,

14       understanding what I've said, is there any

15       further clarification you need?

16                   MR. RIZZI:  No, Your Honor.

17                   THE COURT:  All right.  Counsel,

18       thanks for your patience today.  I appreciate

19       it.  I don't think I have any further scheduled

20       teleconferences with the parties with regard to

21       discovery issues.  But again, as I think I said

22       in a prior call, this may be the kind of case

23       where it does make sense for me to regularly

24       interact with them by phone as the discovery

1     process continues to make sure that I'm staying

2     abreast of what the issues are, and if it's

3     necessary, to try to help foster some good

4     dialogue on how to resolve disputes.

5                    I may set a further status

6     teleconference at some point in the next few

7     weeks perhaps after the core technical document

8     deadline on the 16th hits.  But for now at least

9     I will have to see when that would be scheduled.

10                   With all that said, I wish

11    everybody a very Happy Thanksgiving holiday and

12    I look forward to speaking to you in the future

13    in this case.  Thank you.

14                        MR. RIZZI:  Thank you, Your Honor.

15                        MS. MUSCHAMP:  Thank you, Your

16    Honor.

17                        (The proceedings ended at

18    4:20 p.m.)

19

20

21

22

23

24

1            C E R T I F I C A T I O N

2

3            I, Taneha Carroll, Professional

Court Reporter, certify that the foregoing is a

4    true and accurate transcript of the foregoing

5    proceeding.

6

7            I further certify that I am neither

8    attorney nor counsel for, nor related to nor

9    employed by any of the parties to the action in

10   which this proceeding was taken; further, that I am

11   not a relative or employee of any attorney or

12   counsel employed in this case, nor am I financially

13   interested in this action.

14

15

16        /s/Taneha Carroll
          Taneha Carroll

17
          Professional Reporter and Notary Public
18

19

20

21

22

23

24