Case 1:16-cv-00380-LPS-CJB   Document 177   Filed 09/06/17   Page 1 of 4 PageID #: 7910



August 30, 2017

The Honorable Christopher J. Burke  
J. Caleb Boggs Federal Building **FILED UNDER SEAL**  
844 N. King Street  
Unit 28, Room 2325  
Wilmington, DE 19801-3555

Re:  Tessera v. Broadcom, Case No. 16-380-LPS-CJB

Dear Judge Burke:

We write in advance of the September 6 discovery teleconference. Tessera requested this conference to address two discovery issues that are at an impasse and raise the same underlying issue: Tessera has specifically identified a number of Broadcom accused products, but Broadcom has refused to provide discovery relating to any identified accused product unless Broadcom itself has shipped that product into the U.S. during the damages period. Based on this unilateral and unduly narrow definition of what is relevant for discovery purposes, (1) Broadcom has withheld technical documents and information about certain accused products, and (2) refused to provide sales figures for those products.

## I. Background of Discovery Dispute

The Scheduling Order in this case required that Broadcom produce "core technical documents relating to the accused product(s)" and "sales figures for the accused product(s)." Broadcom also was obligated to respond to Tessera's discovery requests seeking relevant documents and information about the accused products. *See* Ex. A (Tessera Requests for Production); Ex. B (Tessera First Set of Interrogatories). Over the past eight months, Tessera has repeatedly raised, and asked Broadcom to remedy, numerous significant gaps in its discovery responses, by letter, by e-mail, and during multiple meet-and-confer discussions. *See, e.g.,* Exs. 3-15 (Tessera letters to Broadcom dated Jan. 12, Feb. 6, Feb. 20, Mar. 2, Mar. 31, Apr. 13, Apr. 26, Apr. 28, May 18, Jun. 22, Jun. 23, Jun. 28, and Jul. 13, 2017). In hopes that it would move matters forward, Tessera's June 28 letter also included a spreadsheet detailing the missing documents for each product accused of infringing one or both of the interconnect patents (the '001 and '563 patents). Ex. 14. However, Broadcom has unilaterally decided to provide discovery only for the subset of accused products that Broadcom itself shipped into the United States during the damages period and it has refused to provide worldwide sales data for any accused product. *See*, *e.g*., Ex. 15-17 (Broadcom letters to Tessera dated Jan. 17, May 24, and Jul. 26, 2017).

Tessera has explained why it is entitled to discovery relating to products that may not have been shipped into the United States by Broadcom, including the indisputable fact that Broadcom customers are importing products that contain Broadcom accused products into the United States. *See*, *e.g.*, Exs. 9 and 12. To address Broadcom's objection to producing worldwide sales data for all customers, Tessera also agreed to limit its other damages-related discovery

requests to Broadcom's Top 20 customers. *See* Ex. 12. Broadcom proposed to scale this down to its Top 10 customers, but after weeks of negotiations that forced Tessera to declare an impasse, Broadcom finally agreed to identify its Top 20 customers. However, Broadcom continues to refuse to provide discovery relating to identified accused products with a ship-to address outside the United States and refuses to provide worldwide (or any) sales data for its Top 20 customers.

## II.  U.S. Sales For Purposes Of Tessera's Infringement Claims Are Not Limited Solely To Products That Broadcom Itself Shipped To the United States

The single fact that Broadcom shipped certain of the accused products to locations outside the United States is not sufficient to determine whether those sales qualify as U.S. sales for purposes of Tessera's infringement claim. To the contrary, as the Federal Circuit held in *Carnegie Mellon Univ. v. Marvell Tech. Grp.,* 807 F.3d 1283, 1308 (Fed. Cir. 2015), "[t]he standards for determining where a sale may be said to occur do not pinpoint a single, universally applicable fact that determines the answer. . . ." The Federal Circuit noted that many factors are relevant to whether there was a U.S. sale even where the product is never imported into the United States, including where negotiations took place, where products were shipped to, where the "design win" took place, how, where and by whom the products were designed and tested, where the contract or purchase order was entered into, and where payment was made. *Id.* at 1308-10 (finding Marvell was not entitled to judgment as a matter of law that sales did not occur in the U.S. even for products never imported into the U.S., because activities related to designing, simulating, testing, evaluating, and qualifying the chips occurred in California, Marvell provided samples and simulations in the U.S., and contractual commitments were made in the U.S.). Tessera is entitled to discovery relating to those factors as they apply to Broadcom's worldwide sales of the accused products. Tessera should not be required to demonstrate that there are U.S. sales based on these factors before it can obtain relevant discovery, as Broadcom has suggested. Nor can Tessera do so without discovery from Broadcom.

Notably, in another action, Broadcom recently argued for summary judgment that products "ordered, manufactured, shipped, billed, and delivered to buyers abroad" could not qualify as U.S. sales under section 271(a). Ex. 19 (*Godo Kaisha IP Bridge 1 v. Broadcom Ltd. ("IP Bridge")*, No. 2:16-cv-00134, slip op. at 1-2 (E.D. Tex. May 18, 2017). Magistrate Judge Payne recommended that Broadcom's motion be denied, finding that a jury could find that substantial activities relating to those "foreign sales" in fact occurred in the United States (the case then settled before the recommendation was reviewed). In doing so, he reviewed the discovery provided by Broadcom about Broadcom's "design win" process, its Master Purchase Agreements and purchase orders with customers, the support provided by Broadcom employees in the United States to U.S. customers such as Apple, and the fact that Broadcom categorizes "foreign sales" internally and for purposes of awarding commissions as domestic sales. *Id.* at 4. He also factored in that "[n]either party disputes that the overwhelming majority of [Broadcom's] design, development, marketing and sales activities occur in the United States."

*Id.*[1] Here, Broadcom has not provided any of that discovery (although it has recently made a limited offer to do so) and it is refusing to provide other discovery, including worldwide sales figures, even for its Top 20 customers.[2]

Broadcom has claimed that it does not know how its customers are using the Broadcom accused products or whether end products containing those chips are being imported into the United States. This is simply not credible. Based on its own SEC filings, Broadcom has identified Samsung and Apple as its two largest customers over a number of years. *See* Ex. 20 (excerpts from Broadcom's Forms 10-K for 2010-2014). The chips that Broadcom supplies go into smart phones and other consumer products, large volumes of which are then imported into and sold in the U.S. Broadcom also has identified a number of set-top box manufacturers as top customers, including ARRIS/Pace and Technicolor (formerly Thomson). *Id.* Collectively ARRIS/Pace and Technicolor account for more than half of the set-top box market in North America and supply 80% of the set-top box models for U.S. providers Comcast, Cox, Time Warner Cable, and Verizon. Ex. 21 (Technicolor Statement on the Public Interest in 337-TA-1010 Investigation). Other strategic and large customers identified by Broadcom include U.S. companies such as NETGEAR, Hewlett-Packard, EchoStar, Dell, Cisco, and Motorola Mobility. Tessera has identified accused products used in smart phones, set-top boxes, modems, routers, and other end products. It is entitled to take discovery to determine the extent to which Broadcom's worldwide sales of those products qualify as U.S. sales.

Broadcom also has argued that it is sufficient that it identify its Top 20 customers (something it has not yet done) and that Tessera then should be required to seek discovery from those third parties. While Tessera has subpoenaed certain Broadcom large customers, identified from public sources, that does not mean that Broadcom is excused from providing relevant discovery that it has in its possession. This is particularly true where these subpoenaed third parties are, not surprisingly, telling Tessera that it should seek the discovery from Broadcom.

### III. Tessera Is Seeking Discovery Relevant To Its Indirect Infringement Claims

Tessera has alleged indirect infringement under Section 271(b) and is entitled to discovery regarding Broadcom's worldwide sales to support this claim. *SRAM, LLC v. Hayes*

---

[1] In *IP Bridge*, Magistrate Judge Payne rejected Broadcom's attempt to limit discovery to products that it shipped into the U.S. and ordered it to produce worldwide sales information. Ex. 22 (Order dated April 20, 2017) (finding discovery relevant to "whether sales and offers to sell that [Broadcom] describe[s] as foreign are in fact foreign sales under existing precedent.").

[2] Broadcom also has argued that the "Federal Circuit has found that 'pricing and contracting negotiations in the United States alone do not constitute or transform … extraterritorial activities into a sale within the United States for purposes of § 271(a).'" Ex. 17 (citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 831 F.3d 1369, 1378 (Fed. Cir. 2016). The *IP Bridge* recommendation demonstrates that Broadcom's U.S. activities are not limited to "pricing and contracting negotiations." In any event, this is a discovery dispute and the discovery Tessera seeks is relevant to whether Broadcom's sales of products shipped to non-U.S. locations are U.S. sales.

*Bicycle Group, Inc.*, No. 12 C 3629, 2013 WL 6490252 at *3 (N.D. Ill 2013) (world-wide sales are relevant where plaintiff alleged that defendant induced infringement by "buyers that it knew or should have known would use, sell or offer to sell said products in the United States or import said products into the United States"); *Honeywell v. Acer America Corp.*, 655 F. Supp. 2d 650, 658–61 (E.D. Tex. 2009) (plaintiff entitled to discovery of extraterritorial sales based on allegation that defendant "sold potentially infringing modules to foreign companies knowing that those modules would be incorporated into products sold in the United States"). Even for products that were sold outside the United States, chip makers may be liable for indirect infringement if those products are subsequently brought into the United States. *See e.g.*, *M2M Sols. LLC v. Motorola Sols., Inc.*, No. CV 12-33-RGA, 2016 WL 70814, at *21 (D. Del. Jan. 6, 2016); *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 679 (D. Del. 2016).[3]

### IV. Broadcom Should Be Ordered To Provide Technical Documents And Information And Worldwide Sales Data For The Accused Products Identified By Tessera

For the reasons set forth above, Tessera respectfully requests that Broadcom be ordered to produce technical documents and information and worldwide sales data for all of the accused products specifically identified by Tessera regardless of whether Broadcom itself has shipped the accused product into the United States and to make that production within 15 days of the order.

Respectfully submitted,

/s/ Brian E. Farnan

Brian E. Farnan

cc: Counsel of Record (via E-mail)

---

[3] Foreign sales also are relevant in setting a reasonable royalty for damages. *See*, *GE Healthcare Bio-Sciences AB v. Bio-Rad Laboratories, Inc.*, No. 1:14-cv-07080, 2015 WL 7582967 at *2 (S.D.N.Y. Nov. 25, 2015) (citing *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770, 772 (Fed. Cir. 2014)) ("[T]he profits that [the defendant] allegedly obtained from the sales to foreign customers would be relevant to the determination of a reasonable royalty.").