# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TESSERA, INC. and TESSERA ADVANCED TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 16-cv-380-LPS-CJB |
| v. | ) ) | |
| BROADCOM CORPORATION, | ) ) | |
| Defendant. | ) | |

**TESSERA'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO BROADCOM CORPORATION (NOS. 1-84)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Tessera, Inc., and Tessera Advanced Technologies, Inc. (collectively, "Tessera") hereby serve on Defendant Broadcom Corporation the following requests to produce documents and things in accordance with the following instructions and definitions, at the offices of Covington & Burling LLP, 333 Twin Dolphin Drive, Suite 700, Redwood Shores, CA 94065-1418, or at such other location as may be mutually agreed to by counsel, within thirty (30) days from the date of service of these requests.

**DEFINITIONS**

The following instructions and definitions apply to these requests for production.

1.     The term "Tessera" means Tessera, Inc., and Tessera Advanced Technologies, Inc.

2.     The terms "Broadcom," "you," and "your" means Broadcom Corporation and all predecessors, successors, parents, subsidiaries, affiliates, directors, officers, agents,

representatives, consultants, attorneys, or other persons that are acting or have acted on behalf of Broadcom.

3.     The term "Action" means the litigation titled *Tessera, Inc. et al. v. Broadcom Corporation*, Civil Action No. 16-cv-380-LPS-CJB, including all related claims, defenses, counterclaims, and third-party claims, if any.

4.     The terms "document" and "documents" include all things within the meaning and scope of that term as used in the Federal Rules of Civil Procedure and the Federal Rules of Evidence, and includes without limitation the following items, whether printed, recorded, microfilmed, stored electronically or optically, or reproduced by any process, or written or produced by hand, or recorded in any other way, and whether or not claimed to be privileged or confidential or personal: letters; correspondence; memoranda; notes; reports; records; agreements; working papers; communications (including intradepartmental and interdepartmental communications); summaries or records of personal conversations; calendars; diaries; forecasts; statistical statements; graphs; laboratory or research reports and notebooks; charts; minutes or records of conferences; expressions or statements of policy; lists of persons attending meetings or conferences; reports of or summaries of interviews; reports of or summaries of investigations; opinions or reports of consultants; patents and patent application materials; patent appraisals; printed publications; trademark applications, certificates of registration, opinions of counsel; memoranda of agreements, assignments, licenses; reports of or summaries of either negotiations within or without the corporation or preparations for such; bulletins; material and manufacturing specifications; material packaging; manufacturing logs; functional specifications; equipment specifications and operating information; product packaging; designs; logic simulation or emulation materials; instructions; advertisements;

literature; work assignments; memoranda of conversations; notes; notebooks; drafts; data sheets; worksheets; contracts; memoranda of agreements; assignments; licenses; minute books of account; orders; invoices; statements; bills; checks; vouchers; photographs; drawings; charts; catalogs; brochures; computer files; computer discs; articles; manuals; pamphlets; knowledge base documents; technical support documents; application notes; advertisements; circulars; press releases; drafts of any documents; books; instruments; accounts; bills of sale; tapes; electronic communications including but not limited to e-mails; telegraphic communications and all other material of any tangible medium of expression; and original or preliminary notes.  Any comment or notation appearing on any document, and not a part of the original text, is to be considered a separate "document."

5.      The term "thing(s)" has the broadest meaning allowable under Federal Rule of Civil Procedure 34 and includes, without limitation, any tangible object other than a document, objects of every kind and nature, as well as prototypes, models, or physical specimens thereof.

6.      The terms "relate to," "relating to," or "regarding," when used in reference to a particular subject, shall be construed in the most inclusive sense, and shall be considered a request that you identify and produce documents that refer to, discuss, summarize, reflect, constitute, contain, embody, pertain to, mention, constitute of, comprise, show, comment on, evidence, describe or in any other manner concern the referenced subject matter.

7.      The terms "person" and "persons" include both natural persons and entities, including corporations, proprietorships, partnerships, associations, joint ventures, governmental agencies, any other legal entity, any combination thereof, and all predecessors in interest, successors, affiliates, subsidiaries, and related entities.

8.      The terms "third party" or "third parties" mean any person other than Tessera or Broadcom.

9.      The terms "and," "or," and "and/or" shall be construed in the conjunctive or the disjunctive to read the request at its most inclusive.

10.     The term "any" shall include the word all, and vice versa.

11.     The term "each" shall mean each and every.

12.     The term "semiconductor device(s)" refers broadly to semiconductor devices, semiconductor device packages, electronic components, wafers, dies, chips, packages, and assemblies.

13.     The term "circuit board(s)" refers broadly to a sheet of insulating material used for the mounting and interconnection of components in electronic equipment, including but not limited to any circuit board, printed circuit board (PCB), printed circuit board assembly, circuit panel, printed circuit assembly, printed circuit board assembly, circuit card assembly, or backplane assembly.

14.     The term "'563 Patent" means U.S. Patent No. 6,284,563.

15.     The term "'001 Patent" means U.S. Patent No. 6,954,001.

16.     The term "'046 Patent" means U.S. Patent No. 5,666,046.

17.     The term "'699 Patent" means U.S. Patent No. 6,043,699.

18.     The term "'215 Patent" means U.S. Patent No. 6,218,215.

19.     The term "'605 Patent" means U.S. Patent No. 6,080,605.

20.     The term "'076 Patent" means U.S. Patent No. 6,046,076.

21.     The term "Asserted Patents" means the '563, '001, '046, '699, '215, '605, and '076 Patents.

22.     The term "Asserted Claim" means any and all claims of the Asserted Patents that have been or are asserted against Broadcom in this Action.

23.     The term "prior art," for purposes of these requests, means all things, patents, publications, disclosures, sales, or other acts or occurrences included within the broadest meaning of 35 U.S.C. § 102 (or any subpart thereof) and 35 U.S.C. § 103, and all things, patents, publications, disclosures, sales, or other acts or occurrences that any person or entity has identified as "prior art" or relevant to the invalidity of the patent(s) identified in the relevant request.

24.     The terms "'046 Accused Product" and "'046 Accused Products" mean any and all of the following:

- Broadcom's BCM4330 and BCM4334 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4330, BCM4334, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar voltage reference circuit designs as the products identified above.

25.     The terms "'699 Accused Product" and "'699 Accused Products" mean any and all of the following:

- Broadcom's BCM4334 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4334, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar level shifter designs as the products identified above.

26.     The terms "'563 Accused Product" and "'563 Accused Products" mean any and all of the following:

- Broadcom's BCM20715 and BCM2076 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM20715, BCM2076, and all products containing the same;

- Broadcom's BCM4330, BCM4334, BCM43341, BCM43362, BCM43455, BCM4354, BCM43540, and BCM4356 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4330, BCM4334, BCM43341, BCM43362, BCM43455, BCM4354, BCM43540, BCM4356, and all products containing the same;

- Broadcom's BCM47511, BCM4752, BCM47521, BCM47531, and BCM47731 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM47511, BCM4752, BCM47521, BCM47531, BCM47731, and all products containing the same;

- Broadcom's BCM59054 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM59054, and all products containing the same;

- Broadcom's BCM5976 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM5976, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar interconnect structure as the products identified above.

27.    The terms "'001 Accused Product" and "'001 Accused Products" mean any and all of the following:

- Broadcom's BCM20715 and BCM2076 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM20715, BCM2076, and all products containing the same;

- Broadcom's BCM4330, BCM4334, BCM43341, BCM43362, BCM43455, BCM4354, BCM43540, and BCM4356 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4330, BCM4334, BCM43341, BCM43362, BCM43455, BCM4354, BCM43540, BCM4356, and all products containing the same;

- Broadcom's BCM47511, BCM4752, BCM47521, BCM47531, and BCM47731 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM47511, BCM4752, BCM47521, BCM47531, BCM47731, and all products containing the same;

- Broadcom's BCM59054 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM59054, and all products containing the same;

- Broadcom's BCM5976 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM5976, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar interconnect structure as the products identified above.

28.     The terms "'215 Accused Product" and "'215 Accused Products" mean any and all of the following:

- Broadcom's BCM15700 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM15700, and all products containing the same;

- Broadcom's BCM23550 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM23550, and all products containing the same;

- Broadcom's BCM3380, BCM3383 and BCM33843 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM3380, BCM3383, BCM33843, and all products containing the same;

- Broadcom's BCM4709 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4709, and all products containing the same;

- Broadcom's BCM53334 and BCM56850 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM53333 and BCM56850, and all products containing the same;

- Broadcom's BCM57810 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM57810, and all products containing the same;

- Broadcom's BCM63137 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM63137, and all products containing the same;

- Broadcom's BCM7405, BCM7425, BCM7435, and BCM7449 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM7405, BCM7425, BCM7435, BCM7449, and all products containing the same;

- Broadcom's BCM7630 and BCM7634 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM7630, BCM7634, and all products containing the same;

- Broadcom's BCM84833 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM84833, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar packaging as the products identified above.

29.    The terms "'605 Accused Product" and "'605 Accused Products" mean any and

all of the following:

- Broadcom's BCM21553 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM21553, and all products containing the same;

- Broadcom's BCM43241, BCM4336, BCM43569, and BCM43570 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM43241, BCM4336, BCM43569, and BCM43570 or other Broadcom WiFi 802.11 semiconductor devices, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar packaging as the products identified above.

30.    The terms "'076 Accused Product" and "'076 Accused Products" mean any and

all of the following:

- Broadcom's BCM20795 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM20795, and BCM20702, and all products containing the same;

- Broadcom's BCM2035, BCM2042, BCM2045, BCM2046, BCM2048, and BCM20702 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM2035, BCM2042, BCM2045, BCM2046, BCM2048, and BCM20702, and all products containing the same;

- Broadcom's BCM2091 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM2091, and all products containing the same;

8

- Broadcom's BCM2133, BCM21352, and BCM21553 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM2133, BCM21352, and BCM21553, and all products containing the same;

- Broadcom's BCM2727 and BCM2763 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM2727 and BCM2763, and all products containing the same;

- Broadcom's BCM4318, BCM4322, BCM43231, BCM4323, BCM43241, BCM4329, BCM4336, BCM43569, BCM43570 and BCM5357 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4318, BCM4322, BCM43231, BCM4323, BCM43241, BCM4329, BCM4336, BCM43569, BCM43570 and BCM5357, and all products containing the same;

- Broadcom's BCM4717, BCM4718, and BCM47186 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4717, BCM4718, and BCM47186, and all products containing the same;

- Broadcom's BCM4751 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4751, and all products containing the same;

- Broadcom's BCM53115 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM53115, and all products containing the same;

- Broadcom's BCM5722 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM5722, and all products containing the same;

- Broadcom's BCM59036 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM59036, and all products containing the same;

- Broadcom's BCM5973 and BCM5974 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM5973 and BCM5974, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar packaging as the products identified above.

31.     The terms "Broadcom Accused Product" and "Broadcom Accused Products"

mean, collectively, the '563, '001, '046, '699, '215, '605, and '076 Accused Products, and

9

includes any Broadcom Accused Product (1) sold in the United States by any person or entity, whether or not incorporated into a Downstream Product; (2) offered for sale in the United States by any person or entity, whether or not incorporated into a Downstream Product; or (3) imported or will be imported into the United States, sold for importation into the United States, and/or sold within the United States after importation by any person or entity, whether or not incorporated into a Downstream Product.

32.     The terms "Broadcom Accused Circuit Product" and "Broadcom Accused Circuit Products" mean the '046 Accused Products and '699 Accused Products, collectively.

33.     The terms "Broadcom Accused Interconnect Product" and "Broadcom Accused Interconnect Products" mean the '563 Accused Products and '001 Accused Products, collectively.

34.     The terms "Broadcom Accused Packaging Product" and "Broadcom Accused Packaging Products" mean the '215 Accused Products, '605 Accused Products, and '076 Accused Products, collectively.

35.     "Downstream Product" means any product or device incorporating one or more Broadcom Accused Products, including but not limited to cell phones, smart phones, digital music players, laptop or tablet computers, or other mobile devices, consumer electronics, or automotive products.

36.     The terms "Broadcom foundry" and "Broadcom foundries" mean one or more of the foundry subcontractors that have provided or are providing fabrication, manufacturing, and/or testing services with regard to any Broadcom Accused Product or any wafer, chip or die for any Broadcom Accused Product, including but not limited to (a) Taiwan Semiconductor Manufacturing Company and its predecessors, successors, parents, subsidiaries, affiliates,

directors, officers, agents, representatives, consultants, attorneys, and any other person that is

acting or has acted on its behalf; (b) United Microelectronics Corporation and its predecessors,

successors, parents, subsidiaries, affiliates, directors, officers, agents, representatives,

consultants, attorneys, and any other person that is acting or has acted on its behalf;

(c) Semiconductor Manufacturing International Corporation and its predecessors, successors,

parents, subsidiaries, affiliates, directors, officers, agents, representatives, consultants, attorneys,

and any other person that is acting or has acted on its behalf; (d) GlobalFoundries, Inc. (formerly

Chartered Semiconductor Manufacturing) and its predecessors, successors, parents, subsidiaries,

affiliates, directors, officers, agents, representatives, consultants, attorneys, and any other person

that is acting or has acted on its behalf; and (e) any other person that has provided or is providing

any type of fabrication, manufacturing, testing, assembly, and/or packaging services to

Broadcom, directly or indirectly, with regard to any Broadcom Accused Product.

     37.    The terms "Broadcom OSAT" and "Broadcom OSATs" mean one or more of the

assembly and packaging subcontractors that have provided or are providing testing, assembly

and/or packaging services with regard to any Broadcom Accused Product or any wafer, chip or

die for any Broadcom Accused Product, including but not limited to (a) Advanced

Semiconductor Engineering and its predecessors, successors, parents, subsidiaries, affiliates,

directors, officers, agents, representatives, consultants, attorneys, and any other person that is

acting or has acted on its behalf; (b) Siliconware Precision Industries and its predecessors,

successors, parents, subsidiaries, affiliates, directors, officers, agents, representatives,

consultants, attorneys, and any other person that is acting or has acted on its behalf; (c) United

Test and Assembly Center and its predecessors, successors, parents, subsidiaries, affiliates,

directors, officers, agents, representatives, consultants, attorneys, and any other person that is

11

acting or has acted on its behalf; (d) Amkor Technology, Inc. and its predecessors, successors, parents, subsidiaries, affiliates, directors, officers, agents, representatives, consultants, attorneys, and any other person that is acting or has acted on its behalf; (e) STATS ChipPAC and its predecessors, successors, parents, subsidiaries, affiliates, directors, officers, agents, representatives, consultants, attorneys, and any other person that is acting or has acted on its behalf; (f) Signetics High Technology, Inc. and its predecessors, successors, parents, subsidiaries, affiliates, directors, officers, agents, representatives, consultants, attorneys, and any other person that is acting or has acted on its behalf; and (g) any other person that has provided or is providing any type of fabrication, manufacturing, testing, assembly, and/or packaging services to Broadcom, directly or indirectly, with regard to any Broadcom Accused Product.

38.    "Manufacture" means to make, whether experimentally or commercially.

## INSTRUCTIONS

1.    Each request shall be answered pursuant to Fed. R. Civ. P. 26 and 34, and supplemented as required by Fed. R. Civ. P. 26(e), these requests are deemed continuing to the fullest extent possible.

2.    The document requests herein shall be deemed to include any and all relevant documents within the possession, custody, or control of you, including documents located in the personal files of any and all past and present directors, officers, agents, representatives, employees, attorneys and accountants of you.  If you know of the existence, past or present, of any documents or things requested below, but are unable to produce such documents or things because they are not presently in your possession, custody, or control, you shall so state and shall identify such documents or things, and the person who has possession, custody, or control of the documents or things.

3.      Please produce all documents as they are maintained and organized in the normal course of business, including preserving and maintaining any file structures or groupings.  In the alternative, for each document produced, please identify the request(s) for production and, where applicable, the interrogatory(ies) to which it is responsive.

4.      Please produce files as text searchable image files.  When a text-searchable image file is produced, please preserve the integrity of the underlying ESI, i.e., the original formatting, the metadata (as noted below) and, where applicable, the revision history.  Please produce files not easily converted to image format, such as Excel and Access files, in native format.

5.      In the event that any document is withheld or redacted based on a claim of attorney-client privilege, attorney work-product immunity, or any other privilege, identify: (a) the date of the document or information; (b) the source of the document or information; (c) the names and addresses of all persons to whom the document or information was disclosed; and (d) the general subject matter of the document or information.

6.      If any responsive document or thing has been destroyed or lost or is otherwise missing, state: (a) the date of such destruction or loss; (b) the reason for such destruction or loss; (c) the identity of the person or persons who destroyed or lost the document or thing; and (d) the identity of the person or persons who authorized such destruction.

7.      These requests seek all responsive documents in their original language, and, if such original language is not English, these requests also seek all English-language translations that may exist for any such documents.

8.      Each document is to be produced along with all drafts, without abbreviation or redaction.

9. Any keys, codes, explanations, manuals, or other documents necessary for the interpretation or understanding of the documents produced in response to these Requests for Production shall be produced.

10. In the event that you object to any request on the ground that it is overbroad and/or unduly burdensome for any reason, response to that request as narrowed to the least extent necessary, in your judgment, to render it not overbroad/unduly burdensome and state specifically the extent to which you have narrowed that request for purposes of your response and the factual basis for your conclusion.

11. In the event that you object to any request on the ground that it is vague and/or ambiguous, identify the particular words, terms, or phrases that are asserted to make such request vague and/or ambiguous and specify the meaning actually attributed to you by such words for purposes of your response thereto.

12. Broadcom shall produce documents relating to all releases, versions, generations, and/or revisions of each Broadcom Accused Product.

## DOCUMENTS TO BE PRODUCED

### REQUEST FOR PRODUCTION NO. 1:

Documents sufficient to identify all Broadcom Accused Products and, separately for each product, the product name, the product number, any product family, series or group to which the product belongs, the type of product, any internal names, code names, or project names for the product, and any other designations used by you or any of the Broadcom foundries or Broadcom OSATs to refer to the Broadcom Accused Products.

### REQUEST FOR PRODUCTION NO. 2:

For each of the Broadcom Accused Products, documents sufficient to show and explain the meaning of all product numbers, product names, internal names, code names, project names,

and any other designations used by you or any of the Broadcom foundries or Broadcom OSATs

to refer to the Broadcom Accused Products, including but not limited to any decoder or product

numbering guidelines that explain how Broadcom assigns alphanumeric characters for both short

and long product numbers for the Broadcom Accused Products.

**REQUEST FOR PRODUCTION NO. 3:**

Separately for each Broadcom Accused Product, documents sufficient to identify: (a) the

Broadcom foundries that fabricated, manufactured and/or tested the wafers, chips and/or dies

used in the product and the location where that activity occurred; and (b) the Broadcom OSATs

that tested, packaged and/or assembled the Broadcom Accused Products and the location where

that activity occurred.

**REQUEST FOR PRODUCTION NO. 4:**

Five physical samples of each Broadcom Accused Product or, in the alternative, five

physical samples of representative Broadcom Accused Products along with documents sufficient

to identify, separately for each set of five physical samples, the other Broadcom Accused

Products for which the physical samples are representative as to the voltage reference circuits,

level shifters, interconnects and/or packaging.

**REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show and explain how Broadcom catalogues, classifies,

categorizes, or otherwise groups, both internally and externally, its products, including all

product families, product series or other product groupings that include one or more of the

Broadcom Accused Products.

**REQUEST FOR PRODUCTION NO. 6:**

For each Broadcom Accused Circuit Product, all datasheets, technical briefs, and

specifications that are provided or made available to any actual or potential customer of the

15

product, made available through any website or portal maintained by or on behalf of Broadcom, and/or provided or made available through any representative or distributor that distributes, markets and/or sells any of the Broadcom Accused Products.

**REQUEST FOR PRODUCTION NO. 7:**

All agreements and contracts that relate to fabrication, manufacture, testing, packaging and/or assembly of any Broadcom Accused Product by any Broadcom foundry or Broadcom OSAT.

**REQUEST FOR PRODUCTION NO. 8:**

Documents sufficient to identify each facility where Broadcom Accused Products have been or are fabricated, manufactured, tested, packaged and/or assembled, including for each facility an identification of: (a) the owner of the facility; (b) the person that operates the facility; (c) the Broadcom Accused Products that have been or are fabricated, manufactured, tested, packaged and/or assembled at the facility; (d) the activities that occurred with regard to the Broadcom Accused Products at the facility (for example, wafer fabrication, wafer testing, chip packaging); (e) the time periods in which those activities occurred; (f) the quantities (quarterly or monthly by calendar year) of Broadcom Accused Products, or wafers, chips or dies used in Broadcom Accused Products, that were fabricated, manufactured, tested, packaged and/or assembled at the facility.

**REQUEST FOR PRODUCTION NO. 9:**

Separately for each Broadcom Accused Circuit Product, documents sufficient to describe in detail the design, function, structure, and operation of the voltage reference circuits and level shifters in the Broadcom Accused Circuit Products, including but not limited to schematics, design reviews, design review presentations, final design documents, datasheets, and other technical and design documents.

16

**REQUEST FOR PRODUCTION NO. 10:**

Separately for each Broadcom Accused Packaging Product, documents sufficient to describe in detail how those products are designed, fabricated, manufactured, packaged, and assembled, including but not limited to scanning electron microscopy images, photographs, energy dispersive X-ray spectroscopy analysis, line scan analysis, process flows and process flow diagrams, recipes, and design reviews and presentations including packaging information.

**REQUEST FOR PRODUCTION NO. 11:**

Separately for each Broadcom Accused Interconnect Product, documents sufficient to describe in detail how those products are designed, fabricated, manufactured, packaged, and assembled, including but not limited to scanning electron microscopy images, photographs, energy dispersive X-ray spectroscopy analysis, line scan analysis, process flows and process flow diagrams, recipes, design reviews and presentations including interconnect information, layout files, and Graphic Database System II ("GDSII") or similar files.

**REQUEST FOR PRODUCTION NO. 12:**

Separately for each Broadcom Accused Interconnect Product, Broadcom Accused Packaging Product and each semiconductor device in those products, all documents exchanged between Broadcom and any Broadcom foundry or Broadcom OSAT relating to the Broadcom Accused Interconnect Product, Broadcom Accused Packaging Product, or any semiconductor device in those products related to the formation of interconnects or packaging.

**REQUEST FOR PRODUCTION NO. 13:**

All documents relating to review and qualifying of the fabrication process for each Broadcom Accused Interconnect Product and Broadcom Accused Packaging Product, including but not limited to presentations made to Broadcom or to Broadcom customers, requirements documents, audits, and other documents received from any Broadcom Foundry relating to

17

fabrication, manufacturing and/or testing of any Broadcom Accused Product or any semiconductor devices in those products.

## REQUEST FOR PRODUCTION NO. 14:

Documents sufficient to show the step-by-step process for the fabrication of each semiconductor device in each Broadcom Accused Interconnect Product and Broadcom Accused Packaging Product, including but not limited to process flows, recipes, run cards, process routing, process flow routing, routing cards, flow sheets, flow cards, routing processes, and comparable files, reports, or documents, including documents received from any Broadcom foundry.

## REQUEST FOR PRODUCTION NO. 15:

Documents sufficient to show the step-by-step process for the encapsulation of each semiconductor device in each Broadcom Accused Packaging Product, including but not limited to process flows, recipes, run cards, process routing, process flow routing, routing cards, flow sheets, flow cards, routing processes, and comparable files, reports, or documents, including documents received from any Broadcom OSAT.

## REQUEST FOR PRODUCTION NO. 16:

Documents sufficient to show the computer-aided manufacturing flow used in the design and fabrication of each semiconductor device in each Broadcom Accused Interconnect Product and Broadcom Accused Packaging Product, including documents received from any Broadcom foundry.

## REQUEST FOR PRODUCTION NO. 17:

Documents sufficient to show the instructions provided to each machine or tool used in the fabrication of any wafer or portion of a wafer for each semiconductor device in each Broadcom Accused Interconnect Product and Broadcom Accused Packaging Product, including

18

but not limited to recipes, process specifications, and similar documents, including documents received from any Broadcom foundry.

**REQUEST FOR PRODUCTION NO. 18:**

Documents sufficient to determine the package structure or type of any packaged Broadcom Accused Product.

**REQUEST FOR PRODUCTION NO. 19:**

The bills of materials or other equivalent documents sufficient to show the components and materials used to fabricate, manufacture, package and/or assemble the Broadcom Accused Interconnect Product and Broadcom Accused Packaging Product and the wafers, chips or dies that are part of those products.

**REQUEST FOR PRODUCTION NO. 20:**

The Material Safety Data Sheets (MSDS) for each compound or material identified in any bills of materials or other equivalent documents produced in response to Request for Production No. 19.

**REQUEST FOR PRODUCTION NO. 21:**

Documents sufficient to: (a) identify each Broadcom Accused Circuit Product that you have tested or demonstrated in the United States; (b) describe the purpose and result of the testing or demonstration, (c) identify the persons who were involved with and/or attended the testing or demonstration; and (d) provide the timing and location of the testing or demonstration.

**REQUEST FOR PRODUCTION NO. 22:**

Final versions of the schematics for each voltage reference circuit and level shifter in each Broadcom Accused Circuit Product, including but not limited to Cadence, Synopsys, Mentor Graphics, or other similar native files, and the software platform (e.g., product design kit ("PDK")) necessary to review and print these files.

19

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to show all voltage reference circuits used in any Broadcom 802.11 compliant product, including but not limited to Cadence, Synopsys, Mentor Graphics, or other similar native files, and the software platform (e.g., PDK) necessary to review and print these files.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to show all voltage reference circuits stored in a library for use in the design of any Broadcom product, including but not limited to Cadence, Synopsys, Mentor Graphics, or other similar native files, and the software platform (e.g., PDK) necessary to review and print these files.

**REQUEST FOR PRODUCTION NO. 25:**

All documents describing the use of a shared pn junction in the design of a voltage reference circuit in which the output voltage is generated based on the sum of two currents.

**REQUEST FOR PRODUCTION NO. 26:**

All documents describing a voltage reference circuit having a substantially zero temperature coefficient.

**REQUEST FOR PRODUCTION NO. 27:**

All documents describing the design of any voltage reference circuit used in each Broadcom Accused Circuit Product.

**REQUEST FOR PRODUCTION NO. 28:**

Documents sufficient to identify the person(s) who designed any voltage reference circuit used in each Broadcom Accused Circuit Product.

**REQUEST FOR PRODUCTION NO. 29:**

Documents sufficient to identify all products containing a voltage reference circuit designed by the person(s) who designed any voltage reference circuit in each Broadcom Accused Circuit Product.

**REQUEST FOR PRODUCTION NO. 30:**

Documents sufficient to show all level shift circuit designs used in any Broadcom 802.11 compliant product, including but not limited to Cadence, Synopsys, Mentor Graphics, or other similar native files, and the software platform necessary (e.g., PDK) to review and print these files.

**REQUEST FOR PRODUCTION NO. 31:**

Documents sufficient to show all level shift circuit designs stored in a library for use in the design of any Broadcom product, including but not limited to Cadence, Synopsys, Mentor Graphics, or other similar native files, and the software platform (e.g., PDK) necessary to review and print these files.

**REQUEST FOR PRODUCTION NO. 32:**

All documents describing the design of any level shift circuit used in each Broadcom Accused Circuit Product.

**REQUEST FOR PRODUCTION NO. 33:**

All documents describing any benefit from the design of any level shift circuit used in any Broadcom product.

**REQUEST FOR PRODUCTION NO. 34:**

Documents sufficient to identify the person(s) who designed the level shift circuits in each Broadcom Accused Circuit Product.

21

**REQUEST FOR PRODUCTION NO. 35:**

Documents sufficient to identify any products containing a level shift circuit designed by the person(s) who designed any level shift circuit in each Broadcom Accused Circuit Product.

**REQUEST FOR PRODUCTION NO. 36:**

Separately for each Broadcom Accused Packaging Product, documents sufficient to show the complete process used for dispensing and applying semiconductor chips and chip package assemblies used in Broadcom Accused Packaging Products, with resin, mold, silicone, epoxy, or other compliant material, including but not limited to (i) the composition of such compliant material, (ii) all mechanisms used for dispensing and applying such compliant material in, on, or around semiconductor chips and chip package assemblies, (ii) the location(s) of semiconductor chips and chip package assembles during the steps of dispensing and applying such compliant material, (iii) the pressure(s) in such location(s) during the steps of dispensing and applying such compliant material, (iv) the temperature(s) in such location(s) during the steps of dispensing and applying such compliant material, (v) the composition of any gases present in such location(s) during the steps of dispensing and applying such compliant material, (vi) the location(s) at which such compliant material is dispensed and applied relative to the semiconductor chip(s) and chip package assembly(ies), and (vii) the time elapsed during the steps of dispensing and applying such compliant material.

**REQUEST FOR PRODUCTION NO. 37:**

Separately for each Broadcom Accused Packaging Product, documents sufficient to show the complete process used for curing any resin, mold, silicone, epoxy, or other compliant material dispensed and applied in, on, or around semiconductor chips and chip package assemblies used in Broadcom Accused Packaging Products, including but not limited to (i) all

22

mechanisms used for curing such compliant material, (ii) the location(s) of semiconductor chips and chip package assembles during the step of curing such compliant material, (iii) the pressure(s) in the location(s) during the step of curing such compliant material, (iv) the temperature(s) in the location(s) during the step of curing such compliant material, (v) the composition of any gases present in such location(s) during the step of curing such compliant material, and (vi) the time elapsed during the step of curing such compliant material.

### REQUEST FOR PRODUCTION NO. 38:

Separately for each Broadcom Accused Packaging Product, documents sufficient to show the complete process and mechanisms used for eliminating gas bubbles and voids within any resin, mold, silicone, epoxy, or other compliant material dispensed and applied in, on, or around semiconductor chips and chip package assemblies used in Broadcom Accused Packaging Products, during the steps of dispensing, applying and curing any such compliant material.

### REQUEST FOR PRODUCTION NO. 39:

Separately for each Broadcom Accused Packaging Product, documents sufficient to describe the manufacturing process used to encapsulate each semiconductor device in the product, including but not limited to documents sufficient to show: (a) the location, composition, and thickness of any material, including but not limited to any dielectric and thixotropic composition, or any material, that is deposited or applied during that process; (b) the use of any mold or frame or coverlay in that process; (c) the use of any shearing forces applied to any thixotropic material or composition; (d) the temperatures used during each step of the process; (e) the viscosities of any thixotropic material or composition during each step of the process; and (f) all mechanisms used for curing the encapsulated product.

**REQUEST FOR PRODUCTION NO. 40:**

All documents relating to the use of thixotropic compositions or materials in any
Broadcom Accused Packaging Product.

**REQUEST FOR PRODUCTION NO. 41:**

All documents relating to the application of shearing forces in any Broadcom Accused
Packaging Product.

**REQUEST FOR PRODUCTION NO. 42:**

Separately for each Broadcom Accused Interconnect Product, documents sufficient to
describe each semiconductor chip in any Broadcom Accused Interconnect Products including the
following: (a) location, structure, composition, overall shape (including planarity, as well as any
and all slopes, angles, and radii of curvature), size, and thickness of each layer and any and all
gaps within each layer, of material that is deposited on, patterned on, or removed from the
semiconductor wafer during fabrication and packaging of the semiconductor chip; (b) the
resulting layer structure semiconductor chip including the relative spacing of the materials within
each layer; and (c) the electrical connections between each portion of the semiconductor chip.

**REQUEST FOR PRODUCTION NO. 43:**

Separately for each Broadcom Accused Interconnect Product, documents sufficient to
describe and show each layer of wiring, solder, electrode, contact, or other interconnect
material—including each alloy layer therebetween—and each layer of insulating material
adjacent to each such interconnect material, in connection with any semiconductor chip,
including, the location, structure, composition, overall shape (including planarity, as well as any
and all slopes, angles, and radii of curvature), size, and thickness of all such layers, and any and
all gaps within such layers.

**REQUEST FOR PRODUCTION NO. 44:**

Separately for each Broadcom Accused Interconnect Product, process characterization images relating to each layer of wiring, solder, electrode, contact, or other interconnect material—including each alloy layer therebetween—and each layer of insulating material adjacent to each such interconnect material, deposited on, patterned on, or removed from the semiconductor chip during fabrication of the semiconductor chip, including without limitation photographs, scanning electron microscopy images, photomicrographs, atomic force microscopy, surface profilometry, transmission electron microscopy, and including without limitation cross-sectional, bevel, and top-view images, of any such layer relating to any Broadcom Accused Interconnect Products, and documents sufficient to identify the location in the chip that is depicted in each image.

**REQUEST FOR PRODUCTION NO. 45:**

Separately for each Broadcom Accused Interconnect Product, documents sufficient to describe the manner in which any layer of wiring, solder, electrode, contact, or other interconnect material—including any alloy layer therebetween—and each layer of insulating material adjacent to each such interconnect material, is laid out in each Broadcom Accused Interconnect Products.

**REQUEST FOR PRODUCTION NO. 46:**

Separately for each Broadcom Accused Product, documents sufficient to show the (a) number of units sold and the sales price for those units on a monthly basis from May 23, 2010, to the present; (b) name and address of the person to which those products were sold based on how the sale was booked by Broadcom; (c) name and address of the person that paid for those products based on Broadcom's receipt of that payment; (d) name and address of the person to which those products were delivered; and (e) projected number of units to be sold and the

25

projected sales price for those units on a monthly or quarterly basis for the time period May 23, 2010 through trial.

### REQUEST FOR PRODUCTION NO. 47:

Separately for each Broadcom Accused Product, documents relating to each importation into the United States, including the date of importation, the quantity imported, the declared value in U.S. dollars, the importer(s), the port of entry, the person and location to which the shipment was delivered.

### REQUEST FOR PRODUCTION NO. 48:

Copies of your annual reports (including any Form 10Ks) for the annual or fiscal years 2010 through present, and any other investment documents (including any prospectus) prepared since May 23, 2010.

### REQUEST FOR PRODUCTION NO. 49:

All documents related to market or industry reports or studies related to any Broadcom Accused Product, and dated during the period of May 23, 2010 though the present.

### REQUEST FOR PRODUCTION NO. 50:

All documents related to business and product development plans relating to any Broadcom Accused Product.

### REQUEST FOR PRODUCTION NO. 51:

Documents sufficient to identify each distributor and each customer of each Broadcom Accused Product that is made, used, sold, or offered for sale, in the United States, or imported into the United States.

### REQUEST FOR PRODUCTION NO. 52:

Separately for each Broadcom Accused Product, documents sufficient to identify: (a) the dates of first manufacture, sale, and offer for sale in the United States; (b) the dates of first

26

importation into the United States; (c) the unit volume and dollar value of sales made in the

United States; (d) the unit volume and dollar value of sales made abroad for importation into the

United States; and (e) the unit volume of importations into the United States.

### REQUEST FOR PRODUCTION NO. 53:

Separately for each Broadcom Accused Product, all documents that disclose the supply

chain for each product, starting with the manufacture of each product (e.g., geographic location

of manufacture) and ending with the sale of the product (whether made to a distributor, a

wholesaler, a retailers, or directly to a customer), including documents that identify any third

party involved in any part of the supply chain, that party's role, and the dates of that party's

involvement.

### REQUEST FOR PRODUCTION NO. 54:

All documents relating to any ownership interest in or your acquisition of any and all

entities that have produced, made, used, sold, manufactured, licensed, leased, imported, or

exported any Broadcom Accused Product. This request encompasses, but is not limited to: (a)

forecasts; (b) valuations; (c) due diligence; (d) financial analyses; (e) documents concerning

legal claims and/or indemnifications; (f) documents concerning notices of infringement; (g)

documents concerning licensing; and (h) documents concerning any patent (including without

limitation the Asserted Patents).

### REQUEST FOR PRODUCTION NO. 55:

Documents relating to Broadcom's knowledge of the Asserted Patents and/or alleged

infringement of one or more of the Asserted Claims of the Asserted Patents, including but not

limited to documents: (a) sufficient to identify the date on which Broadcom first became aware

of the Asserted Patents; (b) sufficient to identify when Broadcom first became aware of its

alleged infringement of any Asserted Claim of any Asserted Patent; (c) explaining the

circumstances surrounding that awareness; (d) documents relating to any investigation conducted

by Broadcom and any conclusions that it reached with regard to the Asserted Patents and the

alleged infringement.

**REQUEST FOR PRODUCTION NO. 56:**

All documents relating to any effort by Broadcom or any other person to design,

redesign, commercialize or modify any Broadcom Accused Product or any product containing

the same in view of the Asserted Patents.

**REQUEST FOR PRODUCTION NO. 57:**

All documents and things relating to any prototype or commercially-available

semiconductor device, semiconductor device package or product containing the same that is, in

Broadcom's view, a design around or non-infringing alternative to one or more of the Broadcom

Accused Products.

**REQUEST FOR PRODUCTION NO. 58:**

All documents relating to whether there are products, devices, processes, or systems that

are allegedly competitive with, interchangeable with, or possible replacements for the inventions

claimed in the Asserted Patents.

**REQUEST FOR PRODUCTION NO. 59:**

For each claim term in the Asserted Claims of the Asserted Patents that Broadcom will

seek or is seeking to have construed, documents relating to Broadcom's proposed construction of

the claim, including all intrinsic and extrinsic evidence that supports that proposed construction.

**REQUEST FOR PRODUCTION NO. 60:**

All documents that relate to the validity, alleged invalidity, enforceability, alleged

unenforceability, patentability, or alleged non-patentability of any claim of the Asserted Patents.

**REQUEST FOR PRODUCTION NO. 61:**

All documents or things that relate to or constitute Prior Art or alleged Prior Art to any claim of the Asserted Patents.

**REQUEST FOR PRODUCTION NO. 62:**

For each Asserted Patent, documents relating to the relevant field of art and the relevant level of ordinary skill in the art.

**REQUEST FOR PRODUCTION NO. 63:**

All documents relating to the need, perceived need, or alleged lack of need for the inventions claimed in the Asserted Patents.

**REQUEST FOR PRODUCTION NO. 64:**

All documents that relate to the importance, value, commercial success, industry acceptance of, or long-felt need for any invention claimed in the Asserted Patents.

**REQUEST FOR PRODUCTION NO. 65:**

Separately for each Broadcom Accused Product, documents sufficient to disclose the results of your commercial activities relating to the product, including the total quantity made, used, tested, sold, offered for sale, imported, exported, leased, distributed, or licensed in the United States.

**REQUEST FOR PRODUCTION NO. 66:**

All documents that relate to the importance, value, commercial success, industry acceptance of, or long-felt need, or unexpected results for any invention claimed in the Asserted Patents.

**REQUEST FOR PRODUCTION NO. 67:**

Documents sufficient to show your past and present organizational structure, including all parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, groups, departments, business lines or other organizational units.

**REQUEST FOR PRODUCTION NO. 68:**

Organization charts or other documents sufficient to show Broadcom's corporate organization relating to the research and development, engineering, design, fabrication, manufacture, testing, packaging and/or assembly of the Broadcom Accused Products, including identification of the groups, departments, teams or other business units involved with those activities and names of the individuals in those groups, departments, teams or other business units.

**REQUEST FOR PRODUCTION NO. 69:**

Broadcom's document retention policies, including policies relating to storage, maintenance and retention of electronically-stored information.

**REQUEST FOR PRODUCTION NO. 70:**

Documents sufficient to describe all databases, data warehouses, repositories, servers, shared drives, websites, portals, or other locations (collectively "source locations") where documents, information, source code, schematics, design rules, GDSII files, and/or any other electronic files relating to the Broadcom Accused Products are located, including: (a) all source locations that you maintain; (b) all source locations maintained by any third party that are available to some or all of your employees; (c) all source locations that contain financial information relating to the Broadcom Accused Products; and (d) all source locations that are made available to Broadcom customers, Broadcom foundries, Broadcom OSATs, and/or any other Broadcom business partners.

30

**REQUEST FOR PRODUCTION NO. 71:**

All documents that relate to infringement or alleged non-infringement of any Asserted Claim of the Asserted Patents by any Broadcom Accused Product or any product containing the same.

**REQUEST FOR PRODUCTION NO. 72:**

All documents relating to any use of any Broadcom Accused Product or any product containing the same that allegedly does not infringe any Asserted Claim of the Asserted Patents, including all documents relating to any alleged substantial non-infringing use for any Broadcom Accused Product or any product containing the same.

**REQUEST FOR PRODUCTION NO. 73:**

All written discovery responses served by you in any prior litigation or proceeding relating to interconnects, packaging, voltage reference circuits and/or level shifters in one or more of the Broadcom Accused Products.

**REQUEST FOR PRODUCTION NO. 74:**

All expert reports relating to interconnects, packaging, voltage reference circuits and/or level shifters in one or more of the Broadcom Accused Products that were served in any prior litigation.

**REQUEST FOR PRODUCTION NO. 75:**

All documents constituting or containing testimony or statements from any Broadcom current or former employee or any expert relating to interconnects, packaging, voltage reference circuits, and/or level shifters in one or more of the Broadcom Accused Products, including but not limited to transcripts, affidavits, declarations, or other written statements.

**REQUEST FOR PRODUCTION NO. 76:**

All documents relating to or supporting your defenses.

31

**REQUEST FOR PRODUCTION NO. 77:**

All documents you reviewed or relied upon in preparing your Answer to Tessera's

original Complaint and/or Tessera's First Amended Complaint.

**REQUEST FOR PRODUCTION NO. 78:**

All documents relating to or discussing one or more of the Asserted Claims, Asserted

Patents, patents related to an Asserted Patent, and/or foreign counterparts to an Asserted Patent,

including but not limited to any documents that discuss whether or not any Asserted Claim,

Asserted Patent, related patent or foreign counterpart reads on or is infringed by any Broadcom

Accused Product.

**REQUEST FOR PRODUCTION NO. 79:**

All documents relating to or discussing Tessera, this Action, and/or any other litigation or

proceeding that involves an Asserted Patent, related patent or foreign counterpart to an Asserted

Patent.

**REQUEST FOR PRODUCTION NO. 80:**

All communications with any third party relating to or discussing Tessera, this Action,

and/or any other litigation or proceeding that involves an Asserted Patent, related patent or

foreign counterpart to an Asserted Patent.

**REQUEST FOR PRODUCTION NO. 81:**

All documents relating to any requests for reexamination or review of any Asserted

Claims or Asserted Patents, or any other proceedings relating to any Asserted Claim or Asserted

Patent.

**REQUEST FOR PRODUCTION NO. 82:**

Documents sufficient to show any established policies and practices for avoiding

infringement of others' patent rights, including documents that disclose: (a) any internal system

or process that has been used by you for identifying, reviewing, evaluating, or tracking

intellectual property rights that could potentially cover any of the Broadcom Accused Products;

(b) the date you first implemented any such policies and practices; and (c) how you educate your

employees about any such policies and practices.

### REQUEST FOR PRODUCTION NO. 83:

All documents relating to any named inventor of the Asserted Patents.

### REQUEST FOR PRODUCTION NO. 84:

All minutes and other documents relating to any meeting, whether formal or informal, of

your board of directors (or the equivalent) that refer or relate to Tessera or the Asserted Patents.


Dated: August 9, 2016                          Respectfully submitted,

Of Counsel:                                    FARNAN LLP

Robert T. Haslam                               */s/ Brian E. Farnan*
Thomas E. Garten                               Brian E. Farnan (Bar No. 4089)
COVINGTON & BURLING LLP                        Michael J. Farnan (Bar No. 5165)
333 Twin Dolphin Drive, Suite 700              919 North Market Street
Redwood Shores, CA 94065-1418                  12th Floor
Telephone: (650) 632-4700                      Wilmington, DE 19801
Facsimile: (650) 632-4800                      Telephone: (302) 777-0300
rhaslam@cov.com                                Facsimile: (302) 777-0301
asharma@cov.com                                bfarnan@farnanlaw.com
                                               mfarnan@farnanlaw.com
Michael K. Plimack
Nitin Subheader
Dale A. Rice
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
mplimack@cov.com
nsubheader@cov.com

Laura E. Muschamp
Christopher K. Eppich
COVINGTON & BURLING LLP

Tessera's First Set of Requests for Production                    16-cv-380-LPS-CJB
to Broadcom

9191 Towne Centre Drive, 6th Floor
San Diego, CA 92122
Telephone: (858) 678-1800
Facsimile: (858) 678-1600
lmuschamp@cov.com
ceppich@cov.com

34

## CERTIFICATE OF SERVICE

I, Brian E. Farnan, hereby certify that on August 9, 2016, a copy of Tessera's First Set of

Requests for Production of Documents and Things to Broadcom Corporation (Nos. 1-84) was

served on the following as indicated:

Via Hand Delivery and E-Mail
Adam W. Poff
Pilar G. Kraman
YOUNG CONAWAY STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
apoff@ycst.com
pkraman@ycst.com

*Attorneys for Defendant Broadcom
Corporation*

Via E-Mail
David E. Sipiora
Robert J. Artuz
Kevin J. O'Brien
Jonathan D. Olinger
KILPATRICK TOWNSEND &
STOCKTON LLP
dsipiora@kilpatricktownsend.com
rartuz@kilpatricktownsend.com
kobrien@kilpatricktownsend.com
jolinger@kilpatricktownsend.com

Ramy E. Hanna
Steven J. Rizzi
FOLEY & LARDNER LLP
rhanna@foley.com
srizzi@foley.com

*Attorneys for Defendant Broadcom
Corporation*

 /s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TESSERA, INC. and TESSERA ADVANCED TECHNOLOGIES, INC., | ) ) ) |
| Plaintiffs, | ) C.A. No. 16-380-LPS-CJB ) ) |
| v. | ) ) |
| BROADCOM CORPORATION, | ) ) |
| Defendant. | ) ) |

## TESSERA'S FIRST SET OF INTERROGATORIES
## TO BROADCOM CORPORATION

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Stipulation Concerning Certain Procedural and Discovery Matters (D.I. 46), Plaintiffs Tessera, Inc. and Tessera Advanced Technologies, Inc. (collectively, "Tessera") request that Defendant Broadcom Corporation answer the following interrogatories in writing within 30 days of service.

### DEFINITIONS

1.      The terms "Broadcom," "you," and "your" mean Broadcom Corporation and all predecessors, successors, parents, subsidiaries, affiliates, directors, officers, agents, representatives, consultants, attorneys, or other persons that are acting or have acted on behalf of Broadcom.

2.      The terms "document" and "documents" have the broadest possible meaning under Rule 34 of the Federal Rules of Civil Procedure, and include information recorded or stored in any form whatsoever, including without limitation electronically stored information. Any non-identical copy of a document, including without limitation copies bearings comments or notations that are not part of the original text, is to be considered a separate "document."

3.      The terms "relate to," "relating to," or "regarding," mean discussing, summarizing, showing, comprising, referring to, mentioning, containing, stating, describing, embodying, evidencing, constituting, dealing with, pertaining or relating to in any way, or in any other manner concerned with the referenced subject matter, and shall be construed in the most inclusive sense.

4.      The terms "person" and "persons" include both natural persons and entities, including corporations, proprietorships, partnerships, associations, joint ventures, governmental agencies, any other legal entity, any combination thereof, and all predecessors in interest, successors, affiliates, subsidiaries, and related entities.

5.      The terms "and," "or," and "and/or" shall be construed in the conjunctive or the disjunctive to read the request at its most inclusive.

6.      The term "any" shall include the word all, and vice versa.

7.      The term "each" shall mean each and every.

8.      The terms "'046 Accused Product" and "'046 Accused Products" mean any and all of the following:

- Broadcom's BCM4330 and BCM4334 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4330 and BCM4334, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar voltage reference circuit designs as the products identified above.

9.      The terms "'699 Accused Product" and "'699 Accused Products" mean any and all of the following:

- Broadcom's BCM4334 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4334, and all products containing the same; and

2

- All other Broadcom semiconductor devices with the same or a substantially similar level shifter designs as the products identified above.

    10.    The terms "'563 Accused Product" and "'563 Accused Products" mean any and

all of the following:

- Broadcom's BCM20715 and BCM2076 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM20715 and BCM2076, and all products containing the same;

- Broadcom's BCM4330, BCM4334, BCM43341, BCM43362, BCM43455, BCM4354, BCM43540, and BCM4356 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4330, BCM4334, BCM43341, BCM43362, BCM43455, BCM4354, BCM43540, and BCM4356, and all products containing the same;

- Broadcom's BCM47511, BCM4752, BCM47521, BCM47531, and BCM47731 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM47511, BCM4752, BCM47521, BCM47531, and BCM47731, and all products containing the same;

- Broadcom's BCM59054 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM59054, and all products containing the same;

- Broadcom's BCM5976 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM5976, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar interconnect structure as the products identified above.

    11.    The terms "'001 Accused Product" and "'001 Accused Products" mean any and

all of the following:

- Broadcom's BCM20715 and BCM2076 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM20715 and BCM2076, and all products containing the same;

- Broadcom's BCM4330, BCM4334, BCM43341, BCM43362, BCM43455, BCM4354, BCM43540, and BCM4356 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4330, BCM4334, BCM43341, BCM43362, BCM43455, BCM4354, BCM43540, and BCM4356, and all products containing the same;

- Broadcom's BCM47511, BCM4752, BCM47521, BCM47531, and BCM47731 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM47511, BCM4752, BCM47521, BCM47531, and BCM47731, and all products containing the same;

- Broadcom's BCM59054 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM59054, and all products containing the same;

- Broadcom's BCM5976 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM5976, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar interconnect structure as the products identified above.

    12.    The terms "'215 Accused Product" and "'215 Accused Products" mean any and

all of the following:

- Broadcom's BCM15700 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM15700, and all products containing the same;

- Broadcom's BCM23550 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM23550, and all products containing the same;

- Broadcom's BCM3380, BCM3383 and BCM33843 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM3380, BCM3383, and BCM33843, and all products containing the same;

- Broadcom's BCM4709 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4709, and all products containing the same;

- Broadcom's BCM53334 and BCM56850 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM53333 and BCM56850, and all products containing the same;

- Broadcom's BCM57810 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM57810, and all products containing the same;

- Broadcom's BCM63137 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM63137, and all products containing the same;

- Broadcom's BCM7405, BCM7425, BCM7435, and BCM7449 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM7405, BCM7425, BCM7435, and BCM7449, and all products containing the same;

- Broadcom's BCM7630 and BCM7634 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM7630 and BCM7634, and all products containing the same;

- Broadcom's BCM84833 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM84833, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar packaging as the products identified above.

13.     The terms "'605 Accused Product" and "'605 Accused Products" mean any and

all of the following:

- Broadcom's BCM21553 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM21553, and all products containing the same;

- Broadcom's BCM43241, BCM4336, BCM43569, and BCM43570 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM43241, BCM4336, BCM43569, and BCM43570 or other Broadcom WiFi 802.11 semiconductor devices, and all products containing the same; and

- All other Broadcom semiconductor devices with the same or a substantially similar packaging as the products identified above.

14.     The terms "'076 Accused Product" and "'076 Accused Products" mean any and

all of the following:

- Broadcom's BCM20795 and BCM20702 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM20795 and BCM20702, and all products containing the same;

- Broadcom's BCM2035, BCM2042, BCM2045, BCM2046, BCM2048, and BCM20702 semiconductor devices, all Broadcom semiconductor devices that are the same or

substantially similar to the BCM2035, BCM2042, BCM2045, BCM2046, BCM2048, and BCM20702, and all products containing the same;

- Broadcom's BCM2091 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM2091, and all products containing the same;

- Broadcom's BCM2133, BCM21352, and BCM21553 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM2133, BCM21352, and BCM21553, and all products containing the same;

- Broadcom's BCM2727 and BCM2763 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM2727 and BCM2763, and all products containing the same;

- Broadcom's BCM4318, BCM4322, BCM43231, BCM4323, BCM43241, BCM4329, BCM4336, BCM43569, BCM43570 and BCM5357 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4318, BCM4322, BCM43231, BCM4323, BCM43241, BCM4329, BCM4336, BCM43569, BCM43570 and BCM5357, and all products containing the same;

- Broadcom's BCM4717, BCM4718, and BCM47186 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4717, BCM4718, and BCM47186, and all products containing the same;

- Broadcom's BCM4751 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM4751, and all products containing the same;

- Broadcom's BCM53115 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM53115, and all products containing the same;

- Broadcom's BCM5722 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM5722, and all products containing the same;

- Broadcom's BCM59036 semiconductor device, all Broadcom semiconductor devices that are the same or substantially similar to the BCM59036, and all products containing the same;

- Broadcom's BCM5973 and BCM5974 semiconductor devices, all Broadcom semiconductor devices that are the same or substantially similar to the BCM5973 and BCM5974, and all products containing the same; and

6

- All other Broadcom semiconductor devices with the same or a substantially similar packaging as the products identified above.

15.    The terms "Broadcom Accused Product" and "Broadcom Accused Products" mean, collectively, the '563, '001, '046, '699, '215, '605, and '076 Accused Products, and include without limitation any Broadcom Accused Product (1) sold in the United States by any person or entity, whether or not incorporated into a Downstream Product; (2) offered for sale in the United States by any person or entity, whether or not incorporated into a Downstream Product; or (3) imported or will be imported into the United States, sold for importation into the United States, and/or sold within the United States after importation by any person or entity, whether or not incorporated into a Downstream Product.

16.    The terms "Broadcom Accused Circuit Product" and "Broadcom Accused Circuit Products" mean the '046 Accused Products and '699 Accused Products, collectively.

17.    The terms "Broadcom Accused Interconnect Product" and "Broadcom Accused Interconnect Products" mean the '563 Accused Products and '001 Accused Products, collectively.

18.    The terms "Broadcom Accused Packaging Product" and "Broadcom Accused Packaging Products" mean the '215 Accused Products, '605 Accused Products, and '076 Accused Products, collectively.

19.    "Downstream Product" means any product or device incorporating one or more Broadcom Accused Products, including but not limited to cell phones, smart phones, digital music players, laptop or tablet computers, or other mobile devices, consumer electronics, or automotive products.

20.    The terms "Broadcom foundry" and "Broadcom foundries" mean one or more of the foundry subcontractors that have provided or are providing fabrication, manufacturing,

and/or testing services with regard to any Broadcom Accused Product or any wafer, chip or die for any Broadcom Accused Product, including but not limited to (a) Taiwan Semiconductor Manufacturing Company; (b) United Microelectronics Corporation; (c) Semiconductor Manufacturing International Corporation; (d) GlobalFoundries, Inc. (formerly Chartered Semiconductor Manufacturing); (e) predecessors, successors, parents, subsidiaries, affiliates, directors, officers, agents, representatives, consultants, and attorneys of the above-named entities, and any other person that is acting or has acted on their behalf; and (f) any other person that has provided or is providing any type of fabrication, manufacturing, testing, assembly, and/or packaging services to Broadcom, directly or indirectly, with regard to any Broadcom Accused Product.

21.     The terms "Broadcom OSAT" and "Broadcom OSATs" mean one or more of the assembly and packaging subcontractors that have provided or are providing testing, assembly and/or packaging services with regard to any Broadcom Accused Product or any wafer, chip or die for any Broadcom Accused Product, including but not limited to (a) Advanced Semiconductor Engineering; (b) Siliconware Precision Industries; (c) United Test and Assembly Center; (d) Amkor Technology, Inc.; (e) STATS ChipPAC; (f) Signetics High Technology, Inc.; (g) predecessors, successors, parents, subsidiaries, affiliates, directors, officers, agents, representatives, consultants, and attorneys of the above-named entities, and any other person that is acting or has acted on their behalf; and (h) any other person that has provided or is providing any type of fabrication, manufacturing, testing, assembly, and/or packaging services to Broadcom, directly or indirectly, with regard to any Broadcom Accused Product.

22.     "Manufacture" means to make, whether experimentally or commercially.

**INSTRUCTIONS**

1.       There interrogatories are continuing in nature, and shall be supplemented or modified as required by Fed. R. Civ. P. 26(e) to the fullest extent possible.

2.       If Broadcom answers any interrogatory, in whole or in part, by producing documents in accordance with Fed. R. Civ. P. 33(d), specify by production number the specific document or group of documents responsive to the interrogatory.

3.       Unless otherwise specified, the relevant time period for these interrogatories is May 23, 2010 through the trial date set in this case.

4.       If in responding to any interrogatory, you object to any interrogatory or any portion thereof, you should identify the portion to which you object, explain the basis of the objection, and respond to the portion of the interrogatory to which you do not object.

5.       In the event that you object to any interrogatory on the ground that you contend it is overbroad and/or unduly burdensome for any reason, answer the interrogatory as narrowed to the least extent necessary, in your judgment, to render it not overbroad/unduly burdensome, and state specifically the extent to which you have narrowed the interrogatory for purposes of your response.

6.       If in responding to any interrogatory, you claim ambiguity in either the interrogatory or a definition or an instruction applicable thereto, identify in your response the language you consider ambiguous and state the interpretation you used to respond to the interrogatory.

7.       If in responding to any interrogatory, you withhold the answer to all or part of the interrogatory on the claim of privilege, work product, or other privilege or immunity, you shall state the specific factual and legal basis for doing so and answer any part of the interrogatory which is not alleged to be privileged.  The information regarding the factual and legal basis for

9

the assertion of privilege should be supplied in sufficient detail to permit Plaintiffs to assess the applicability of the privilege claimed.

## INTERROGATORIES

### INTERROGATORY NO. 1:

For each Broadcom Accused Product, provide all identifying information used to classify each product including but not limited to the following: (a) the product name (e.g., Broadcom's core part number/high level marketing part number); (b) the short product number (e.g., Broadcom's mid-level marketing part number); (c) the extended product number(s) (e.g., Broadcom's i-part number); (d) the family or series of products that the product belongs to; (e) any internal names, code names, or project names for the product; (f) any other designations used by you or any of the Broadcom foundries or Broadcom OSAT's to refer to the product; and (g) the type of product it is.

### INTERROGATORY NO. 2:

For each Broadcom Accused Packaging Product and Broadcom Accused Interconnect Product and each semiconductor device in those products, describe in detail how the Broadcom Accused Packaging Product or Broadcom Accused Interconnect Product and the semiconductor devices in those products are engineered, designed, fabricated, manufactured, packaged, and assembled including but not limited to a description of the following: (a) the technology node; (b) the packaging type; (c) the names of the Broadcom foundry(ies) and Broadcom OSAT's that fabricated, manufactured, packaged and/or assembled the Broadcom Accused Packaging Product or Broadcom Accused Interconnect Product and the semiconductor devices in the product; (d) a list of the equipment used in the fabrication and packaging of the products; (e) the type of dispensing used for the underfill and/or encapsulant (e.g. needle dispensing), and (f) the design rules used in the fabrication of the product.

**INTERROGATORY NO. 3:**

For each Broadcom Accused Interconnect Product, describe in detail each layer in the product including: (a) each layer of wiring, solder, electrode, contact, or other interconnect material—including each alloy layer therebetween—and each layer of insulating material adjacent to each such interconnect material added by a Broadcom foundry or Broadcom OSAT, in connection with any semiconductor chip, including, the location, structure, composition, overall shape (including planarity, as well as any and all slopes, angles, and radii of curvature), size, and thickness of all such layers, and any and all gaps within such layers; (b) each layer of dielectric, resin and other compliant materials including but not limited to silicone, epoxy, polyimide, and polymer materials added by a Broadcom foundry or Broadcom OSAT, in connection with any semiconductor chip, including, the location, structure, composition, overall shape (including planarity, as well as any and all slopes, angles, and radii of curvature), size, and thickness of all such layers, and any and all gaps within such layers; and (c) the process by which each layer identified in (a) and (b) is laid out in each Broadcom Accused Interconnect Products.

**INTERROGATORY NO. 4:**

For each Broadcom Accused Product, identify the Broadcom employee(s) responsible for interacting with the foundry(ies) and OSATs identified in response to Interrogatory No. 1, including (a) the identification of each Broadcom employee by name, title, location and job responsibilities, (b) the identification of each employee of the foundry and/or OSAT, by name, company and title, that each identified Broadcom employee has communicated with regarding the fabrication or manufacture of the Broadcom Accused Product, (c) the frequency that each Broadcom employee travels to the foundry and/or OSAT, and (d) a description of any electronic access provided to Broadcom by its foundry(ies) and/or OSATs for the exchange of information regarding Broadcom products.

**INTERROGATORY NO. 5:**

For each Broadcom Accused Circuit Product, provide the following information related to the design of the level shifters and voltage regulators: (a) the lead designer for the product; (b) the designer(s) of the power management units in the product; (c) the designer(s) of the level shifter in the product, (d) the designer(s) of the voltage regulator in the product, (e) the product numbers (including at least core product numbers, marketing part numbers and i-part numbers) of any additional products designed by the designers identified in (a) through (d) above, (f) the library names or other designations assigned for the voltage regulator and/or level shifter design in the Broadcom Accused Circuit Products in a Process Development Kit ("PDK") for a given process technology or node; and (g) the product names (including at least core product numbers, marketing part numbers and i-part numbers) of any additional products that use the same level shifter and/or voltage regulator design in the Broadcom Accused Circuit Products or that are based on the same level shifter and/or voltage regulator design.

**INTERROGATORY NO. 6:**

Set forth the basis for your contentions regarding any affirmative defenses you have asserted or may assert in this litigation including the legal and factual bases for each such contention, and an identification of the documents or other evidence that you allege supports each such contention.

**INTERROGATORY NO. 7:**

Separately for each Broadcom Accused Product and each Asserted Claim that you contend is not infringed, set forth the basis for your contention that the claim is not infringed by providing a claim chart for each Broadcom Accused Product that identifies, on a limitation-by-limitation basis, each claim limitation that you contend is not met, explains the basis for your position that the limitation is not met (either literally and under the doctrine of equivalents),

identifies the persons knowledgeable about those contentions, and identifies all documents, tests, experiments, data or other evidence that you rely on to support your contention.


Dated: January 13, 2017

Of Counsel:

Robert T. Haslam
Thomas E. Garten
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
rhaslam@cov.com
asharma@cov.com

Michael K. Plimack
Nitin Subheader
Dale A. Rice
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
mplimack@cov.com
nsubheader@cov.com

Laura E. Muschamp
Christopher K. Eppich
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 1500
Los Angeles, CA 90067
Telephone: (424)332-4800
lmuschamp@cov.com
ceppich@cov.com

Respectfully submitted,

FARNAN LLP

*/s/ Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street
12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

13

## <u>CERTIFICATE OF SERVICE</u>

I, Brian E. Farnan, hereby certify that on January 13, 2017, a copy of Tessera's First Set

of Interrogatories to Broadcom Corporation was served on the following as indicated:


<u>Via Hand Delivery and E-Mail</u>
Adam W. Poff
Pilar G. Kraman
YOUNG CONAWAY STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
apoff@ycst.com
pkraman@ycst.com

*Attorneys for Defendant Broadcom
Corporation*

<u>Via E-Mail</u>
David E. Sipiora
Robert J. Artuz
Kevin J. O'Brien
Jonathan D. Olinger
KILPATRICK TOWNSEND &
STOCKTON LLP
dsipiora@kilpatricktownsend.com
rartuz@kilpatricktownsend.com
kobrien@kilpatricktownsend.com
jolinger@kilpatricktownsend.com

Ramy E. Hanna
Steven J. Rizzi
FOLEY & LARDNER LLP
rhanna@foley.com
srizzi@foley.com

*Attorneys for Defendant Broadcom
Corporation*

 /s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)

# EXHIBIT 3

**REDACTED**

# EXHIBIT 4

# REDACTED

# EXHIBIT 5

**REDACTED**

# EXHIBIT 6

**REDACTED**

# EXHIBIT 7

**REDACTED**

# EXHIBIT 8

**REDACTED**

# EXHIBIT 9

# REDACTED

# EXHIBIT 10

**REDACTED**

# EXHIBIT 11

**REDACTED**

# EXHIBIT 12

# COVINGTON

BEIJING  BRUSSELS  LONDON  LOS ANGELES
NEW YORK  SAN FRANCISCO  SEOUL
SHANGHAI  SILICON VALLEY  WASHINGTON

Dale A. Rice

Covington & Burling LLP
One Front Street
San Francisco, CA 94111-5356
T  +1 415 591 7081
drice@cov.com

June 22, 2017

**Via E-Mail as PDF Attachment**

David E. Sipiora
Matthew C. Holohan
Kilpatrick Townsend & Stockton LLP
1400 Wewatta Street, Suite 600
Denver, CO 80202

Steven J. Rizzi
Ramy E. Hanna
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016-1314

Jonathan D. Olinger
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, Georgia 30309-4528

Debra A. Lange
Foley & Lardner LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007

Re:    *Tessera, Inc. and Tessera Advanced Technologies, Inc. v. Broadcom
       Corporation*, Civil Action No. 16-cv-380-LPS-CJB

Counsel for Broadcom:

We write with regard to Broadcom's failure to timely produce "sales figures for the
accused products" as required by the Scheduling Order (D.I. 41 at 7.b) and its continuing failure
to produce sales data as called for by Request for Production No. 46. These failures were
addressed in Tessera's April 26, 2017 letter and during our meet and confer on May 25, 2017.
Broadcom indicated that it would remedy at least some of these deficiencies, but we have yet to
receive any supplemental production. As a result, none of the deficiencies outlined in the April
26, 2017 has been cured.

In addition, we understand that Broadcom continues to limit its production to products
that Broadcom itself has sold in the United States or has shipped to a location in the United
States. U.S. sales for damages purposes are not so restricted, as discussed in the April 16, 2017
letter, during the meet and confer, and in the recent recommendation from Magistrate Judge
Payne in *Godo Kaisha IP Bridge 1 v. Broadcom Limited, et al.*, Civil Action No. 2:16-CV-
00134-JRG. At a minimum, Tessera is entitled to discovery to determine which Broadcom sales
may qualify as U.S. sales. During the meet and confer, Broadcom stated that it would not
produce wholesale worldwide sales data, but that it might consider a more limited proposal. We
asked at that time whether Broadcom would agree to produce worldwide sales data for its largest
customers (Apple and Samsung) given that products containing Broadcom chips are indisputably
being imported into the United States. Broadcom did not agree to do so, but again said it would
consider a proposal from Tessera.

June 22, 2017
Page 2

     In an attempt to bridge the wide gap between the parties, Tessera proposes that Broadcom supplement its response to Request for Production No. 46 to provide worldwide sales data for the Top 20 Broadcom Customers as that term is defined in Tessera's Second Set of Requests for Production. Based on the public information about Broadcom's largest and more significant customers, it appears that all of those customers are importing at least some products into the United States.

     On a related issue, we have a concern that Broadcom has limited its production of core and other technical documents even for the products specifically identified by Tessera based on Broadcom's narrow view of what constitutes a U.S. sale. Specifically, Broadcom has intimated that core and other technical documents have not been produced for the identified accused products if Broadcom itself did not sell the products in the U.S. or ship them to a location in the U.S. Since we do not have the sales figures and data called for, we cannot determine whether gaps in Broadcom's production are in fact due to this unilateral decision by Broadcom to limit discovery based on its unduly restrictive definition of U.S. sales. We therefore ask that Broadcom confirm that it has produced or will produce core documents and the other technical documents called for by Tessera's document requests for all identified accused products. We also expect Broadcom to produce these documents for any products subsequently identified and other reasonably similar products.

     As we need to make progress on these issues, please provide a time to meet and confer next week.

Very truly yours,

Dale A. Rice

# EXHIBIT 13

# REDACTED

# EXHIBIT 14

# REDACTED

# EXHIBIT 15

**REDACTED**

# EXHIBIT 16

**REDACTED**

# EXHIBIT 17

# REDACTED

# EXHIBIT 18

**REDACTED**

# EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GODO KAISHA IP BRIDGE 1, | § | |
| | § | |
| | § | CIVIL ACTION NO.  2:16-CV-00134-JRG |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BROADCOM LIMITED, BROADCOM | § | |
| CORPORATION, AVAGO | § | |
| TECHNOLOGIES, LTD., AVAGO | § | |
| TECHNOLOGIES U.S., INC., LSI | § | |
| CORPORATION, | | |
| | | |
| Defendants. | | |

## REPORT AND RECOMMENDATION

The Court recommends the Motion for Partial Summary Judgment (Dkt. No. 214) (the "Motion") be **DENIED**.

The question before the Court is whether a reasonable juror could find that Defendants' products that are ordered, manufactured, shipped, billed, and delivered to buyers abroad ("Foreign Products") are sales within the United States under 35 U.S.C. § 271.

## BACKGROUND

1.     Broadcom is a fabless semiconductor company.  "Fabless" manufacturers design and sell hardware devices and semiconductor chips while outsourcing the fabrication (i.e., "fab") aspect of the devices to separate and specialized manufacturers called semiconductor foundries.  In other words, Broadcom designs and develops semiconductor chips domestically, but outsources the task of fabricating them to foundries in Asia.

2.     Broadcom sells its products to companies like IBM or Apple.  When Broadcom's customers send requests for design and quotes, Broadcom enters into a process called a "design-

win."  During this process, Broadcom engineers work with the requester's engineers to design a chip that will meet the company's needs.  The process may occur in the United States or abroad, depending on the parties' location and needs.  In the end, if the requesting company awards Broadcom a "design win," the parties may enter into a Master Purchase Agreement ("MPA").

3.    MPAs are not contracts to sell specific products.  Rather, they largely set forth expectations with respect to future transactions. They include terms to be included in future sales, including expectations regarding quantity and pricing (*see* Dkt. No. 214-11 at 6).  For example, the Master Development and Supply Agreement between Apple and Broadcom includes a "Production Forecast" that does not create an obligation to purchase any goods, and a corresponding "Supply Commitment" to produce goods to accommodate production forecasts.  (Dkt. No. 214-11 at 3–4.) The purchase orders detail the specific sales transactions involving Broadcom products, including prices and quantities, which can be "subject to and governed by the terms of [the MPA]." (Dkt. No. 214-11 at 7.)  While not all MPAs set forth units or prices for specific products or contractual obligations to buy, Broadcom often enters additional agreements in the United States with customers that do establish firm commitments.  For example, Plaintiff points to a Statement of Work between Apple, Inc. and Broadcom Corp. entered into pursuant to a prior MPA that establishes firm commitments to purchase specific products.

## ANALYSIS

1.    Whomever, "without authority . . . offers to sell, or sells any patented invention, within the United States . . . ." directly infringes a patent. 35 U.S.C. § 271(a).  The patent statute does not define the meaning of a "sale" within the United States for purposes of § 271(a).  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1379 (Fed. Cir. 2014).  No "single, universally applicable fact" controls the answer of where a sale occurs, *Carnegie Mellon Univ. v. Marvell Tech.*

*Grp., Ltd.*, 807 F.3d 1283, 1308 (Fed. Cir. 2015), and a sale may in fact occur in one or more locations, *id.* That said "[i]t is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad," *Power Integrations, Inc.*, *v. Fairchild Semiconductor Int'l*, 711 F.3d 1348, 1371 (Fed. Cir. 2013), and accordingly, the Court interprets Section 271 against a background presumption against exterritorial reach, *Marvell*, 807 F.3d at 1306. For example, in *Power Integrations*, the Federal Circuit applied the presumption against extraterritoriality to reject the theory that a patentee can recover damages for worldwide sales that were the direct and foreseeable result of domestic infringement. *Power Integrations*, 711 F.3d at 1371.

2. Determining whether a sale is in the United States is a matter of fact, and there is no single fact that determines the answer. *Marvell*, 807 F.3d at 1308. The jury may consider, for example, the place of inking the legal commitment to buy and sell, the place of delivery, and where other "substantial activities of the sales transactions occurred." *Id.*; *see also Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1311 (Fed. Cir.2010) (holding that a sale is "not limited to the transfer of tangible property" but may also be determined by 'the agreement by which such a transfer takes place."). Having reviewed the case law, the Court is of the opinion that summary judgment is proper only if the movant can demonstrate that, after viewing all facts in favor of non-movant, no reasonable juror could find that no substantial activities of a sales transaction occurred inside the United States. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1379 (Fed. Cir. 2014) ("[W]hen substantial activities of a sales transaction, including the final formation of a contract for sale encompassing all essential terms as well as the delivery and performance under that sales contract, occur entirely outside the United States, pricing and contracting negotiations in the United States alone do not constitute or transform those extraterritorial activities into a sale within the United States for purposes of § 271(a).") On the

other hand, if the facts properly viewed in favor of the non-movant fall short of this standard, notwithstanding the presumption against extraterritoriality, summary judgment should be denied. *See Marvell*, F.3d at 1309.  The presumption is more appropriately addressed in a jury instruction.

      3.     Defendants have not persuaded the Court that the facts, viewed in Plaintiff's favor, reflect that no substantial activities relating to the sales transactions for the Foreign Products occur in the United States.  Therefore, summary judgment should be denied.  A reasonable jury could find that many substantial activities relating to sales transactions occurred within the United States based on at least the fact that:

- Neither party disputes that the overwhelming majority of Defendants' design, development, marketing and sales activities occur in the United States.

- Master Purchase Agreements entered into in the United States govern the terms of purchase orders entered into outside the United States, and at least some Master Purchase Agreements identify specific products and prices.

- Purchase orders entered into overseas may be processed and maintained by Broadcom's domestic sales team.

- U.S. sales teams provide support to Defendants' U.S. customers, and Broadcom categorizes its sales information and activity for internal purposes based on the location of end customers.  For example, Broadcom currently has a dedicated sales and engineering team for Apple based in the U.S.

- Defendants track sales commissions for sales of products made overseas as if they were domestic sales.  For example, if Broadcom makes a sale to Cisco in the United States, but the underlying good was transacted and shipped overseas, the revenue would be marked as a U.S. sale for the purpose of sales force commissions.

- Defendants track total "design win" revenue based on the location of the end customer.  Those totals determine sales force compensation, and can include products manufactured overseas.

## CONCLUSION

What Defendants present as a clear legal and factual situation is actually one rife with both factual uncertainties and without clear guidance from the Federal Circuit. As the Federal Circuit explained in *Marvell* concerning the chip design market and chip designer Marvell Technology Group, Ltd.:

> Chip designers like Marvell sell customized chips with designs specifically tailored for incorporating into customers' products. Because of the customized nature of the chips, designers and potential customers put themselves through a lengthy "sales cycle," involving extensive joint work over several years, before any sale is made and chips enter mass production. Only at the end of that sales cycle, if the chip designer is successful, does it secure a "design win," but that win generally results in a customer's exclusive use of that designer's customized chip for a certain period, amounting to tens or hundreds of millions of chips over several years. One executive from a now-defunct chip maker called the industry a "winner takes all business."

> Marvell's facilities are in northern California, and CMU's industry expert, Dr. Bajorek, showed that "with the exception of the chip making . . . all the activities related to designing, simulating, testing, evaluating, qualifying the chips by Marvell as well as by its customers occur[ ] in the United States. He also used Marvell's records to show that Marvell, from California, provided potential customers with samples and simulations incorporating its designs. Marvell itself stipulated that "[d]uring [its] sales cycle, [its] engineers assist [its] customers in implementing [its] solutions into their product." And there was some evidence suggesting that specific contractual commitments for specific volumes of chips were made in the United States.

*Marvell*, 807 F.3d at 1308–09 (internal citations omitted). On that record, the Federal Circuit could not say that a reasonable jury could not find the chips to have been sold in the United States. *Id.* at 1309.

It is hard to distinguish the facts of this case from *Marvell*. Therefore, on this record and applying *Marvell* to the summary judgment context at bar, the Court recommends the Motion be **DENIED**. The Court further **RECOMMENDS** that the parties meet-and-confer and submit a joint brief as to an appropriate jury instruction to inform the jury of the presumption against extraterritoriality.

5

A party's failure to file objections to the findings, conclusions, and recommendations contained in this report within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings, and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

**SIGNED this 18th day of May, 2017.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 20

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

---

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended December 31, 2010

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from_____ to _____

### Commission file number 000-23993



# Broadcom Corporation
*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **California** | **33-0480482** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |

**5300 California Avenue**
**Irvine, California 92617-3038**
*(Address of Principal Executive Offices) (Zip Code)*

Registrant's telephone number, including area code: (949) 926-5000

### Securities registered pursuant to Section 12(b) of the Act:

| Title of Class | Name of Exchange on Which Registered |
|---|---|
| **Class A Common Stock, $0.0001 par value** | **The Nasdaq Stock Market LLC**<br>**(Nasdaq Global Select Market)** |

### Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑         Accelerated filer ☐         Non-accelerated filer ☐         Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).   Yes ☐   No ☑

The aggregate market value of the registrant's common stock, $0.0001 par value per share, held by non-affiliates of the registrant on June 30, 2010, the last business day of the registrant's most recently completed second fiscal quarter, was $16.0 billion (based on the closing sales price of the registrant's common stock on that date). Shares of the registrant's common stock held by each officer and director and each person known to the registrant to own 10% or more of the outstanding voting power of the registrant have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not a determination for other purposes.

The registrant has two classes of common stock authorized, Class A common stock and Class B common stock. The rights, preferences and privileges of each class of common stock are substantially identical except for voting rights. Shares of Class B common stock are not publicly traded but are convertible at any time into shares of Class A common stock on a one-for-one basis. As of December 31, 2010 there were 484.7 million shares of Class A common stock and 54.0 million shares of Class B common stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates by reference certain information from the registrant's definitive proxy statement (the "Proxy Statement") for the 2011 Annual Meeting of Shareholders to be filed on or before May 2, 2011.

technology. Gigabit and 10 Gigabit Ethernet controllers deliver high performance dual-port, single-chip C-NIC at 1Gbps or 10-Gbps rates, without requiring external packet memory.

### Backplane and Optical Front-End Physical Layer Devices

To address increasing volumes of data traffic both in data centers and service provider networks , we offer a portfolio of 10G and 40G Ethernet transceivers, forward error correction solutions, and chips for backplanes and optical interconnect. These devices are low-power solutions for very high density 10G and 40G switching solutions. We also offer 2.5G and 10G SONET/SDH/OTN transceivers that enable the development of low-cost, high-density optical transport equipment, enabling telecommunications and service providers to efficiently deliver data and voice traffic over existing fiber networks. Our use of the CMOS process allows substantially higher levels of integration and lower power consumption than competitive solutions.

### Custom Silicon Products

We offer proprietary silicon devices for the LAN, WAN and PC markets that allow our customers to semi-customize by integrating their own intellectual property. For example, we have developed complex mixed-signal designs for customers that leverage our advanced design processes.

### Licensing of Intellectual Property

We generate licensing revenue and related income from the licensing of our intellectual property. The vast majority of our licensing revenue and related income to date has been derived from agreements with two customers, Verizon Wireless and QUALCOMM Incorporated. See detailed discussion in "*Overview*" section in Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations.* This licensing revenue and related income represented 3.3%, 4.8% and 3.7% of our total net revenue in 2010, 2009 and 2008, respectively.

### Reference Platforms

To assist our customers in developing products, we develop reference platforms designed around our integrated circuit products that represent prototypical system-level applications. These reference platforms generally include an extensive suite of software drivers, as well as protocol and application layer software. By providing reference platforms that may ultimately be incorporated into our customers' end products, we assist our customers in transitioning from initial prototype designs to final production releases. We believe this enables our customers to achieve easier and faster transitions from the initial prototype designs through final production releases. We believe these reference platform designs also significantly enhance customers' confidence that our products will meet their market requirements and product introduction schedules.

### Customers and Strategic Relationships

We sell our products to leading wired and wireless communications manufacturers. We have also established strategic relationships with multiservice operators that provide wired and wireless communications services to consumers and businesses. Customers currently shipping wired and/or wireless communications equipment and devices incorporating our products include:

- Alcatel
- Apple
- Cisco
- Dell
- EchoStar
- Hewlett-Packard
- Huawei Technologies
- LG

- Motorola
- Netgear
- Nintendo
- Nokia
- Pace
- Samsung
- Technicolor

A small number of customers have historically accounted for a substantial portion of our net revenue. Sales to our five largest customers represented 38.9%, 34.6% and 35.8% of our net revenue in 2010, 2009 and 2008,

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2011**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 000-23993**

## Broadcom Corporation
*(Exact Name of Registrant as Specified in Its Charter)*

| California | 33-0480482 |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |

**5300 California Avenue**
**Irvine, California 92617-3038**
*(Address of Principal Executive Offices) (Zip Code)*

**Registrant's telephone number, including area code: (949) 926-5000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Class | Name of Exchange on Which Registered |
|---|---|
| Class A Common Stock, $0.0001 par value | The NASDAQ Stock Market LLC (NASDAQ Global Select Market) |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☑    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).    Yes ☐    No ☑

The aggregate market value of the registrant's common stock, $0.0001 par value per share, held by non-affiliates of the registrant on June 30, 2011, the last business day of the registrant's most recently completed second fiscal quarter, was $16.19 billion (based on the closing sales price of the registrant's common stock on that date). Shares of the registrant's common stock held by each officer and director and each person known to the registrant to own 10% or more of the outstanding voting power of the registrant have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not a determination for other purposes.

The registrant has two classes of common stock authorized, Class A common stock and Class B common stock. The rights, preferences and privileges of each class of common stock are substantially identical except for voting rights. Shares of Class B common stock are not publicly traded but are convertible at any time into shares of Class A common stock on a one-for-one basis. As of December 31, 2011 there were 492 million shares of Class A common stock and 53 million shares of Class B common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III incorporates by reference certain information from the registrant's definitive proxy statement for the 2012 Annual Meeting of Shareholders to be filed on or before April 27, 2012.

**Customers and Strategic Relationships**

We sell our products to leading wired and wireless communications manufacturers. We have also established strategic relationships with multiservice operators that provide wired and wireless communications services to consumers and businesses. Customers currently shipping wired and/or wireless communications equipment and devices incorporating our products include:

- Alcatel
- Apple
- Cisco
- Dell
- EchoStar
- Hewlett-Packard
- Huawei Technologies
- LG
- Motorola
- Netgear
- Nokia
- Pace
- Samsung
- Technicolor
- ZTE

A small number of customers have historically accounted for a substantial portion of our net revenue. Sales to our five largest customers represented 42.6%, 38.6% and 34.6% of our net revenue in 2011, 2010 and 2009, respectively. In 2011 sales to Apple and Samsung represented 13.1% and 10.0% of our net revenue, respectively. In 2010, sales to Apple and Samsung represented 10.9% and 10.0% of our net revenue, respectively. See Note 13 of Notes to Consolidated Financial Statements, included in Part IV, Item 15 of this Report. We expect that our key customers will continue to account for a substantial portion of our net revenue in 2012 and in the foreseeable future. These customers and their respective contributions to our net revenue have varied and will likely continue to vary from period to period. We typically sell products pursuant to purchase orders that customers can generally cancel, change or defer on short notice without incurring a significant penalty.

**Research and Development**

We have assembled a large team of experienced engineers and technologists, many of whom are leaders in their particular field or discipline. As of December 31, 2011 we had approximately 7,260 research and development employees, including over 800 employees with Ph.D.s. These key employees are involved in advancing our core technologies, as well as product development. Because SoC solutions benefit from the same underlying core technologies, we are able to address a wide range of communications markets with a relatively focused investment in research and development. Our research and development expense was $1.98 billion, $1.76 billion and $1.54 billion in 2011, 2010 and 2009, respectively. These amounts included stock-based compensation expense for employees engaged in research and development of $364 million, $341 million and $352 million in 2011, 2010 and 2009, respectively.

We believe that increased IP integration and the timely introduction of new products are essential to our growth. While we endeavor to manage our costs and expenses to attain our long-term business objectives, we plan to maintain significant research and development staffing levels for the foreseeable future. We have design centers throughout the United States, including our principal design facilities in Irvine, California and Santa Clara County, California. Internationally, we have design facilities in Asia, Europe, Israel and Canada. We anticipate establishing additional design centers in the United States and in other countries.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2012

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to
Commission file number: 000-23993



# Broadcom Corporation
*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **California** | **33-0480482** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |

**5300 California Avenue**
**Irvine, California 92617-3038**
*(Address of Principal Executive Offices) (Zip Code)*
**(Registrant's telephone number, including area code): (949) 926-5000**
**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Class | Name of Exchange on Which Registered |
|---|---|
| **Class A Common Stock, $0.0001 par value** | **The Nasdaq Stock Market LLC** |
| | **(Nasdaq Global Select Market)** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☒

The aggregate market value of the registrant's common stock, $0.0001 par value per share, held by non-affiliates of the registrant on June 30, 2012, the last business day of the registrant's most recently completed second fiscal quarter, was $17.08 billion (based on the closing sales price of the registrant's common stock on that date). Shares of the registrant's common stock held by each officer and director and each person known to the registrant to own 10% or more of the outstanding voting power of the registrant have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not a determination for other purposes.

The registrant has two classes of common stock authorized, Class A common stock and Class B common stock. The rights, preferences and privileges of each class of common stock are substantially identical except for voting rights. Shares of Class B common stock are not publicly traded but are convertible at any time into shares of Class A common stock on a one-for-one basis. As of December 31, 2012 there were 518 million shares of Class A common stock and 51 million shares of Class B common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates by reference certain information from the registrant's definitive proxy statement for the 2013 Annual Meeting of Shareholders to be filed on or before April 30, 2013.

revenue in 2012, 2011 and 2010, respectively. The income from the Qualcomm Agreement is non-recurring and will terminate in April 2013. There can be no assurances that we will be able to enter into similar arrangements of this magnitude in the future.

### Reference Platforms

To assist our customers in developing products, we develop reference platforms designed around our integrated circuit products that represent prototypical system-level applications. These reference platforms generally include an extensive suite of software drivers, as well as protocol and application layer software. By providing reference platforms that may ultimately be incorporated into our customers' end products, we assist our customers in transitioning from initial prototype designs to final production releases. We believe this enables our customers to achieve easier and faster transitions from the initial prototype designs through final production releases. We believe these reference platform designs also significantly enhance customers' confidence that our products will meet their market requirements and product introduction schedules.

### Customers and Strategic Relationships

We sell our products to leading wired and wireless communications manufacturers. We have also established strategic relationships with multiservice operators that provide wired and wireless communications services to consumers and businesses. Our leading customers currently shipping wired and/or wireless communications equipment and devices incorporating our products include:

- Alcatel-Lucent
- Apple
- Cisco
- Dell
- EchoStar
- Hewlett-Packard
- Huawei Technologies
- Humax
- Motorola Mobility
- Netgear
- Nokia
- Pace
- Samsung
- Thomson
- ZTE

A small number of customers have historically accounted for a substantial portion of our net revenue. Contributions to our net revenue by these customers have increased in the last several years. Sales to our five largest customers represented 47.2%, 42.6% and 38.6% of our net revenue in 2012, 2011 and 2010, respectively. In 2012, 2011 and 2010 sales to Samsung and Apple represented 17.3% and 14.6%, 10.0% and 13.1%, and 10.0% and 10.9% of our net revenue, respectively. See Note 11 of Notes to Consolidated Financial Statements, included in Part IV, Item 15 of this Report. We expect that our key customers will continue to account for a substantial portion of our net revenue in 2013 and in the foreseeable future. We typically sell products pursuant to purchase orders that customers can generally cancel, change or defer on short notice without incurring a significant penalty.

### Research and Development

We have assembled a large team of experienced engineers and technologists, many of whom are leaders in their particular field or discipline. As of December 31, 2012 we had approximately 8,700 research and development employees (or approximately 77% of our total employees), including over 850 employees with Ph.D.s. These key employees are involved in advancing our core technologies, as well as product development. We believe that increased intellectual property integration and the timely introduction of new products are essential to our growth. Because SoC solutions benefit from the same underlying core technologies, we are able to address a wide range of communications markets with a relatively focused investment in research and development. Our research and development expense was $2.32 billion, $1.98 billion and $1.76 billion in 2012, 2011 and 2010, respectively. These amounts included stock-based compensation expense for employees engaged in research and development of $368 million, $363 million and $342 million in 2012, 2011 and 2010, respectively. We have design centers throughout the United States, including our principal design facilities in Irvine, California and Santa Clara County, California. Internationally, we have design facilities in Asia, Europe, Israel and Canada. We anticipate establishing additional design centers in the United States and in other countries.

7

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2013**

**or**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**
**Commission file number: 000-23993**



# Broadcom Corporation
*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **California** | **33-0480482** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |

**5300 California Avenue**
**Irvine, California 92617-3038**
*(Address of Principal Executive Offices) (Zip Code)*
**(Registrant's telephone number, including area code): (949) 926-5000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Class | Name of Exchange on Which Registered |
|---|---|
| **Class A Common Stock, $0.0001 par value** | **The Nasdaq Stock Market LLC (Nasdaq Global Select Market)** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒            Accelerated filer ☐            Non-accelerated filer ☐            Smaller reporting company ☐
*(Do not check if a smaller reporting company)*

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).  Yes ☐ No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant on was $17.83 billion (based on the closing sales price of the registrant's common stock on the Nasdaq Global Select Market on June 30, 2013). As of December 31, 2013 there were 531 million shares of Class A common stock and 50 million shares of Class B common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates by reference certain information from the registrant's definitive proxy statement for the 2014 Annual Meeting of Shareholders to be filed on or before April 30, 2014.

**Customers and Strategic Relationships**

We sell our products to leading wired and wireless communications manufacturers. We have also established strategic relationships with multiservice operators that provide wired and wireless communications services to consumers and businesses. Our leading customers currently shipping wired and/or wireless communications equipment and devices incorporating our products include:

- Alcatel-Lucent
- Apple
- Arris
- Cisco
- Hewlett-Packard
- Huawei Technologies
- Pace
- Samsung
- Thomson
- ZTE

A small number of customers have historically accounted for a substantial portion of our net revenue. Contributions to our net revenue by these customers have increased in the last several years. Sales to our five largest customers represented 48.3%, 46.9% and 42.3% of our net revenue in 2013, 2012 and 2011, respectively. In 2013, 2012 and 2011 sales to Samsung represented 21.3%, 17.3%, and 10.0% of our net revenue, respectively. In 2013, 2012 and 2011 sales to Apple represented 13.3%, 14.6%, and 13.1% of our net revenue, respectively. See Note 12 of Notes to Consolidated Financial Statements, included in Part IV, Item 15 of this Report. We expect that our key customers will continue to account for a substantial portion of our net revenue in 2014 and in the foreseeable future. We typically sell products pursuant to purchase orders that customers can generally cancel, change or defer on short notice without incurring a significant penalty.

**Research and Development**

We have assembled a large team of experienced engineers and technologists, many of whom are leaders in their particular field or discipline. As of December 31, 2013 we had approximately 9,800 research and development employees (or approximately 78% of our total employees), including over 850 employees with Ph.D.s. These key employees are involved in advancing our core technologies, as well as product development. We believe that increased intellectual property integration and the timely introduction of new products are essential to our growth. Because SoC solutions benefit from the same underlying core technologies, we are able to address a wide range of communications markets with a relatively focused investment in research and development. Our research and development expense was $2.49 billion, $2.32 billion and $1.98 billion in 2013, 2012 and 2011, respectively. These amounts included stock-based compensation expense for employees engaged in research and development of $363 million, $368 million and $363 million in 2013, 2012 and 2011, respectively. We have design centers throughout the United States, including our principal design facilities in Irvine, California and Santa Clara County, California. Internationally, we have design facilities in Asia, Europe and the Middle East.

Our revenue and our research and development costs as a percentage of revenue are subject to the cyclicality and seasonality of our industry. Our research and development costs on an absolute dollar basis are not, however, meaningfully affected by these patterns. We endeavor to manage our cost structure to attain long-term business objectives, rather than focusing on short-term profit targets.

**Manufacturing**

*Wafer Fabrication*

We depend on multiple foundry subcontractors located in Asia to manufacture a majority of our products. Our key silicon foundries are:

- Taiwan Semiconductor Manufacturing Corporation, or TSMC, in Taiwan;
- United Microelectronics Corporation in Singapore and Taiwan;
- Semiconductor Manufacturing International Corporation in China; and
- GlobalFoundries, Inc. (formerly Chartered Semiconductor Manufacturing) in Singapore and Germany.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2014

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from     to

**Commission file number: 000-23993**



# Broadcom Corporation
*(Exact Name of Registrant as Specified in Its Charter)*

| **California** | **33-0480482** |
|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |

**5300 California Avenue**
**Irvine, California 92617-3038**
*(Address of Principal Executive Offices) (Zip Code)*

**(Registrant's telephone number, including area code): (949) 926-5000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Class | Name of Exchange on Which Registered |
|---|---|
| Class A Common Stock, $0.0001 par value | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒      Accelerated filer ☐      Non-accelerated filer ☐      Smaller reporting company ☐
*(Do not check if a smaller reporting company)*

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).   Yes ☐   No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant on June 30, 2014, was $20.00 billion (based on the closing sales price of the registrant's common stock on the Nasdaq Global Select Market on that date). As of December 31, 2014 there were 550 million shares of Class A common stock and 49 million shares of Class B common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates by reference certain information from the registrant's definitive proxy statement for the 2015 Annual Meeting of Shareholders to be filed on or before April 30, 2015.

**Customers and Strategic Relationships**

We sell our products to leading wired and wireless communications manufacturers. We have also established strategic relationships with multiservice operators that provide wired and wireless communications services to consumers and businesses. Our leading customers currently shipping wired and/or wireless communications equipment and devices incorporating our products include:

- Alcatel-Lucent
- Apple
- Arris
- Cisco
- Huawei Technologies

- Humax
- Pace
- Samsung
- Technicolor
- ZTE

A small number of customers have historically accounted for a substantial portion of our net revenue. Contributions to our net revenue by these customers have increased in the last several years. Sales to our five largest customers represented 44.1%, 48.3% and 46.9% of our net revenue in 2014, 2013 and 2012, respectively. In 2014, 2013 and 2012 sales to Samsung represented 14.2%, 21.3%, and 17.3% of our net revenue, respectively. In 2014, 2013 and 2012 sales to Apple represented 14.0%, 13.3%, and 14.6% of our net revenue, respectively. See Note 11 of Notes to Consolidated Financial Statements, included in Part IV, Item 15 of this Report. We expect that our key customers will continue to account for a substantial portion of our net revenue in 2015 and in the foreseeable future. We typically sell products pursuant to purchase orders that customers can generally cancel, change or defer on short notice without incurring a significant penalty.

**Research and Development**

We have assembled a large team of experienced engineers and technologists, many of whom are leaders in their particular field or discipline. As of December 31, 2014 we had approximately 8,000 research and development employees (or approximately 75% of our total employees), including over 800 employees with Ph.D.s. These key employees are involved in advancing our core technologies, as well as product development. We believe that increased intellectual property integration and the timely introduction of new products are essential to our growth. Because SoC solutions benefit from the same underlying core technologies, we are able to address a wide range of communications markets with a relatively focused investment in research and development. Our research and development expense was $2.37 billion, $2.49 billion and $2.32 billion in 2014, 2013 and 2012, respectively. These amounts included stock-based compensation expense for employees engaged in research and development of $304 million, $363 million and $368 million in 2014, 2013 and 2012, respectively. We have design centers throughout the United States, including our principal design facilities in Irvine, California and Santa Clara County, California, as well as Asia, Europe and the Middle East.

Our revenue and our research and development costs as a percentage of revenue are subject to the cyclicality and seasonality of our industry. Our research and development costs on an absolute dollar basis are not, however, meaningfully affected by these patterns. We endeavor to manage our cost structure to attain long-term business objectives, rather than focusing on short-term profit targets.

**Manufacturing**

*Wafer Fabrication*

We depend on multiple foundry subcontractors located in Asia to manufacture a majority of our products. Our key silicon foundries are:

- Taiwan Semiconductor Manufacturing Corporation, or TSMC, in Taiwan;
- United Microelectronics Corporation in Singapore and Taiwan;
- Semiconductor Manufacturing International Corporation in China; and
- GlobalFoundries, Inc. (formerly Chartered Semiconductor Manufacturing) in Singapore and Germany.

By subcontracting manufacturing, we focus resources on design and test applications where we believe we have greater competitive advantages. This strategy also avoids the high capital cost of owning and operating semiconductor

# EXHIBIT 21

**UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.**

In the Matter Of

CERTAIN SEMICONDUCTOR DEVICES,
SEMICONDUCTOR DEVICE PACKAGES, AND
PRODUCTS CONTAINING SAME

Inv. No. 337-TA-1010

**<u>TECHNICOLOR'S STATEMENT ON THE PUBLIC INTEREST</u>**

Pursuant to 19 U.S.C. § 210.50(a)(4), Technicolor S.A., Technicolor USA, Inc., and Technicolor

Connected Home USA LLC (collectively, "Technicolor") respectfully submit this Statement on the

Public Interest in connection with issues raised by the Recommended Determination ("RD") in this

investigation. The RD would have a profound and disproportional impact on American workers,

companies, and consumers for such fundamental services as television, internet, and telecommunications.

Respondents believe that the ALJ's finding of a Section 337 violation as to just one of the three asserted

patents was error, and have sought Commission review. However, if the Commission finds a violation

occurred, Technicolor respectfully submits, based on public interest concerns enumerated in 19 U.S.C.

1337(d)(1) and (f)(1), that any remedy imposed should be narrowly tailored, with no cease and desist

order, no bond, and any exclusion order deferred by six (6) months to mitigate the disruption to American

consumers, workers, companies, and industries. Such tailoring of the remedy would allow time for

Respondents to design around and qualify new, non-accused products to service the needs of the public.

## I.    THE RECOMMENDED REMEDY WOULD DISPROPORTIONATELY HARM THE PUBLIC INTEREST

Technicolor is a global technology company with a U.S.-based subsidiary located in, among

other locations, Indianapolis, Indiana. Its products include set-top boxes, broadband modems, and more.

Together with its seven co-respondents, Technicolor has a profound impact on the United States

economy.[1] For example, co-respondents ARRIS and Technicolor are the world's largest STB suppliers

and, collectively, they supply more than half the STBs deployed in North America.[2] For major cable

service providers such as Comcast, Cox, Time Warner Cable, and Verizon; ARRIS (including Pace) and

---

[1] At issue are semiconductor chips and thousands of products and services integrating those chips in four distinct sectors: cable and related information networks, telecommunications switches, mobile communications, and computing.

[2] J. Baumgartner, Arris, Pace Topped Set-Top Box Market in 2014, Multichannel News (Apr. 23, 2015), http://www.multichannel.com/news/technology/arris-pace-topped-set-top-box-market-2014/390019; J. Wetherill, Futuresource Consulting, Set-Top Box Industry Consolidation Continues with Technicolor-Cisco Deal (July 27, 2015), http://futuresourceconsulting.com/2015-07-Set-Top-Box-Industry-Consolidation-2323.html

Technicolor (including Cisco) set-top box models accounted for 80 percent of cable set-top box models procured by these service providers in 2015.[3]  As of December 31, 2016 Technicolor employed over 7,500 highly skilled workers throughout the U.S. with campuses in Indiana, Northern California, Southern California, Georgia, New York, New Jersey, Ohio, and Pennsylvania.  The STBs at issue are essential to Comcast and other Technicolor customers' provision of information and programming that contributes to public health, safety, and welfare. *See* Comcast's Aug. 2, 2017 Public Interest Statement.

A majority of Technicolor's recent model set-top boxes and cable modems sold in the U.S. are accused in this investigation. An exclusion of two market leaders' supply of set-top boxes in the U.S. would require the remaining small players in the U.S. to immediately and significantly increase their production. There is no evidence of excess capacity available at any of the allegedly competing suppliers that could meet the market demand if the requested remedial orders were issued—let alone by licensees. Further, set-top boxes are based on cable service providers' technical specifications and are customized for operations on individual cable operators' networks. Conversion to alternative STBs by cable service providers requires lead time and there will be disruptions not just for providers but also for the customers.

Thus, sudden imposition of any remedial order could unnecessarily and improperly disrupt the operations of Technicolor and its customers and have significant adverse impact on consumers and employment in the United States. The most recent Internet & Television Association statistics indicate that as of 2016, the cable industry, directly and indirectly, accounted for more than 2.3 million U.S. jobs, which represents $106 billion in personal income.  *See* Unleashing Connectivity and Entertainment in America: A Study of the Cable Industry's Economic Impact (2016), available at

https://www.ncta.com/sites/prod/files/2016 Bortz Economic Analysis Report.pdf.)

Protecting American jobs is an important goal of every agency of the government, and such harms to the public cannot be squared with the narrow scope of violation the ALJ actually found in the

---

[3] "2015 Annual Report Voluntary Agreement for Ongoing Improvement to the Energy Efficiency of Set-top Boxes," D+R International, August 8, 2016, at pp. 7, 25-30, available at http://www.energyefficiency.us/library/pdf/SetTopBox-AnnualReport-2015.pdf.

Technicolor's Statement on the Public Interest                    Investigation No. 337-TA-1010

Initial Determination.  Here, Respondents prevailed against two of Tessera's three asserted patents.  As to

the third (the '946 Patent), the ALJ found Tessera's patented technology was trivial in the context of the

technology of a semiconductor chip; and even more so in the context of a downstream product

incorporating such a chip.  *See* ID at 230.  A blanket prohibition of the sale or importation of

Technicolor's products—based on a minimal value patent that will expire next year—will cause

disproportionate harm to Technicolor, its customers, and the public generally.

## II.   TESSERA CANNOT FILL THE VOID LEFT BY AN EXCLUSION ORDER

The disproportionality of the RD is even more pronounced in view of Tessera's lack of

meaningful contribution to the United States economy. Tessera, a non-practicing entity, does not

manufacture *any* of the products it seeks to exclude from the United States. Indeed, Tessera did not even

invent the purported technology underlying the patent at issue, but rather acquired the '946 patent from

another.  Relatedly, the ALJ found that Tessera itself lacks a domestic industry in the U.S. relative to the

purported intellectual property rights now in dispute—denying Tessera's licensing-as-domestic-industry

claims.  Because Tessera lacked its own U.S. domestic industry, it relies on the domestic industry of

licensees Cypress Semiconductor (from whom Tessera acquired the asserted patent) and Micron

Technologies (whom Tessera sued for patent infringement in 2005). Such an attenuated claim to

domestic industry further underscores the disproportionality of the ALJ's recommended remedy. Indeed,

it is precisely because so many non-practicing entities have tried to avail themselves of Section 337

remedies—notwithstanding their lack of U.S. domestic industry—that Congress has considered raising

requirements for entities like Tessera to pursue alleged Section 337 violations. *See e.g.,* H.R. 2189

("Trade Protection Not Troll Protection Act"), available at https://www.congress.gov/bill/115th-

congress/house-bill/2189.

Because Tessera does not make any products, let alone the products that compete with those it

seeks to exclude, it cannot ensure American consumers will have timely access to the products and

services implicated by the RD.  For this additional reason, Technicolor submits that the Commission

should, in the event it finds a Section 337 violation, mitigate the severe remedy recommended by the ALJ to avoid harm to the public good.

## III.    ANY RELIEF SHOULD BE NARROWLY TAILORED

As discussed above, manifest harms to the public would result from the broad remedies recommended by the ALJ.  Under circumstances like these, the Commission has found it appropriate to narrowly tailor relief to mitigate harm to the public.  For example, in *Certain Baseband Processor Chips and Chipsets, Transmitter and Receiver (Radio) Chips, Power Control Chips*, the Commission declined to exclude all cellular phones (the accused downstream products) that contained infringing chips—rather, the Commission fashioned a limited exclusion order which allowed existing models of phones that contained infringing chips imported for sale in the U.S. on or before the date of the exclusion order to continue to enter the U.S.  *See* Inv. No. 337-TA-543, Comm'n Op. at 28, 150-51.  In this way, the Commission avoided disruption to the cellular device industry while at the same time incentivizing the respondents to design around the complainant's patent.

A limited exclusion order—to the extent one is appropriate here—like the one which issued in *Baseband Processor Chips* would significantly alleviate the harms discussed above.  Whereas an order immediately barring the importation or sale of any "infringing products" would result in a significant disruption to numerous industries (such as the cable television and telecommunications industries, among others), a narrow exclusion which allows for the sale of existing products would avoid disruption while incentivizing the Respondents to phase out the accused technologies and replace them with newer, non-accused alternatives.

## IV.    SHOULD ANY REMEDY ISSUE, THE PUBLIC INTEREST WARRANTS DEFERRAL FOR AT LEAST SIX MONTHS

If the Commission finds violation, Technicolor respectfully requests that the Commission grant a time-limited grace period to allow Technicolor and its customers sufficient time to phase out the implicated chips and design around the '946 Patent. The sudden imposition of any remedial order would

Technicolor's Statement on the Public Interest                    Investigation No. 337-TA-1010

unnecessarily disrupt the ability of American consumers to access important services.  A grace period

would reduce these harms by permitting the orderly transition away from the accused technology.

Here, Technicolor will not be able to easily replace the accused Broadcom chips with non-

infringing alternatives from other providers in their set-top boxes due to qualification and redesign

issues.  The accused chips are sole-sourced from Broadcom and alternative chips cannot simply be

swapped into the products without some amount of redesign, which would take many months at a

minimum.  Extending an exclusion order to Technicolor Products would not only cause disruption to

Technicolor but also to their customers who rely on Technicolor for products that are specially

customized for operations in their individual networks.  These customers include cable service operators,

who will not have access to alternative set-top boxes and cable modems, and this in-turn would impact

end-consumers. Thus, a grace period of at least six months is both reasonable and appropriate—if a

remedy is appropriate at all.[4]

## V.    CONCLUSION

Technicolor respectfully requests that the Commission narrowly tailor any relief to avoid harms

to untold numbers of American consumers and businesses to access fundamental information technology

particularly as to the set-top boxes, broadband modems, and other products provided by Technicolor.  As

non-practicing entity Tessera can do nothing to mitigate with its own products the public harm that would

result from an exclusion order, Technicolor respectfully requests that the Commission narrowly tailor any

relief.  At a minimum, Technicolor should be afforded a grace period of at least six (6) months to phase

out the accused technologies to avoid sudden and significant harm to the public good.

---

[4] For example, the RD in *Certain Television Sets* included a *twelve* month delay to ameliorate short-term
disruption to the U.S. television market and consumers should the Commission find a violation occurred.
Inv. No. 337-TA-910, I.D. at 224-27 (Feb. 27, 2015), no violation found in Comm'n Op. (Oct. 30, 2015).
The Commission itself has also noted the propriety of delaying remedy out of deference to the public
interest, even where the public interest factors did not weigh against the issuance of a remedy generally.
*See, e.g.*, *Certain Personal Data and Mobile Communications Devices and Related Software*, Inv. No.
337-TA-710, Comm'n Op. at 83 (Dec. 29, 2011).

DATED: August 2, 2017

Respectfully submitted,

/s/ *Joshua B. Pond*

**KILPATRICK TOWNSEND & STOCKTON LLP**
David E. Sipiora
Kristopher L. Reed
Matthew C. Holohan
Brian P. O'Donnell
1400 Wewatta Street, Suite 600
Denver, CO 80202
Tel.: (303) 571-4000
Fax: (303) 571-4321
dsipiora@kilpatricktownsend.com
kreed@kilpatricktownsend.com
mholohan@kilpatricktownsend.com
bodonnell@kilpatricktownsend.com

Joshua B. Pond
607 14th Street, NW, Suite 900
Washington, DC 20005-2018
Tel.: (202) 508-5800
Fax: (202) 508-5858
jpond@kilpatricktownsend.com

Norris P. Boothe
Matthew J. Meyer
1080 Marsh Road
Menlo Park, CA 94025
Tel.: (650) 326-2400
Fax: (650) 326-2422
nboothe@kilpatricktownsend.com

FOSTER MURPHY ALTMAN & NICKEL PC
David F. Nickel
Matthew N. Duescher
1899 L Street, N.W., Suite 1150
Washington, D.C. 20036
Telephone: (202) 822-4100
Facsimile: (202) 822-4199
FM-Broadcom-1010@fostermurphy.com

*Counsel for Respondents Broadcom Limited, Broadcom
Corporation, Avago Technologies Limited, Avago
Technologies U.S. Inc., Arista Networks, Inc., ARRIS
International plc, ARRIS Group, Inc., ARRIS
Technology, Inc., ARRIS Enterprises Inc., ARRIS
Solutions, Inc., Pace Ltd., Pace Americas, LLC, Pace
USA, LLC, Comcast Cable Communications, LLC,
Comcast Cable Communications Management, LLC,
Comcast Business Communications, LLC, HTC
Corporation, HTC America, Inc., NETGEAR, Inc.,*

6

*Technicolor S.A., Technicolor USA, Inc., Technicolor Connected Home USA LLC, ASUSTeK Computer Inc. and ASUS Computer International*

7

**CERTIFICATE OF SERVICE**

I, Pamela A. Freitik, hereby certify that the attached document has been served upon the following parties as indicated below on August 2, 2017.

| The Honorable Lisa R. Barton<br>Secretary to the Commission<br>U.S. International Trade Commission<br>500 E Street SW, Room 112-A<br>Washington, DC 20436 | ☒ Via EDIS<br>☐ Via First Class Mail<br>☐ Via Express Delivery<br>☒ Via Hand Delivery |
|---|---|
| The Honorable Dee Lord<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E. Street SW, Room 317<br>Washington, DC  20436 | ☐ Via First Class Mail<br>☐ Via Express Delivery<br>☒ Via Hand Delivery<br>☒ Via Electronic Mail at<br>*edward.jou@usitc.gov* |
| Sturgis M. Sobin<br>Shara Aranoff<br>Daniel E. Valencia<br>COVINGTON & BURLING LLP<br>One CityCenter, 850 Tenth Street, N.W.<br>Washington, DC 20001 | ☐ Via EDIS<br>☐ Via First Class Mail<br>☐ Via Express Delivery<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail at<br>*Tessera-Broadcom@cov.com* |
| Michael K. Plimack<br>Dale A. Rice<br>Nitin Subhedar<br>COVINGTON & BURLING LLP<br>One Front Street<br>San Francisco, CA 94111 | ☐ Via EDIS<br>☐ Via First Class Mail<br>☐ Via Express Delivery<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail at<br>*Tessera-Broadcom@cov.com* |
| Robert T. Haslam<br>Anupam Sharma<br>Thomas E. Garten<br>COVINGTON & BURLING LLP<br>333 Twin Dolphin Drive<br>Redwood Shores, CA 94065-1418<br><br>*Counsel for Complainants Tessera Technologies, Inc., Tessera, Inc. and Invensas Corporation* | ☐ Via EDIS<br>☐ Via First Class Mail<br>☐ Via Express Delivery<br>☐ Via Hand Delivery<br>☒ Via Electronic Mail at<br>*Tessera-Broadcom@cov.com* |

/s/ *Pamela A. Freitik*
Pamela A. Freitik

# EXHIBIT 22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| Godo Kaisha IP Bridge 1, | § |
| | § |
| v. | § |
| | §    Case No. 2:16-CV-134-JRG-RSP |
| Broadcom Limited et al. | § |
| | § |

## ORDER

Before the Court is Plaintiff's Motion to Compel Defendants to Produce Sales and Distribution Agreements and Related Documents, Financial Information, Patent License Agreements, and Samples of the Accused Products (Dkt. No. 113) (the "Motion"). The Court previously carried the Motion. (*See* Dkt. No. 247.)

Having considered the Motion, the Court is of the opinion that the Motion should be and hereby is **GRANTED AS MODIFIED**. Further, the Partial Summary Judgment Motion That Product Sold Overseas Are Not Infringing (Dkt. No. 214) (the "Summary Judgment Motion") is **CARRIED** as explained below.

Defendants produced patent license agreements and samples of the Accused Products as requested in the Motion. (*See* Dkt No. 178). The only issues in the Motion that remain are (1) the production sales and distribution agreements for the accused products and information related thereto and (2) sales and financial data for all accused products.

A party may obtain discovery of any non-privileged matter that is relevant to the claim or defense of a party. Fed. R. Civ. P. 26(b)(1). For reasons explained in the briefing, the supplemental briefing, and in the March 28, 2017 Civil Minutes in *The California Institute of Technology v. Broadcom Limited*, et al., Case No. 2:16-cv-03714 (Dkt. No. 233-1) (the "Minute Order"), the Court is persuaded that the requested discovery is at least relevant to issues raised by Broadcom in its pending

Summary Judgment Motion. Specifically, the requested documents are relevant to the issue of where the accused products are sold. The parties genuinely dispute the location of Defendants' sales, and IP Bridge may conduct discovery to determine whether the sales and offers to sell that Defendants describe as foreign are in fact foreign sales under existing precedent. The Court **ORDERS** Defendants to produce **worldwide sales information such as sales agreements, negotiation documents, and design wins not limited to those products shipped to an address in the United States** no later than **May 5, 2017**. In all other respects, the Motion is **DENIED**.

      In light of this Order, the Summary Judgment Motion (Dkt. No. 238) is **CARRIED**. Federal Rule of Civil Procedure 56(d) provides that if a non-movant shows that it cannot present facts essential to justify its opposition Court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. The Court is persuaded that Rule 56(d) applies here. Specifically, resolving the Summary Judgment Motion requires the Court to, among other things, analyze where the "substantial activities" of sales transactions occur. Despite Broadcom's protestations, the court is not convinced that Broadcom has produced all documents that may bear on the Court's analysis.

      In light of this Order, Plaintiff may file a ten-page supplemental brief in opposition to the Summary Judgment Motion by **May 15, 2017** and Defendants may file a ten-page supplemental response brief by **May 23, 2017**. The parties are **ORDERED** to meet and confer as to whether an additional deposition is needed to discuss any documents produced pursuant to this Order.

      **SIGNED this 19th day of April, 2017.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE