# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TESSERA, INC. and TESSERA ADVANCED TECHNOLOGIES, INC., ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) | Civil Action No. 16-380-LPS-CJB |
| ) BROADCOM CORPORATION, ) ) | |
| Defendant. ) | |

## MEMORANDUM ORDER

Pending before the Court are certain discovery disputes (hereinafter, the "Motion") raised by Plaintiffs Tessera, Inc. and Tessera Advanced Technologies, Inc. (collectively, "Tessera"). (D.I. 171) Having considered Defendant Broadcom Corporation's ("Broadcom") opposition, the parties' letter submissions, (D.I. 173, 176, 179, 180), and the arguments made during the parties' September 6, 2017 teleconference with the Court, the Court hereby ORDERS that the Motion be DENIED.

## I. BACKGROUND

Tessera instituted this patent infringement action against Broadcom on May 23, 2016. (D.I. 1) In the now-operative Second Amended Complaint, Tessera alleges direct and indirect infringement of certain claims of seven patents: United States Patent Nos. 5,666,046; 6,043,699; 6,046,076; 6,080,605; 6,218,215; 6,284,563; and 6,954,001. (D.I. 30) On January 25, 2017, Chief Judge Leonard P. Stark referred the case to the Court, *inter alia*, to resolve all discovery disputes. (D.I. 62)

The Motion was filed on August 23, 2017. (D.I. 171) With it, Tessera asserts that Broadcom has refused to provide core technical documents for certain specifically-identified

accused products (semiconductor chips) that Broadcom itself did not ship into the United States in the past six years (i.e., accused products without a "Ship To" location located in the U.S.)[1] and worldwide sales data for all accused products. (*See* D.I. 173 at 1, 3; *id.*, ex. 16 at 4; *id.*, ex. 17 at 2; D.I. 179 at 3; *see also* D.I. 176 at 4; *id*, ex. A at 1) Specifically, Tessera is seeking the following core technical documents for specifically-accused products that fall into the category above (products relating to the "Interconnect and Packaging Patents" in-suit): (1) die specifications; (2) GDS files; (3) RDL passivation, substrate, bump and assembly drawings; (4) assembly qualification reports/assembly instructions; (5) material composition declarations; (6) data sheets; and (7) process flows and recipes. (D.I. 179 at 3) Regarding worldwide sales data, Tessera requests such data for all specifically-accused products, such production to include information about the end customer, including "Parent_End_Name, Sold_To_Parent, and End_Cust_Name, or the equivalent."[2] (*Id.* at 3 (citing *id.*, ex. 28 at 20))[3]

---

[1] More specifically, these are products for which Broadcom has no sales records from 2010 to 2016 indicating a U.S. "Ship To" location—meaning that the products at issue were sold and then shipped (at least initially) to a location outside of the U.S. (*See, e.g.*, D.I. 173, ex. 16 at 2; D.I. 180, ex. 1 at ¶¶ 4-5)

[2] The three referenced fields correspond to a slide found in a spreadsheet produced by Broadcom in a different case, wherein worldwide sales are organized based on, *inter alia*, the "Parent_End_Name, Sold_To_Parent, and "End_Cust_Name[.]" (D.I. 179, ex. 28 at 20)

[3] Tessera asserts that Broadcom must produce the requested documents due to the requirement in the Scheduling Order that Broadcom produce "core technical documents relating to the accused product(s)" and "sales figures for the accused product(s)[,]" and because such documents are responsive to certain (unspecified) Tessera requests for production and Tessera interrogatories. (D.I. 173 at 1) Broadcom does not appear to dispute that the language of the Scheduling Order and/or the nature of the discovery requests made by Tessera would call for the documents at issue to be produced, were the Court to disagree with Broadcom's arguments, discussed herein, regarding the lack of connection between the products and any U.S.-based acts of infringement.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 37 applies to motions to compel discovery, providing that "[o]n notice to other parties and all affected persons, a party may move for an order compelling . . . discovery." Fed. R. Civ. P. 37(a)(1). Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). The Rule further states that relevant information "need not be admissible in evidence to be discoverable." *Id.*

When a party objects to discovery requests, "the burden falls on the party seeking the discovery to show the relevance of the information requested." *Kaiser v. Stewart*, Civ. A. No. 96–6643, 1996 WL 730533, at *2 (E.D. Pa. Dec. 10, 1996) (citations omitted); *see also In re Wilmington Trust Secs. Litig.*, Master Civ. No. 10-990-SLR-SRF, 2017 WL 2457456, at *4 (D. Del. June 6, 2017). Discovery is relevant, *inter alia*, if used "'to flesh out a pattern of facts already known to a party relating to an issue necessarily in the case.'" *Invensas Corp. v. Renesas Elecs. Corp.*, 287 F.R.D. 273, 278 (D. Del. 2012) (quoting *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1326 (Fed. Cir. 1990)). However, "'requested information is not relevant . . . if the inquiry is based on the party's mere suspicion or speculation.'" *Id.* (quoting *Micro Motion, Inc.*, 894 F.2d at 1326).

"Once relevance is shown, the party opposing discovery may show why discovery, even if relevant, should not be permitted." *Paoli v. Stetser*, Civil Action No. 12-66-GMS-CJB, 2013 WL 2154393, at *3 (D. Del. May 16, 2013) (quoting *Kaiser*, 1996 WL 730533, at *2).

3

## III. DISCUSSION

### A. Request for Core Technical Documents of Accused Products With a Foreign "Ship To" Address

Tessera requests that this Court enter an order requiring Broadcom to produce core technical documents relating to specifically-accused products that Broadcom asserts were not shipped to a U.S. recipient. (D.I. 173 at 1) Broadcom objects to this request on relevance grounds, arguing that Tessera has failed to show how this category of specifically-accused products ("the accused products at issue") are relevant to its case or theories. (D.I. 176 at 1) Put simply, Broadcom argues that products not made, used, sold or imported into the U.S. are not subject to the patent laws of the U.S. and thus not relevant in this action. (*Id.* at 2) Tessera, then, as the party moving to compel, bears the burden of establishing how core technical documents regarding products with "Ship To" addresses outside the U.S. are relevant to its claims for direct patent infringement.

Of course, these core technical documents would be relevant to Tessera's claims of direct infringement if the accused products at issue were, *inter alia*, considered to have been the subject of a U.S.-based sale by Broadcom. *See* 35 U.S.C. § 271(a). Tessera argues that the accused products at issue—even though they were initially shipped to a foreign address—may still qualify as products that were the subject of United States-based infringing sales, pursuant to the rationale set out in *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283 (Fed. Cir. 2015). (D.I. 173 at 2) In *Marvell*, the United States Court of Appeals for the Federal Circuit noted that there is no "single, universally applicable fact that determines the answer" as to where an infringing sale is said to occur and, further, that it is not settled whether a sale can have more

than just one location. *Marvell*, 807 F.3d at 1308. In determining where a sale occurred, a court is to focus on, *inter alia*, the "place of inking the legal commitment to buy and sell and a place of delivery" and where "'substantial activities of the sales transactions' occurred[.]" *Id.* (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1379 (Fed. Cir. 2014)). Potentially relevant information includes: (1) where specific orders of accused products were negotiated and made final; and/or (2) (at least in the context of a situation where a defendant/accused infringer is working to obtain a "design win" with regard to the design of a particular product that will be sold to a particular customer) where design and testing of accused products occurred, where the defendant shipped samples of those products to the customer, and where the defendant provided assistance to the customer with incorporating the accused product into the customer's product. *Id.* at 1309.

Even in light of *Marvell*, Broadcom argues that "there can be no serious dispute that the vast majority of allegedly infringing activities relating to the international sale of accused products in this case take place abroad—outside the jurisdiction of U.S. patent law." (D.I. 176 at 2) For support, Broadcom cites to a declaration from its Senior Director of Worldwide Sales Operations (the "Broadcom declaration"), which lists various activities relating to the accused products at issue that are said to take place outside the U.S.: (1) that manufacturing and distribution of the products occur outside the U.S.; (2) that price quotations and purchase orders for such products are provided by non-U.S. employees; (3) that the purchase orders and final invoices for the products all issue from separate Broadcom entities that are incorporated overseas and (4) that shipments of the products are made from outside the U.S. (*Id.* (citing *id.*, ex. 1 at ¶¶ 3-6))

5

To be sure, as Tessera argues in response, the question here is not whether Broadcom has some facts on its side that it can later use to argue the ultimate issue (that is, whether sales of these products are U.S. sales). Nor is the question here whether Tessera can now definitively *prove* that these sales are U.S.-based sales. *Cf. Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.*, 422 F. Supp. 2d 934, 945-46 (N.D. Ill. 2006) (finding that a plaintiff did not need to *prove* that the defendant induced a third-party to infringe before the plaintiff could get discovery on foreign sales of accused products—only that the plaintiff demonstrate that this discovery was *relevant* to its claims of infringement). Instead, the question is whether Tessera has made a sufficient record to demonstrate relevance—that is, whether Tessera has demonstrated, beyond citing to mere "'suspicion or speculation[,]'" that the discovery will flesh out facts regarding an infringement issue that is necessarily in the case. *Invensas Corp.*, 287 F.R.D. at 278 (quoting *Micro Motion*, 894 F.2d at 1326); *see also Apotex, Inc. v. Mylan Pharms., Inc.*, No. 12-60704-CIV, 2013 WL 8184264, at *3, *6 (S.D. Fla. June 4, 2013).

In asserting that it has met that burden here, Tessera points exclusively to one source of evidence—that relating to another civil matter not before this Court: *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, Case No. 2:16-CV-0134-JRG-RSP (E.D. Tex.). (*See, e.g.*, D.I. 173 at 2; D.I. 179 at 1-2) In *Godo Kaisha*, the defendants (including Defendant here, Broadcom) moved for summary judgment that certain accused products (Broadcom semiconductor chips) that were "ordered, manufactured, shipped, billed, and delivered to buyers abroad" could not qualify as sales in the United States pursuant to 35 U.S.C. § 271(a) ("Section 271(a)"). *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, Civil Action No. 2:16-CV-00134-JRG, 2017 WL 2869332, at *1 (E.D. Tex. May 18, 2017) (*cited in* D.I. 173 at 2 & ex. 19). United States Magistrate Judge Roy

S. Payne of the United States District Court for the Eastern District of Texas ultimately recommended that Broadcom's motion be denied. In doing so, Judge Payne concluded that a reasonable jury could find that "many substantial activities" relating to the sales of the Broadcom semiconductor chip products at issue there occurred within the U.S., such that the sales could qualify as U.S.-based sales under Section 271(a). *Id.* at *2. More specifically, Judge Payne cited to record evidence that was presented to him in that case, which he found indicated that: (1) the overwhelming majority of Broadcom's design, development, marketing and sales activities occurred in the U.S.; (2) certain Master Purchase Agreements ("MPAs") entered into in the U.S. govern the terms of purchase orders (for the products at issue) entered into outside the U.S., and some of those MPAs identify specific products and prices; (3) purchase orders entered into overseas may be processed and maintained by Broadcom's domestic sales team; (4) U.S.-based sales teams provide support to Broadcom's U.S.-based customers, and Broadcom categorizes its sales information and activity for internal purposes based on the location of end customers for the products at issue; (5) Broadcom tracks sales commissions for sales of products made overseas as if they were domestic sales; and (6) Broadcom tracks total "design win" revenue based on the location of the end customer for the product, and such totals (which include products manufactured overseas) determine sales force compensation. *Id.*

Tessera asserts that Judge Payne's analysis in *Godo Kaisha* is relevant here because over 80% of the accused products in this case were also accused products in *Godo Kaisha* (the "overlapping products").[4] (D.I. 179 at 1; *see also id.*, exs. 23, 24) Tessera attached a spreadsheet

---

[4] Tessera does not specify which of the overlapping products are also products as to which Broadcom has not provided discovery here (i.e., because they are products for which Broadcom has "Ship To" addresses that are outside the U.S.).

to its supplemental letter brief comparing the accused products in this case to those in *Godo Kaisha*. (*Id.*, ex. 23) This spreadsheet was created, at least in part, by comparing the 260 accused products in this case (which Tessera has identified by either referencing the product's "I-Part Number" or "Marketing Part Number," or both) with the products accused in the operative complaint in *Godo Kaisha* (which the plaintiff there identified by the product's "BCM short part number" or by "product series"); Tessera then asserted that, with the exception of only 42 accused products in this case, the "*Godo Kaisha* accused product or product series match" the remainder of the products in this litigation. (*See id.* at 1-2 & exs. 23, 24)[5]

In the Court's view, Tessera has not yet met its burden to demonstrate relevance. Here, the Court has not been provided with any (or nearly any) of the underlying documents that the *Godo Kaisha* Court relied upon in order to come to the conclusions it reached in the decision discussed above. The Court greatly respects the judicial decisionmaker who came to the decision in *Godo Kaisha*, and it may well be that—if the Court were presented with those same documents—it would conclude that these documents provide sufficient evidence that the accused products at issue are relevant to the claims at issue in this case. But the Court cannot just assume or guess that it would draw that conclusion *if* it saw the documents at issue. It must actually be provided with a sufficient record by Tessera to support such a conclusion, and such a record has not yet been made. The Court notes that at the time of briefing, Tessera was to receive discovery from Broadcom relating to sales of the accused products at issue. (D.I. 176 at 2; D.I. 180 at 1) It

---

[5] It is a little less clear from the record whether the accused products referenced in the *Godo Kaisha* complaint were still the accused products at issue (and the accused products being referred to) when Judge Payne issued his Report and Recommendation denying summary judgment. The Court has heard no argument from Broadcom that suggests that they were not.

8

may be that with this discovery (which appears to include the very documents that Judge Payne relied on in *Godo Kaisha* to draw the above-referenced conclusions about Broadcom's sales activities), (D.I. 192 at 30; *see also id.* at 39), Tessera can meet its burden in the future.

### B. Request for Worldwide Sales Data for the Accused Products

Tessera also requests that this Court require Broadcom to produce "worldwide sales data" for the specifically-accused products. (D.I. 173 at 1-4; D.I. 179 at 3) Broadcom makes a similar relevance objection to production of this information as it does regarding production of core technical documents—that Tessera cannot tie such product sales to its current allegations of U.S.-based patent infringement. (D.I. 176 at 1, 4)

Tessera allots little space in its briefing to arguing about the relevance of Broadcom's worldwide sales data. (*See* D.I. 173 at 3-4) In essence, its argument consists of two points: (1) worldwide sales data for all accused products is relevant to Tessera's indirect infringement allegations; and (2) chip makers like Broadcom may be liable for indirect infringement, *inter alia*, if they sold infringing products overseas, and those products later make their way into the U.S. (e.g., by being incorporated into third-party products that are sold in the U.S.). (*Id.*)

Broadcom does not take issue with those points *per se*, but instead argues that Tessera should not be allowed to "demand[] foreign sales information based on speculation that Broadcom sells internationally to customers who then import the accused Broadcom products into the [United States][,]" rather it "should be sent away to go do the discovery to test the truth of such a theory[.]" (D.I. 176 at 4) Broadcom notes that it has offered to identify for Tessera its top 20 customers based on worldwide sales, so that Tessera can "propound discovery to those customers to determine if any of Broadcom's international product sales to these customers

9

ended up in products later imported into the U.S.." (*Id.* at 1) Broadcom directs Tessera to its third-party customers because it "does not track where the products go [once shipped to third-parties overseas] and thus cannot know which if any of those products are [later] imported into the U.S." (*Id.*)

Again, Tessera does not need to *prove* conclusively the substance of its indirect infringement claims against Broadcom before it is entitled to discovery on sales relating to such claims. *See, e.g., 3Com Corp. v. D-Link Sys., Inc.*, No. C 03-2177 VRW, 2007 WL 949596, at *3 (N.D. Cal. Mar. 27, 2007). Rather, Tessera needs to show that its request is premised on more than "'mere suspicion or speculation'" as to how the discovery is linked to indirect infringement allegations properly in this case. *Invensas Corp.*, 287 F.R.D. at 278 (citation omitted) Here, again, the Court determines that Tessera has not yet met that burden.

To be sure, Tessera has identified a number of Broadcom third-party customers that (it is not disputed) have a large presence in U.S. (*See, e.g.*, D.I. 173, ex. 20 at 2 (Broadcom's Forms 10-K for 2010 to 2014, which include a "Customers and Strategic Relationships" section listing companies such as Apple, Dell, Motorola, Nintendo, and Samsung). And Tessera has also identified accused products and "representative downstream products" into which the Broadcom products are incorporated. (D.I. 179, ex. 26 at 46)

Tessera has not, however, provided any information *particular* to any accused product or any third-party maker of any representative downstream product that could lead to the conclusion that a Broadcom accused product that was sold overseas was, *in fact*, later brought back into the U.S. Essentially, Tessera is asking the Court to assume or guess that products incorporated into third-party representative downstream products were later sold into the U.S. because those third

10

parties also have a U.S. presence. That amounts to a request that the Court rely on speculation in order to conclude that this material is relevant. And that the Court cannot do.

### III. CONCLUSION

For the reasons stated above, the Court ORDERS that the Motion is DENIED.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the order. Any such redacted version shall be submitted no later than **October 27, 2017**, for review by the Court, along with a detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: October 24, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE